**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-cv-21570-BLOOM**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MIAMI-DADE COUNTY, THE BOARD
OF COUNTY COMMISSIONERS, *et al.*,

      Defendants.

_____ /

**<u>ORDER TO SHOW CAUSE</u>**

**THIS CAUSE** is before the Court following receipt of the Lead Monitor's Interim Report, dated August 12, 2022. This report follows a glaring lack of compliance by the Defendants, resulting in life-threatening consequences to inmates.

The parties entered into a Consent Agreement ("Consent Agreement"), ECF No. [5-2], effective May 22, 2013, to remedy the constitutional violations at the Miami-Dade County correctional facilities regarding inmates' medical care, mental health care, and suicide prevention. A separate Settlement Agreement was signed on April 30, 2013, addressing inmates' protection from harm, fire and life safety, and inmate grievances. *Id.* at 5; ECF No. [85-1] ("Settlement Agreement"). The Consent Agreement contained deadlines and requirements for implementation of 119 provisions. The Settlement Agreement contains 56 paragraphs. Defendants were to implement all provisions of the Consent Agreement and Settlement Agreement within 180 days of the Effective Dates. More than nine (9) years later, Defendants *still* have not achieved full compliance with either Agreement.

At the last status conference before the Court on April 15, 2022, following the Independent

Monitors' Compliance Report #14, Lead Monitor Susan McCampbell reported that 11 of the 115 paragraphs in the Consent Agreement remain in partial compliance, and 5 of the 56 paragraphs in the Settlement Agreement remain in partial compliance. *See* ECF No. [244] at 10. Ms. McCampbell advised the Court of the Monitors' significant concerns regarding inmate in-custody deaths in the last year. As the Monitors reported, there were 14 deaths in 2021, and 6 deaths in 2022 at the time of the status conference. *See id*. at 11.

The Monitors also expressed that one of the main reasons Defendants have failed to reach full compliance is a lack of leadership, but they remained optimistic due to the support and involvement of Miami-Dade County Mayor Daniella Levine Cava. The United States agreed with the Monitors' assessment that a lack of effective leadership hampered progress but echoed the Monitors' hope that the Mayor's active involvement would propel Defendants toward compliance. *Id*. at 21, 25-26. At the status conference, the Mayor stated:

> I'm here today to show this Court, the Department of Justice, and the monitoring team that the County at the highest level is absolutely committed to bringing Corrections into full and lasting compliance with the consent agreement.
> But in addition to that, I want to ensure that Miami-Dade Corrections goes above and beyond the requirements of these agreements and orders and ultimately that we are able to position this department as a national leader and a model for corrections departments across the country. That is my commitment.
> I consider that the consent agreement and any reforms of the utmost importance. And I have not been in the position for long, but I have now taken a deep dive, and will continue to do so, to learn as much as I can to drive these reforms necessary to make our system more efficient, safe and humane for our inmates and our staff.

*Id*. at 35-36.

Based upon the parties' representations, the Court announced it expected full compliance with the remaining provisions in the Consent Agreement and Settlement Agreement by November 18, 2022 and scheduled a final status conference on December 16, 2022.

However, since the April status conference, Defendants appear to be no closer to reaching full compliance by the Court's deadline and inmates' safety and welfare remains a critical concern. The attached Interim Report prepared by Ms. McCampbell details that, as of August 12, 2022, there have been eleven (11) inmate deaths in 2022, four (4) of which were suicides. The Interim Report identifies four main issues that remain of critical concern to the Monitors:

1. Care of inmates with serious mental illness and segregation;

2. Inmate classification;

3. Mechanisms and systems to assess sentinel events (deaths, serious harm); and

4. Mental health staffing.

The devastating failures have prompted Ms. McCampbell and Dr. Robert Greifinger, medical monitor, to submit their resignations in this case as of December 30, 2022. Interim Report at 3. Since the Interim Report, the Court has learned of *more* incidents of self-harm and/or inmate-on-inmate violence:

- August 22, 2022 – an inmate was involved in a self-harm/suicide attempt at the Pretrial Detention Center, and as of August 26, 2022 is in the Mental Health Treatment Center at Turner Guilford Knight ("TGK").

- August 24, 2022 – two co-housed inmates at TGK fought in their cell, resulting in severe injuries to one of the inmates. The injured inmate also attempted self-harm almost one year ago.

- August 26, 2022 – two inmates at Metro West Detention Center were involved in an altercation that resulted in one of the inmates sustaining severe injuries. The injured inmate remains in a coma with multi-organ failure and a poor prognosis.

These incidents highlight the Court's concerns that the Defendants' lack of compliance is resulting in serious and life-threatening consequences, and that the United States is not seeking any relief.

As the Interim Report succinctly states:

> It is the responsibility of the plaintiffs, the U.S. Department of Justice, to engage
> the County in discussing remedies to the current situations, as well as attend to the
> Court's direction to propose sanctions if compliance is not achieved in the October
> tour. It is apparent that the strategies implemented/attempted since 2013 – summary
> action plans and guidance (outcomes and due dates) contained in the fourteen
> compliance reports have not resulted in reforms, harm continues, resources
> continue to be expended, and frustration grows on all sides.

Interim Report at 15. The Interim Report also states that "[a]t the core of the County's inability to

gain and sustain compliance are the internal culture of the organization, leadership ambivalence,

and absence of sufficient subject matter expertise." *Id*. at 2.

Despite the most recent incidents, and the long-standing deficiencies in protecting inmates

from harm, the United States has failed to seek sanctions or other relief since May 2018, nor has

the United States sought enforcement of the provisions of the Consent Agreement or the Settlement

Agreement. The Consent Agreement specifically allows the United States to seek Court

intervention, *see* ECF No. [5-2] at 33, VII.E., and the Settlement Agreement states, in pertinent

part, that if the "DOJ determines that the County has not substantially complied with this

Agreement the DOJ may pursue litigation against the County." *See* ECF No. [85-1] at 21, VII.D.

Accordingly, it is **ORDERED AND ADJUDGED** that the parties shall appear before this

Court on **October 12, 2022 at 9:00 a.m. at 400 North Miami Avenue, Courtroom 10-2, Miami,**

**Florida 33128**. The United States shall show cause as to why, despite Defendants' well-

documented and repeated failures to comply with the Consent Agreement and Settlement

Agreement, the United States has failed to seek enforcement of either Agreement. The United

States shall further provide a written response to this Order **no later than September 16, 2022**.

The response shall include a summary of sanctions the United States has requested of courts in

similar cases, and why the United States has failed to seek those sanctions in this case.

4

Case No. 13-cv-21570-BLOOM

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 30, 2022.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | |
| **MIAMI-DADE COUNTY;** | **1:13-CV-21570 CIV** |
| **MIAMI-DADE COUNTY BOARD OF COUNTY The** | **Honorable Beth Bloom** |
| **COMMISSIONERS; MIAMI-DADE COUNTY** | |
| **PUBLIC HEALTH TRUST** | |
| **Defendants,** | |

## Interim Report
## August 12, 2022

Author: Susan W. McCampbell, M.C.R.P., C.J.M., Lead Monitor

## Table of Contents

| | | Page |
|---|---|---|
| I. | Introduction | 2 |
| II. | At Issue – Inmate Protection from Harm | 4 |
| III. | Background | 5 |
| IV. | Protection From Harm | 9 |
| | A. Inmates with Serious Mental Illness (SMI) in custodial segregation | 9 |
| |    Consent Agreement III. C. 6. a. (4). i., ii and III. C. 6. a. (6) | |
| | B. CHS Staffing | 9 |
| |    Consent Agreement III. C. 7. | |
| | C. Morbidity and Mortality (M&M) Reviews, Self-Critical Analysis | 11 |
| |        Consent Agreement III. A. 7. a. – c., | |
| |    Settlement Agreement III. D.2. a. b. | |
| | D. Inmate Classification and Inmate/Inmate Violence | 13 |
| |    Settlement Agreement III. A. 1. a. (1), (11) | |
| V. | The County's Response | 15 |
| VI. | What's Next | 18 |
| VII. | Conclusions | 18 |
| | Attachment | |
| | A – Priority Themes of the Monitors' Fourteen Compliance Reports | 20 |

## I.       Introduction

The Department of Justice's investigation of the Miami-Dade County Jail was delivered to the County on August 24, 2011.[1]  Almost eleven years to that date, the County still struggles to gain and sustain compliance with the Agreements, resulting in continuing harm to inmates.

At the request of the Court, this report addresses contemporary critical deficiencies in protection from harm for inmates in the custody of Miami-Dade Corrections and Rehabilitation (MDCR).   The deficiencies identified by the Independent Monitors are long-standing, documented in the fourteen (14) Compliance Reports[2].  Events in the last few weeks have accelerated the Monitors' consternation absent meaningful actions and progress by the County.

This Interim Report includes the County's response to these issues, as known at this time.

Whether or not the County has achieved substantial compliance with the provisions of the two agreements has become secondary to the Monitors, as imminent harm to inmates resulting from the County's failure to analyze sentinel events and meaningfully implement long-awaited changes to *systems*.  It is our belief, based on current information, that the paragraphs noted below are not in compliance.   Further delays in repairing what needs to be fixed in systems will result in more harm to inmates.  At the core of the County's inability to gain and sustain compliance are the internal culture of the organization, leadership ambivalence, and absence of sufficient subject matter expertise.

To date in 2022, there have been eleven (11) inmate deaths of which four are suicides. There were fourteen (14) inmate deaths in all of 2021.[3]  While Covid was the medical cause of several of these deaths in both years, that fact in and of itself does not relieve the County of its duty to care for ill inmates.  As noted in the #14 Compliance Report, the number of inmate deaths in Miami-Dade County was substantially above the deaths per 100,000 in jail

---

[1] https://www.justice.gov/sites/default/files/crt/legacy/2011/08/29/Miami-Dade_findlet_8-24-11.pdf Accessed on August 5, 2022

[2] See Attachment A – priority "themes" of the 14 Compliance Reports.

[3] A review of data I have maintained since 2013 for deaths in custody in Miami-Dade County:  2013 = 12, 2014 = 6 (including one suicide), 2015 = 7 (including one suicide), 2016 = 6 (including one suicide), 2017 = 13 (including three suicides), 2018 = 5, 2019 = 7, 2020 = 10, 2021 = 14 (including one suicide), and 2022 YTD = 11 (including four suicides).  Examining this data for all reported deaths in custody, based on average daily population/100,000 inmates: 2014 – 129/100,000, 2015- 162.83/100,000, 2016 – 140.09/100,000, 2017 – 284.27/100,000, 2018 – 126.87/100,000, 2019 – 162.04/100,000, 2020 – 240.38/100,000, 2021 – 339.97/100,000.

populations nationally, as reported in the most recent data from the U. S. Department of Justice, Bureau of Justice Statistics.[4,5]  In the #14 Compliance Report, the Monitors reported their concerns about the 34% increase in inmate/inmate violence.  MDCR provided data for the first five months of 2022, that does not reflect any downward trends.  The #14 Compliance Report also presented data regarding increases in uses of force by 48% over the previous year, increases in traumatic injuries to inmates, and data about the use of force involving inmates on the mental health caseload.[6]  To provide a human face on the violence MDCR reported in CY 2020, 1,148 inmates involved in altercations, in 2021, 1,946, and for the first five months of CY 2022, 1,223 inmate; annualized for 2022, this increase is approximately 86% compared to CY 2020.[7]

On August 1, 2022, I provided my resignation as the lead monitor, and Robert B. Greifinger, MD, medical monitor, provided his resignation as well.  The narrative in this Interim Report highlights why we believe that our time is better spent elsewhere after December 30, 2022. We honestly don't know what else we can do to propel the County to compliance.  Over the years, we asked ourselves whether the lack of substantive progress was due to leadership, subject matter expertise, cooperation between CHS and MDCR, organizational structure, arrogance, internal agency culture (negative), the will to make changes, prioritization, or ineffective management of compliance initiatives. We have concluded it is a combination of all those elements.

This Interim Report has not been reviewed by the parties.  The members of the monitoring team reviewed a draft of this Interim Report to assure accuracy and to add their professional voices.

---

[4] U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics (BJS) reports that for 2019 there were 167 deaths per 100,000.  https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf (page 1) Applying this to Miami-Dade County jails for 2021, the rate per 100,000 is 340 per 100,000 population (14 deaths, average daily population of 4,118).  BJS is a supplemental report notes that from March 1 – June 30 2020, 33 confirmed deaths of inmates due to Covid-19 were reported.  This does not include all jails, but rather about 28% of the nation's jails https://bjs.ojp.gov/content/pub/pdf/iclipjj20.pdf page 10.
[5] #14 Compliance Report, page 10.
[6] #14 Compliance Report, pages 15-16, 63-73.  See also #13 Compliance Report, pages 62-66. Other compliance reports also provided data regarding uses of force and inmate/inmate violence.
[7] Source: MDCR.

## II.     At Issue – Inmate Protection from Harm

These are the matters at issue which have proven to be intransigent:

A. Care of inmates with serious mental illness and segregation (Consent Agreement III. C. 6. a. (4). i., ii and III. C. 6. a. (6)) After negotiating for several years, the County agreed in July 2021 to a policy consistent with the Consent Agreement, and proposed measures/data indicating compliance.  Since then, the County cannot provide reliable data to assess their compliance.

B. Inmate Classification (Settlement Agreement III. A. 1. a. (1)) The County has not established and maintained an objective, validated, classification system, resulting in the failure to keep inmates safe, and contributing to inmate/inmate violence (Settlement Agreement III. A.1.a. (11))

C. Mechanisms and systems to assess sentinel events (deaths, serious harm) (Consent Agreement III. A. 7. a. – c. and Settlement Agreement III. D.2. a. b.) For more than four years, the Monitors provided substantial critiques of the Morbidity and Mortality Reviews.[8]  The deficiencies are, persistently, that the County fails to identify the underlying issues/causes, fails to develop measurable corrective actions, and fails to evaluate the impact of the corrective actions.  We anticipate that the investigation into the circumstances of RG's suicide on July 30th will reveal the same deficiencies of screening and supervision that we have highlighted in our previous reviews.[9]

D. Mental Health Staffing (Consent Agreement III. C. 7.). There remain vacancies in both psychiatric and mental health leadership and staffing to assure timely access to care for inmates with mental illness, which the County reports is approximately 67% of the inmate population.  There is an interim Chief Psychiatrist (one of several in the past few years), and now an interim Director of Behavioral Health.  While we understand there are challenges in recruiting and retaining permanent professionals, regardless the services need to be provided timely and competently.

The harm to inmates due to the County's failure to address these operational practices as required by the paragraphs of both the Consent and Settlement Agreement are:

---

[8] See Compliance Reports # 8 – 14, since January 2018.
[9] As of the date of this report, there are three morbidity and mortality reviews pending (or overdue) GH, DG, JCA.

- Failure to accurately classify inmates by custodial risk resulting in not separating inmates safely in discrete housing,  thus contributing to inmate/inmate violence as documented in the #14 Compliance Report; and continuing reported violence through the first five months of 2022.
- Failure to credibly and reliability examine sentinel events to identify the root causes, rather than symptoms, to develop and implement measurable corrective actions to address the core issues, and to assess if these actions are effective.
- Failure to address the core issues associated with inmate/inmate violence, beyond inmate classification system failure, and to develop and implement strategies that are grounded in data, measurable, and produce results.
- Failure to create an integrated system to collect data and to document that inmates with serious mental illness housed in custodial segregation receive the treatment and out-of-cell time required by the Consent Agreement.
- Assuring that there is sufficient psychiatric and mental health leadership and staff consistent with the requirements of the Consent Agreement, and that those resources are deployed to meet the needs of the inmate population.[10]

## III.    Background

Since 2013, the Monitors have produced thousands [and thousands] of pages of reports, recommendations, edits, minutes of meetings, including monthly meetings, critiques of morbidity and mortality reviews, provision of technical assistance, links to other subject matter experts and resources, and review of draft documents all efforts focused to help the County achieve and sustain compliance with both the Consent Agreement and Settlement Agreement.[11]  We have spent hundreds [perhaps thousands] of hours on telephone calls, and more recently "Zoom" meetings, to respond to questions, provide feedback, and iron out processes and procedures.  The Court has been alerted to these efforts via the Summary

---

[10] I acknowledge that the provisions addressing Mental Health Staffing (CA III. C. 7.) were "sunsetted" by the parties after the #12 Compliance Report.  However, this issue was raised by the County in March, 2022, with the proposal sent for the Monitors' approval to use Psychiatric Nurse Practitioners (P-APNRs) and increased use of telepsychiatry for assessment and treatment services in place of psychiatrists.  This then created the larger dialogue about sufficiently of psychiatric and mental health staffing.  Even if these paragraphs are "sunsetted", the Monitors will not ignore the vacancies in medical/mental health leadership and staffing and the resulting negative impact on inmates with mental illness.  The Monitors have concurred with the County's use of P-APNRs provided that data is identified, collected, and analyzed to demonstrate effectiveness of the strategy, and that providers receive an orientation to help them better appreciate and understand the environment of their clients.

[11]The parties have held monthly conference calls starting with August 19, 2013.  Summary notes are maintained for each meeting, approved by the parties, and circulated to all.  These summaries of notes provide additional tracking of issues and proposed resolutions since 2013.

Action Plans filed with the Court, and the fourteen Compliance Reports.[12]  In all compliance report recommendations to achieve compliance have been included

The amount of resources devoted to achieving and sustaining compliance has been acknowledged by all parties as unanticipated and highly significant.  Yet, the allocation of resources have yet not yielded the required results.

There were a substantial number of retirements at the leadership level in MDCR since 2013, as well as resignations and changes in CHS leadership and mid-management providers and support staff.  The net impact has been negative - the loss of organizational memory, project management experience, subject matter expertise, resulting in loss of continuity and the need to often start over.  This has been enormously frustrating for the Monitors.  The Monitors are often the only reliable keepers of records and knowledgeable of the history of the compliance initiatives.

There has undeniably been progress.   For example, the County's commitment to close the notorious 9th floor of the Pre-Trial Detention Center and opening the Mental Health Treatment Center in Turner-Guilford-Knight is evidence of the commitment, and a very positive change.  Since 2013, the County has gained compliance with 104 of the 115 paragraphs in the Consent Agreement, and 51 of the 56 paragraphs of the Settlement Agreement.[13]  While the County's work is worthy of acknowledgement, the paragraphs that are yet to gain substantial compliance are foundational, core, provisions that directly impact protection from harm, and thus are the most challenging.  The County's position has been to agree that changes are necessary, and that these changes will be made asserting that compliance will be achieved by the "next" report of the monitors.

When the #14 Compliance Report,[14] April 11, 2022, noted that the County had not achieved compliance with all paragraphs, the parties agreed to a strategy that required quarterly meeting with the DOJ, the County and the Monitors to "to evaluate initiatives to achieve and sustain compliance for both the Settlement Agreement and the Consent Agreement.  If there are concerns by the Monitors or DOJ that sufficient progress has not been made, the

---

[12] In 2014 and 2016 the County provided status reports to the Court for "Summary Action Plans".  To the Monitors it appeared that the County was spending more time on the Summary Action Plans than engaging in the work necessary to actually effect changes to processes, train staff, implement provisions, and evaluate outcomes.
[13] See Attachments A and B, # 14 Compliance Report,  April 11, 2022.
[14] Case 1:13-cv-21570-BB Document 239-1 Entered on FLSD Docket 04/11/2022 Page 1 of 98

Monitors will so document to the Court.  If a status conference is needed as an interim remedy, the Monitors will so suggest to the Court."[15]

Following the filing of #14 Compliance Report, the County accelerated their efforts through production of draft policies and procedures for review by the Monitors and DOJ.  Many of these written directives had languished in MDCR's bureaucracy following the Monitors' comments provided in late 2021.  These policies had not been finalized by the County, nor had the concerns of the Monitors been addressed. The County provided six drafts of written directives on May 27th , and six more in mid-July.   The topics of these drafts included substantial operational elements for both CHS and MDCR:  physical site checks, inmates with serious mental illness in custodial segregation and performance monitoring, health care services, inmate disciplinary procedures, inmate classification and procedures, inmate programs and services, administrative reviews, recognizing and supervising inmates with mental illness, suicide precautions, and mortality and morbidity reviews.  The effort required of the Monitors to review these drafts, was substantial a relatively short period of time.  The County finalized six directives since July 15th.

As reported to the Court, the parties met in Miami on July 12 – 14, 2022.[16]  At that time, my colleagues and I were cautiously optimistic that the County strategies were pointing toward compliance.

This is what changed following that mid-July meetings that now causes the Monitors grave reservations not only about compliance, but for inmate protection from harm:

- Resignation of the compliance coordinator effective September 9, 2022.[17,18]  [As reported later in this report, the County initiated changes in leadership at MDCR on August 10th resulting in the compliance coordinator withdrawing her resignation.]
- Failure to produce a coherent data plan to assess the County's compliance with management of inmates with serious mental illness housed in segregation.
- Documentation (dated May 25, 2022 but not provided to the Monitors until July 11th) of the impact of the County's unilateral amendment to the formerly validated inmate classification system resulting in dangerously inaccurate security

---

[15]#14 Compliance Report, page 6.

[16] Case 1:13-cv-21570-BB Document 245-1 Entered on FLSD Docket 07/19/2022

[17] On July 22, 2022 the County provided a schedule for the hiring of a compliance coordinator, which, optimistically, predicted a replacement between September 1 – 9, 2022.

[18] Using the monthly conference call summary of notes from August 2013 to present, I am able to identify (Bennett, Hoo-you, Bones). Although both the CA and SA provide for a compliance coordinator, the Monitors have not objected to one compliance coordinator with the authority to work with both CHS and MDCR.

classification levels (e.g., 71.1% of inmates were classified at the same level) and housing, thus contributing to inmate/inmate violence.

- Failure to produce, as promised, the foundational data of the staffing plan for CHS, directly addressing the provision of required mental health treatment services.
- The production on July 22, 2022 of the long-awaited internal review of the two homicides which occurred in April and May 2021 which were both astoundingly inadequate.[19]
- The suicide of RG, July 30, 2022

With these evolving and disquieting circumstances, following the mid-July meetings, I sent four letters to the County with details of the deficiencies in inmate classification, data to document compliance with provisions addressing inmates with serious mental illness in segregation, CHS staffing analysis, and the "IA" investigations of the two 2021 homicides.[20] Not only does the information underlying these letters point to not achieving compliance with these specific provisions, but more importantly, it highlights continuing harm to inmates.

One of the most troubling elements of the County's work since mid-July has been the County's failure to meet their own stated objectives to demonstrate that compliance can be achieved and documented. The products, particularly the review of the homicides and the revelation of changes to the classification system are not, in my view, evidence of success of this representation. Additionally, the Monitors' long-standing requests to CHS to provide the data used to determine staffing have yet to be provided, including reliable provider productivity data, inmate refusals to go to medical/mental health appointments, and relief factors to designate the number of staff needed 24/7.[21]

---

[19]Demonstrating how the County's inability to produce a credible investigation of the homicides fails to protect inmates, on August 4, 2022, two Level I mental health inmates, housed together in a mental health housing unit were involved in an altercation that resulted in one of the inmates transported as a trauma alert to the hospital, and placed in ICU. The inmate who was attached was returned several days later to TGK and is being held there and treatment for his injuries. Inmates at Level I Level I. Inmates deemed appropriate for this level of care meet the following criteria: (1) Persistent/imminent danger of harm to self or others. (2) Performed a self-injurious act, with the clear intention of suicide. (3) Inmate placed on suicide precaution. Or (4) Inmate who is unable to maintain a minimal level of personal hygiene.

[20] Dates of the correspondence: Classification July 21, 2022, Data for inmates with SMI July 21, 2022, CHS staffing July 26, 2022, homicide investigations July 27, 2022.

[21]Since 2013, the County, engaged subject matter experts from time to time. Specifically in 2018 CHS engaged three subject matter [medical] experts to assist in compliance initiatives as a remedy to gaining compliance as promised to the Court. There was, in my view, no substantive gain toward compliance from these experts' work; although the experts most likely provided process improvements to the County of which we were not aware. In 2019, the County engaged a subject matter expert to validate the inmate classification system. Her work concluded in 2021. She has been retained again, to address the changes to the classification system

The totality of these circumstances has troubled me and my colleagues. I have no doubt that the Mayor is committed to not only achieving compliance but establishing MDCR as a reputable jail system. What is lacking, in my view, is leadership and subject matter expertise at MDCR, as I told the Mayor several times, most recently on August 3rd. CHS has a more substantial foundation, but still struggles.

## IV.    Protection from Harm

The correspondence provided to the County, referenced above, provided details as to the deficiencies in the critical areas of protection from harm. To summarize:

### A.  Inmates with Serious Mental Illness (SMI) held in custodial segregation
Consent Agreement III. C. 6. a. (4). i., ii and III. C. 6. a. (6)

In July 2021, after years of sometimes acrimonious discussions, the County agreed to a policy which conforms to the relevant sections of the Consent Agreement (#12-002, Inmates in Custodial Segregation (Administrative, Protective Custody and Disciplinary). As a critical component of the County's policy, performance measures were included. It became clear by the late 2021 that the County was not able to produce credible data. Without credible, verifiable data, it is not possible to safeguard the inmates with SMI held in disciplinary, administrative, or protective custody and assure that treatment per the Consent Agreement. Technical assistance was provided on multiple occasions as to how to identify credible and reliable data, as well as how to audit the data to document the County is following its own policies. This set of credible and reliable data has yet to be identified. It should be noted that the Director of Behavioral Health, who had been involved with this work, left County employment on June 10th. An interim replacement was named on May 30th to provide some overlap; but the lack of continuity is observed by the Monitors.

It is an important step to identify the credible, reliable data that is needed to assess compliance, it is another to understand the purpose of the data collection, appreciate the need for auditing, and engage in prompt corrective actions where the County's own policy is not met.

---

made by MDCR (see elsewhere in this Interim Report). In May 2022, the County engaged a correctional subject matter expert to assist with jail issues and compliance.

In the interim, I believe there is on-going harm to inmates with serious mental illness who are held in custodial segregation.

**B. CHS Staffing** Consent Agreement III. C. 7.

There is no question that the staffing and resources for inmate medical, mental health, dental and specialized medical care have improved enormously in eleven years.  When former MDCR Director Ryan began his tenure in Miami-Dade County in 2006 he was unable to even learn what medical providers worked at what facility and at what times.  CHS and the Public Health Trust have invested not only human resources, but training and initiatives to address risk management and total quality management.

What has recently plagued CHS' staffing stability is the competition in the public and private sector for health care professionals and the perceived challenges of working in a correctional environment, with sometimes less than cooperative patients.  Additionally, the prevalence of mental illness among inmates is substantially stretching psychiatric and behavioral health staff.

The Consent Agreement requires CHS to have a staffing plan and to implement that plan.  The Consent Agreement also provides for a licensed chief psychiatrist and a mental health program director (e.g. behavioral health director).   These paragraphs were "sunsetted" after the #12 Compliance Report, as having been in compliance continually for 18 months.  In fact, that was probably not true.  There has not been a full-time (chief psychiatrist since 2020.[22]  There are other vacancies, and/or positions filled by interim employees (e.g., behavioral health director).[23]  To partially address staffing issues, the County has asked for, and the Monitors have approved a revision to the staffing plan to allow for psychiatric nurse practitioners (P-APRN) to fill positions designated previously for psychiatrists and to further expand access to psychiatrists by increasing use of telepsychiatry.

---

[22] The Monitors concerns about a permanent Chief Psychiatrist are noted in Compliance Reports 10 – 14.
[23] Using the monthly summary of notes to identify (probably not all) psychiatrists and behavioral health directors I note the following since 2013.  2013 - William McKeon, Interim Director, 2014 - Mercy Gonzalez, MD, 2015 - Patricia Junquera, MD, 2016 – Dr. Giamarie Daino, Chief Psychologist, 2017 – Dr. Thomas Robertson, Chief Psychologist, 2019 – Dr. Cary Acosta, Behavioral Health Director, 2020 – Hortensia Valeron, M.D, Chief Psychiatrist, 2020 – Dr. Vickki-Anne Samuel, MD (part-time , interim, Chief Psychiatrist), 2022 Patricia Ares-Romero, MD (interim, part-time) Chief Psychiatrist), Dr. Jonathan Dugdill (Interim Behavioral Health Director).

The Monitors have asked at least since the beginning of 2022 for the data that underlies the decisions about CHS staffing.  These include, but are not limited to productivity data, impact of inmate "refusals" to be taken to the clinic or other locations for care, availability of custody staff to escort inmates to clinics, and, most recently, the shift relief factor – that is, how many people are needed to fill one position to provide continuous care, compensating for hours of vacations, sick leave, miliary leave, training days, etc.

The Monitors are continually updated regarding CHS' efforts to recruit and retain medical and mental health providers.  We do not discount the challenge faced by CHS and Jackson, but we cite none-the-less the requirements to provide care to inmates with mental illness.  Inmates on the mental health case load were involved with sentinel events (e.g., deaths or attempted self-harm) in the last three years at a higher number than inmates not on the mental health caseload.[24]

Taken as a whole, we retain concerns about the qualified, licensed physical persons available at required hours to screen, diagnose, and treat inmates with mental illness.  We believe we need answers to our questions.

## C.  Morbidity and Mortality (M&M) Reviews, Self-Critical Analysis Consent Agreement III. A. 7. a. – c. and Settlement Agreement III. D.2. a. b.

The County has yet to develop the systems, subject matter expertise, oversight and leadership necessary to produce morbidity and mortality reviews, and self-critical analysis of sentinel events to learn from the experience, to implement and measure corrective actions and keep inmates (and staff) safe.  With the hiring of Sylvia McQueen, MD as CHS' Medical Director earlier in 2022, help has been found.  But Dr. McQueen is just one person trying to influence the these needed changes in both CHS and MDCR, as well as her other duties.[25]

---

[24] As reported in the #14 Compliance Report (pages 64-65): For the second quarter of 2021, inmates on the mental health caseload comprised 67% (N=2,79) of the average daily population[24], and were involved in 78% (N=770) of inmate/inmate assaults.  MDCR notes that individuals included in the incidents could have been an aggressor/victim, or a witness.  This data has been previously identified in Compliance Reports as a concern.  Inmates at Level IV on the mental health caseload are the largest number of those on the mental health caseload (approximately 1,600) involved in 1,067 inmate/inmate assaults during the first half of 2021[24]; compared to 693 Level IV inmates involved in inmate/inmate assaults during the last six months of 2020; an increase of 53.9%.[24]

[25] See #14 Compliance Report, pages 16-17, 34-36.

During the last two years, the Monitors provided detailed critiques of thirty-one (31) morbidity and mortality reviews.  We did not ask for, nor did we necessarily want  the County to divert resources to refute or answer the Monitors' findings, but rather we wanted the County to use the information to improve the next M&M.  We are, of course, open to corrections of facts in our observations and recommendations.   We neither received response or feedback to our reviews, nor did the subsequent M&Ms improve.[26]

I acknowledge improvements in CHS' review of incidents; however, corrective action needs to be concrete and measurable.  There has not been parallel progress from MDCR.  This is even after there was "training" provided on how to conduct root cause analysis to the MDCR leadership team.

Of grave concern, still, is that absence of credible investigations of the two homicides that happened in April and May <u>2021</u>.  The County forwarded to the Monitors their "IA" investigations of these two events on July 22, <u>2022</u>.  Without repeating everything that is in the letter regarding these "investigations", I quote from the letter:

> "Essentially, the two new IA reports include little, if any, contemporary information,  are disorganized and confusing, repetitive of previous documents, and include no further analysis.  Most disturbing is that both these reports endorse the findings of the two 2021 Executive Summaries, Mortality Reviews,  and corrective action plans.  These two reports were insufficient, as they failed to identify the substantive issues contributing to these deaths, and the corrective actions lacked depth and measurable objectives . . The 2022 reviewers did not examine if the corrective actions contained in the 2021 reports were implemented, measured, or achieved the intended outcome.  This further challenges the value and scope of these reports."[27]

---

[26] On June 18, 2021 I received a 115 page County response to the draft of the #13 Compliance Report which included a challenge to our data (the report's draft data was correct),  provided the DOJ's settlement with Alameda County, California's Santa Rita jail (inferring, I suppose, that the current Consent Agreement was somehow unfair to Miami-Dade County), and 10 pages of refutation to some, but not all, of the Monitors' reviews of specific M&Ms.

[27] Letter from S. W. McCampbell to J. D. Patterson, Chief of Corrections, July 27, 2022.

Without complete and credible M&M reviews, and engagement in meaningful self-critical analysis, inmates are not protected from harm (nor are staff).  There is more than a "head-in-the-sand" mentality to this avoidance.  This result manifests as apparent attempts to avoid accountability at the top levels of MDCR's organization.

The most recent suicide on July 30, 2022 may (or may not) have been prevented if the County had engaged in self-critical analysis for the other three suicide in 2022, implemented measurable changes, and assessed the outcomes.

### D.  Inmate Classification and Inmate/Inmate Violence
   Settlement Agreement III. A. 1. a. (1), (11)

Very briefly, the foundation of inmate (and staff) safety in any jail is the objective classification system that assesses, and houses inmates based on their risk to facility safety, the staff, and each other.  This risk is determined by analyzing and documenting the specific inmate misconduct, behaviors, discipline, altercations, etc. and creating an algorithm which assigns risk and can be overridden by documentation if warranted.  Housing of inmates is by risk, not by charge, sex, race, age, past incarceration – although each of those factors plays a role.

MDCR agreed that to achieve compliance of the relevant paragraph of the Settlement Agreement that requires I am provided data to determine if the system works, a validation study would be undertaken.  This work was begun in 2019 and was completed in 2020.  The validation study was a tedious, time-consuming process because of the absence of a contemporary, inclusive jail management information system (which has been pending implementation since at least 2013).  The result of this work was that as the validated study was completed and applied these were the results:  67% of the inmates in custody at that time had a custody change level; 56% of inmates had a housing reassignment, and 48% of inmates had a downgrade of their custody level and 15% had no custody change.[28]  The County chose to retain nine custody levels, which is their prerogative, the final validation study identified 38.7% of inmates at Low Medium (Levels 4-5).[29]

When the subject matter expert who performed the validation study, Patricia Hardyman, Ph.D., reexamined the classification structure in April of 2022, her

---

[28] #12 Compliance Report, page 78.
[29] Simulation and Validation of the Miami-Dade Corrections and Rehabilitation Department Revised Jail Classification Decision Trees, February 4, 2020, Conducted by Patricia L. Hardyman, Ph.D. page 13.

finding was that 71.1% of inmates were then classified at Level 4 – essentially resulting in little or no separation by risk.[30]  While it is unclear why the system was modified and by whom between February 2020 and March 2022, significant damage was done.  While this is being repaired (scheduled to be completed by the end of October), it only serves to highlight the absence of leadership, self-critical analysis, and subject matter expertise in MDCR for such a critical operational area.

An additional highly significant deficiency in the application of a classification system in MDCR is the lack of understanding of how to develop and implement a housing plan based on the inmate's classification.  For example, when touring the jail system in April 2022, I found housing units in which inmates on Level III behavioral health designation[31] were co-housed with *custody* level classification I through IX.  This results in inmates in <u>all</u> custody levels from MX1 [inmates charged with serious felonies, who are violent and have past or present serious institutional behavior problems]co-housed with inmates at level IX, who pose no threat to security; all who have a mental health diagnosis.

This findings illustrates two (at least) important deficiencies – the lack of understanding and expertise about classification generally – putting inmates with a mental health diagnosis together, without regard to the threat posed by other inmates' *custody* levels; and secondly, the lack of understanding how this dysfunction of the classification system contributed to the level of inmate/inmate violence in MDCR.

While the County now is hastening to fix all this; there should not have been a need to fix it at all.  Additionally, the County should not need for the Monitors to calculate and report the level of violence in the County's facilities. It is imperative the County uses this data to develop a plan(s) (whose outcomes can be measured) and implements it – whether there are Federal Court Monitors or not.

---

[30] This reengagement of Dr. Hardyman was triggered by the Monitors learning about the changes MDCR had made to the underpinnings of the classification algorithms, and the increasing level of inmate/inmate violence with the Monitors believed was directly attributable to the misfunctioning of the classification system.  Concerns about the classification process/systems were contained in all 14 of the compliance reports.

[31] Inmates classified as requiring Level III level of care will receive i.  evaluation and stabilizing in the appropriate setting; ii. psychotropic medication, as clinically appropriate; iii. evaluation and assessment by a psychiatrist at a frequency of no less than once every 30 days; iv. individual counseling and group counseling, as deemed clinically appropriate by the treating psychiatrist; and v. access to at least one group counseling session per month or more, as clinically indicated.

The on-going harm to inmates is due to the County's failure to competently act, after all these years.  This is more than just a concern; it is alarming.  Deaths, injuries from inmate/inmate alterations, trips to the emergency room for injuries, uses of force – especially uses of force involving inmates on the mental health caseload, and the breakdown of the classification system result in a jail that is very unsafe for inmates and staff.  The County chooses, apparently to listen to each other, rather than to the Monitors and DOJ; or even survey what is happening in jails of similar size in the state or in the nation.   Initiative is needed.

## V.      The County's Response

Beginning in February 2022, the County's Mayor, and the Deputy County Mayor for Public Safety, began to *hear* the concerns of the Monitors and DOJ as the preparation for the #14 Compliance Report commenced. The Mayor gave her personal commitment to address the circumstances, aimed at successfully concluding the work, as seen by her appearance before the Court on April 15, 2022.   Since that initial meeting, and true to her word, she has made herself and her staff available at any time.   At that time, she designated an Interim Director for MDCR and hired a new assistant director focused on quality management.  As noted in this report, the County has contracted with a correctional expert, Gary Raney, as well as re-engaged Dr. Hardyman to fix the classification system.

The Mayor's involvement and detailed knowledge of the remaining issues, along with her encouragement to CHS and MDCR, had not yet resulted in mid-July in the needed outcomes. This is, in my opinion, because the hole is quite deep, and the remaining work to repair *systemic* issues is complex and time consuming.

It is the responsibility of the plaintiffs, the U. S. Department of Justice, to engage the County in discussing remedies to the current situation, as well as attend to the Court's direction to propose sanctions if compliance is not achieved in the October tour.  It is apparent that the strategies implemented/attempted since 2013 – summary action plans and guidance (outcomes and due dates) contained in the fourteen compliance reports have not resulted in reforms, harm continues, resources continue to be expended, and frustration grows on all sides.

Perhaps spurred by my and Dr. Greifinger's resignations, and the four letters I sent to the County outlining the post July meeting substantive outcomes that foreshadowed findings in

the next compliance report, the County reached out to DOJ and me, engaged in frank discussions clarifying concerns and options, and then offered interim remedies.

I advised the parties that I am preparing a report at the direction of the Court. I assured the County's attorneys that I would include the County's latest commitments and initiatives as part of that report.  The County suggested I might include their entire email, which I have done: [Email of August 11, 2022 from Bernardo Pastor, Assistant County Attorney to Susan W. McCampbell, William Maddox (DOJ) and Laura Cowall (DOJ)]:

> "As you know, Mayor Daniella Levine Cava remains committed to providing the highest quality service for Miami-Dade Corrections and Rehabilitation ("MDCR") and its population, and is redoubling her efforts in promoting the safety, security, and proper care of inmates and staff, and preventing harm.  As we outlined during our August 10, 2022 call, Miami-Dade County is taking several immediate steps to significantly restructure the organization of MDCR leadership in its continued effort to foster a best practices culture, increase accountability, identify and develop effective leadership, and enhance training.  This will be a two-pronged approach: short-term measures to immediately address concerns, and long-term, more permanent changes to the organizational leadership structure.  To these ends, effective immediately, the Mayor made several key organizational changes at MDCR.
>
> First, J.D. Patterson will be named Interim MDCR Director, and will hold this position until a permanent Director is on-boarded following the ongoing nationwide recruitment effort.  Second, two (2) Interim Deputy Directors will be appointed, whose role will be—working closely with MDCR consultant and national corrections expert Gary Raney—to serve and assist Mr. Patterson with the day-to-day responsibilities of the department.  To maximize respective areas of expertise, there will be an Interim Deputy Director for Operations, and Interim Director for Administration.  Notably, both positions will report directly—and only to—the Mayor and Interim Director Patterson and will be in positions of authority over all MDCR staff.
>
> Third, the current Quality Improvement Assistant Director will be reassigned to the MDCR Internal Affairs Unit.  Given his background, he is well-suited to accomplish his mission of revamping this unit.  Fourth, Kim Bones, who as you know intended to resign from MDCR, has reconsidered and agreed to stay on because of the new organizational plan and vision, and will remain the Compliance Coordinator.
>
> Fifth, Gary Raney will be the Mayor's Special Advisor on all matters pertaining to inmate safety.  He has committed to assuming expanded responsibilities to transition MDCR through the process of securing a permanent Director and fully implementing all of the Mayor's goals and initiatives.  Mr. Raney's expanded role cannot be overstated.
>
> We expect his consulting agreement will be amended to reflect an increased and integral role in advising Interim Director Patterson and the Mayor.  Mr. Raney will be onsite starting August 22, 2022, and for approximately three (3) weeks thereafter, with regular subsequent onsite visits.  He will also continue to be accessible to Interim Director Patterson and the Mayor remotely.   Mr. Raney will have direct access to the Mayor, and authority and input on standard operating procedures regarding all aspects of inmate safety and conditions of confinement. Mr. Raney's expanded role

will also include, but not be limited to, making personnel and staffing recommendations, evaluating staff performance and progress, reviewing and making final recommendations—and verifying the proper implementation of—MDCR policies governing safe conditions of confinement, and enhancing critical incident response, reviews, and analysis.  He will also make recommendations regarding additional specialized consultants, over whom he'd have authority.

Mr. Raney will have increased access to information to perform the aforementioned duties, and will be providing weekly written progress reports to the Mayor outlining the status and progress of all operations, all of which can be shared with the Department of Justice and the Monitor.  And, of course, Mr. Raney will continue to be a key participant in the national recruitment process for the permanent Director.  He will also continue to advise on organization restructuring initiatives and leadership development opportunities.  Mr. Raney informs that he is comfortable with his enhanced role, and that in light of the corresponding organizational structure changes, MDCR can effectively move forward.

We also wish to mention that an updated Corrections Health Services organization plan is being developed and will be provided.

Also, of note, the Mayor is evaluating utilization of additional resources from other County departments.  For example, the Miami-Dade Public Safety Training Institute, an FDLE and CJSTC accredited institution that is responsible for the training of public safety personnel, shall be given the authority to assess and enhance MDCR's training program.  The Institute can assist in identification of concerns and implementation of methodologies associated with incident analysis and training development; assist in solving systemic issues related to current policy and practical application; provide training on emerging trends (e.g., mental health, suicide prevention, use of force); and assist in the development and implementation of training and policy reform.  The goal is to provide MDCR personnel with, among other things, the tools/training necessary to properly recognize the root cause to problems, take the appropriate action relevant to each situation, and develop a monitoring process to ensure proper outcomes.  The Mayor always welcomes input and other recommendations to effectuate the goals described above.

In accordance with our conversation, please share this correspondence and your recommendations with your supervisors at the Department of Justice.

We remain available to address any other concerns and answer any questions that you or your superiors may have.  We will also make ourselves available to speak or meet with anyone else at the Department of Justice to discuss these matters."

On August 11th I spoke with Jackson President, Don Steigman who advised me that there will be imminent leadership changes in CHS with the goals of strengthening organizational management as well as improving data collection and analysis.   I have not been able to independently confirm that Ms. Bones has rescinded her resignation, although I don't believe the County would misrepresent this.

The County's proposals (both for MDCR and CHS) are significant.  Steps to assure protection from harm for the County's inmate population are needed.   It is regrettable that

the County has taken this long to propose needed changes, prioritize inmate protection from harm,  and address the concerns the Monitors raised in all compliance reports.

## VI.     What's Next

The parties should take actions to guarantee that the County's offered remedies of August 11th , and those which might emerge over the next several months, are promptly implemented with regular communication to keep initiatives on track.  There needs to be objective measures of the proposed outcomes with benchmarks to assure the initiatives keep on track.    A flurry of actions, perhaps long overdue, are the beginning, not the conclusion.

The Monitors will be on-site October 11 – 13, 2022 to assess compliance, focusing on the eleven paragraphs not in compliance.  It is our intention, as always, to provide our objective findings, informed by documentation provided by the County, observations, discussions and interviews.  We will also evaluate paragraphs for which compliance has not yet sustained for the required 18 months of compliance.

It is up to the parties to decide how, who and when both Dr. Greifinger and I will be replaced on the monitoring team.  I will provide to whoever is designated the substantial electronic files, the archives of this matter, that I maintained since 2013.

The County has a jail system to run with the everyday challenges and crises to manage.  The needed reforms are not adjuncts to daily operations, rather integral components of operations to keep all safe.

## VII.    Conclusions

The findings letter of Department of Justice's Investigation of the Miami-Dade County Jail was delivered to the County on August 24, 2011.[32,33]  The summary of concerns included (not an inclusive list):

- Suicide risk and serious mental health needs,
- Inadequate acute care, chronic care, outpatient treatment, and discharge services to prisoners with mental illness,

---

[32] The DOJ's on-site investigations were on June 9 – 13, 2008, June 16-20 2008 and April 7-8, 2009.
[33] https://www.justice.gov/sites/default/files/crt/legacy/2011/08/29/Miami-Dade_findlet_8-24-11.pdf
Accessed on August 5, 2022 page 1.

- Indifference to the serious medical needs of prisoners, management of chronic health problems,
- Inadequate intake screening, initial health assessment and acute care for newly incarcerated prisoners,
- Use of excessive force,
- Indifference to the serious risk of harm to prisoners posed by fellow prisoners . . . resulting in ongoing harm and serious risk of harm, and
- Conditions of confinement.

The facts are that most of the remedies contained in 2013 DOJ letter, and subsequently placed in the Consent Agreement and Settlement Agreement, have been implemented by the County. However, the intransigent, systemic, issues that remain after all this time are critical to inmate (and staff) safety.

The Monitors' focus on the County's gaining and sustaining compliance with the Consent Agreement and Settlement Agreement has been replaced by alarm about continuing serious harm to inmates that the County appears to struggle to fix.   All involved – the Monitors, the Plaintiffs, and the County have devoted considerable resources.  There is a concerning absence of continuity in leadership, particularly in mental health resources and provision of treatment.

Based on the discussions of the last ten days, the County's representations emailed on August 11th , and my conversation with Mr. Steigman, I believe that the County's attention is now laser focused on protection from harm.   There remains a need for a cogent compliance plan, intertwined with the focus on inmate and staff safety.  This plan can incorporate the basics of the *SMART* model – specific, measurable, achievable, realistic and timely.

I, and Dr. Greifinger remain available to assist the Court, and until December 30th, the parties in working toward compliance, and take immediate steps to protect inmates from harm.

**Attachment A**

> **Issues/Priorities from Compliance Reports**
> **Prepared by McCampbell August 3, 2022**

These are the topics of priority concern, (i.e. the "headlines") identified in the introduction to each of the fourteen (14) compliance report.  Additionally, for *every* compliance report, *each* paragraph has analysis and recommendations.

1. **First  - November 5, 2013**
   a. Compliance process
   b. Crowding and criminal justice system collaboration
   c. TTC (Stockade)
   d. Training Lesson Plans
   e. Better understanding of the Forensic Diversion Facility
   f. 9th Floor
   g. Investigations, Mortality Reviews
2. **Second - May 22, 2014**
   a. Leadership (interim leadership in CHS and MDCR)
   b. Organization and Collaboration
   c. Opening MHTC
   d. Conditions of confinement in TTC and PTDC
   e. Coordination among the County's justice system
   f. Initiative, Problem Solving and the Data Driven Jail
   g. Use of Force
3. **Third - November 28, 2014**
   a. Leadership (interim leadership in CHS and MDCR)
   b. Organization and Collaboration
   c. Opening MHTC
   d. Conditions of confinement in TTC and PTDC
   e. Classification
   f. PREA
   g. Court Notice – Summary Action Plans
   h. Inmate Safety – Inmate/Inmate Violence
   i. Coordination among the County's justice system
   j. Initiative, Problem Solving and the Data Driven Jail
   k. Use of Force
   l. Achieving Compliance and additional monitoring resources
   m. Policies, procedures and employee training
4. **Fourth – July 3, 2015**
   a. CHS Staffing
   b. Opening the MHTC
   c. Collaboration between CHS and MDCR
   d. Completion of policies/procedures/written directives
   e. PREA
   f. MDCR's Future Leadership

      g.  Jail Bed Replacement (issues at PTDC)
      h.  Data Driven Jail; CHS Bi-Annual Reporting

**5.  Fifth – February 15, 2016**
      a.  Mental Health Housing
      b.  Completion of policies/procedures/written directives
      c.  Collaboration between CHS and MDCR
      d.  Improved Communication with Inmates and Inmate Facilities
      e.  PREA
      f.  MDCR's Future Leadership
      g.  Jail Bed Replacements
      h.  Data Driven Jail, CHS Bi-Annual Reporting
      i.  Use of Force

**6.  Sixth – September 9, 2016**
      a.  Staffing – CHS and MDCR
      b.  Mental Health Housing
      c.  Collaboration CHS and MDCR
      d.  Improved Communication with Inmates and Inmate Facilities
      e.  PREA
      f.  MDCR's Future Leadership
      g.  Jail Bed Replacements
      h.  Data Driven Jail; CHS Bi-Annual Reporting
      i.  Use of Force

**7.  Seventh – April 4, 2017**
      a.  Replacement beds for PTDC
      b.  MDCR Staff Training
      c.  63% of inmates with mental health diagnosis
      d.  Use of force involving inmates on the mental health caseload
      e.  Reduce violence
      f.  Implement inmate management data system
      g.  CHS and MDCR refine criminal incident review, root cause analysis and action planning
      h.  Re-envision Metro West
      i.  MDCR Leadership
      j.  Inmate grievance process
      k.  Addressing monitors' recommendations; response to monitors' data requests
      l.  PREA
      m.  Collaboration CHS and MDCR
      n.  CHS implement effective quality management program
      o.  Ineffective mental health screening

**8.  Eighth – January 18, 2018**
      a.  MDCR Staffing
      b.  Classification
      c.  Investigative Capacities and protection from harm
      d.  Inmate grievance process
      e.  Inmate violence
      f.  Offender management information system

    g.  Compliance management
    h.  Collaboration between CHS and MDCR
    i.  Sustainability SA **(30 recommendations)**
    j.  Addressing monitors' recommendations; response to monitors' data requests
    k.  Demonstration of data supporting clinical decisions
    l.  Morbidity and mortality reviews, integration of corrective action plans into quality management
    m.  Medical – poor performance with clinical chronic care guidelines; unresponsive grievance responses; insufficient progress addressing health assessments; poor peer review program
    n.  Implementation of an effective quality management program
    o.  Insufficient mental health screening
    p.  Inaccurate MH leveling, Suicide Classification, and Preventable Morbidity and Morality
    q.  Recommendations for CA next steps **(37 recommendations)**

9. **Nineth – August 24, 2018**
    a.  Inmate/inmate violence
    b.  MDCR Staffing
    c.  Classification
    d.  Investigative Capacities and Protection from Harm
    e.  Inmate Grievance Process
    f.  Violence Countermeasures
    g.  Offender Management System
    h.  Obtaining and sustaining compliance
    i.  Collaboration between CHS and MDCR
    j.  Self-audits and critical self-analysis
    k.  Link between consent and settlement agreements
    l.  CHS addressing monitors' recommendations; response to monitors' data requests
    m.  Poorly analyzed data
    n.  Morbidity and mortality reviews (see 8th report)
    o.  CHS quality management program
    p.  Custodial staffing in MHTC
    q.  Inmates with SMI in custodial segregation
    r.  Discharge planning

10. **Tenth – March 22, 2019. (Shorter report by mutual consensus)**
    a.  Twenty-three (23) paragraphs in CA not in compliance; remedial action steps developed
    b.  Process review issues for Compliance Report
    c.  Inmate/inmate violence and use of force
    d.  Analysis, Audits and Self-critical Analysis
    e.  Validation of the Classification system
    f.  MDCR Staffing
    g.  Investigations
    h.  Inmate grievances
    i.  SA - 16 recommendations

    j.  Improving jail facilities
    k.  Sustainability

## 11. Eleventh – October 28, 2019

    a.  Retention of a permanent Medical Director of Behavioral Health/Chief Psychiatrist.
    b.  Risk profiles (III.A.2.d).
    c.  Sick call process (III.A.3.a. (2).
    d.  Medication administration and management (III.A.4.d.).
    e.  Improvements in laboratory testing and related processes (III.A.4.e.).
    f.  Discharge planning (III.A.6.a.(1)-(3)).
    g.  Continuing emphases on improving mortality and morbidity reviews (III.A.7.a. b. c.).
    h.  Improved performance for detoxification protocols (III.B.1.a.)
    i.  Referral to mental health care (III.C.1.a.).
    j.  Mental health treatment planning (III.C.2.d.).
    k.  Alignment of screening, assessment, diagnosis, etc. (III.C.2.k.).
    l.  Individualized treatment plans (III.C.3.e.).
    m.  Mental Health Beds assessment in collaboration with MDCR's upcoming revised jail objective classification system (III.C.5.d.).
    n.  Long-term custodial segregation (III.C.6.a.(6)) and III.C.6.a. (11).
    o.  Staffing training on suicide risk assessment protocols (III. C.9.d.).
    p.  CA - 20 recommendations
    q.  Classification
    r.  Inmate/inmate violence, use of force
    s.  Analysis, Audits and Self-Critical Analysis
    t.  Segregation of inmates with SMI
    u.  Investigations
    v.  Inmate Grievances
    w.  Improving jail facilities
    x.  Sustainability

## 12. Twelfth – November 17, 2020

    a.  Action Steps/Due Dates
        i.  By January 4, 2021, the County will provide the final draft documents to achieve compliance with paragraph CA – C. 6. a. (6) regarding patients with SMI in custodial segregation.  The parties will confer and agree to have the final documents in place by March 1, 2021. (See pages 54 – 60 and Monitor's letters of August 17 and September 19, 2020.)
        ii.  By December 1, 2020, the County will provide an update to the Monitors of the data documenting inmates with SMI held in custodial segregation for the first three quarters of 2020 and the length of time held.
        iii.  By February 1, 2021, the County will provide an action plan to address and decrease the uses of force involving patients on the mental health caseload. (See pages 78-85.) See also SA III. A. 1.a. (11).

iv. By March 1, 2021, the County will provide a plan of action to improve accurate document of out-of-cell time of patients with SMI held in custodial segregation. The audit reflective of implementing the recommendations of the County's plan of action will be provided to the Monitors on or before June 1, 2021. (See pages 57-59). See CA III. C. 6. a. (4). ii.

b. Retention of a permanent Medical Director of Behavioral Health/Chief Psychiatrist.

c. Risk profiles and Suicide Risk Assessment(III.A.2.d. (page 18) and III.C.2.c. (page 37)).

d. Alignment of screening, assessment, diagnosis, etc. (III.C.2.k. page 42).

e. Individualized treatment plans (III.C.3.e. page 46).

f. Long-term custodial segregation (III.C.6.a.(6) and III.C.6.a. (11)) (pages 54-60).

g. Auditing of suicide attempt, suicide gesture, and non-suicidal self-injury classification (III. C.9.d. (page 67) and III.D.2.a.(3) (page 71).

h. Classification

i. Inmate/inmate violence, uses of force

j. MDCR Countermeasures

k. Analysis, audits and self-critical analysis

l. Investigations

m. Inmate Grievances MDCR and CHS

n. Improving jail facilities and the PSCC

o. Offender management information system

p. PREA

q. Sustainability

## 13. Thirteenth – June 25, 2021

a. Recruitment/retention of a permanent Chief Medical Officer

b. Recruitment/retention of a permanent Director of Behavioral Health/Chief Psychiatrist

c. Morbidity and Mortality Reviews (III. A.7. a.-c.)

d. Long-term custodial segregation of inmates with serious mental illness (III.C.6.a(4)i. and ii.

e. Classification

f. Inmate/inmate violence

g. Audits and Self-Critical Analysis

h. Investigations

i. Improving jail facilities and the PSCC

j. Offender Management Information System

## 14. Fourteenth – April 11, 2022

a. Inmates with mental illness

b. Inmate deaths in-custody

c. Inmate/inmate violence

d. Morbidity and Mortality Reviews/Self-Critical Analysis

e. Medical Mental Health staffing, Training and Leadership

f. Inmate Grievances

g.  Tour Watch System, Data, Remedies
h.  Tracking of Inmate Medical complaints
i.  Management of inmates with SMI in Segregation and Restricted Housing
j.  Jail management information system
k.  Investigations
l.  Compliance Coordinator
m.  On-going quality Improvement
n.  Recruitment/retention of a permanent Director of Behavioral Health/Chief Psychiatrist
o.  Morbidity and Mortality Reviews (III. A.7. a.-c.)
p.  Long-term custodial segregation of inmates with serious mental illness (III.C.6.a(4)i. and ii.
q.  Data collection, analysis, collaboration with MDCR, objective and measurable corrective actions, and evaluation of the impacts of corrective actions.
r.  Consolidated initiatives and countermeasures anchored in data, and focused on root causes of inmate violence.
s.  Documentation and implementation of EHR and outside record review findings.
t.  Patient specificity in treatment planning.