**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 13-21570-CIV-BLOOM**

UNITED STATES OF AMERICA
      Plaintiff,
v.
MIAMI-DADE COUNTY, THE BOARD
OF COUNTY COMMISSIONERS, *et. al.*,
        Defendants.
                                      /

**INDEPENDENT COMPLIANCE DIRECTOR**
**SELF-ASSESSMENT REPORT**
**February 15 – May 15, 2023**

On February 15, 2023 the Court signed an Order appointing an Independent Compliance Director (ICD) to oversee and guide efforts to bring the Miami-Dade Corrections and Rehabilitation Department (MDCR) into compliance with the provisions of the Consent Agreement and Settlement Agreement in Case 1:13-cv-21570-BB.  Pursuant to the Order, the ICD created a strategic plan for reaching compliance and submitted it to the Court.  Additionally, the Order read:

"The Compliance Director is responsible for drafting and filing a Self-Assessment Report on a quarterly basis. The Self-Assessment Report shall describe the progress with each provision of the Compliance Director's Plan of Action, including the implementation status of the Agreements, as well as every court-ordered remedy. Additionally, this Self-Assessment Report shall identify any barriers to progress, any corrective action taken by the Compliance Director to address inadequate progress, and any other matters deemed relevant by the Compliance Director."

While there are separate provisions that remain outstanding, the ICD has grouped most of them into five topic areas:

1.  Protection from Harm/Objective Inmate Classification

2.  Segregation of Inmates with Serious Mental Illness

3.  Mortality and Morbidity Reviews, Now Referred to as Major Incident Reviews

4.  Audits and Continuous Improvement

5.  Sexual Misconduct (compliance with the Prison Rape Elimination Act (PREA))

The defendants wanted continuity to track the provisions related to Corrections Health Services (CHS)/Jackson Health System; therefore, the ICD included CHS in the strategic plan.  This added topic areas for:

6.  Medical and Mental Health Care (intake screening, health assessments, access to care, medication management, recordkeeping, discharge planning and the other half of mortality and morbidity reviews)

7.  Health Assessments (medication administration and the refusal of psychotropic medications)

8.  Mental Health Care and Suicide Prevention (interdisciplinary treatment team plans and suicide prevention)

9.  Mental Health Practices (screening, housing and mental health management)

Additionally, Miami-Dade County Mayor Daniella Levine Cava asked that the efforts go beyond compliance with the Agreements and also seek to make the jail system the best it could be. There are many antiquated or poorly informed processes in the MDCR, including security practices, data systems, tracking, reporting and reviewing data, and systems for creating and monitoring positive changes. A few of these were then included in the strategic plan, although they do not correlate to an outstanding provision in either of the Agreements.

10. Technology and Data

11. Use of Force and Use of Restraints

12. Organizational Culture and Alignment

13. Leadership Development

2

An updated version of the strategic plan is attached.

## ICD History with Miami-Dade County

After years of struggling to reach and maintain substantial compliance, Miami-Dade County contracted with Gary Raney (now the ICD), as a consultant to develop strategies to achieve compliance with the Consent Agreement and Settlement Agreement. An initial assessment identified two overarching system failures in MDCR. First, the inmate classification system, which is the core process to protect inmates from harm by separating them by risk level, was inherently flawed. Secondly, the County failed to effectively use data to create processes that could create change and measure outcomes.

The ICD brought new processes and new decision-making systems to MDCR. While the changes were difficult for some because of many years of entrenched attitudes, the ICD found that most staff were able to overcome their apprehension, and many became excited about the changes. It has often been said that the MDCR culture was, "Keep your head down, do the minimum and you'll be okay." Whether true or not, the culture did not embrace innovation and change. Power was driven more by personality than performance. Those dynamics will be discussed later in this report, but it will continue to be one of the greatest obstacles to long-term success in the MDCR.

Along the way, the ICD developed a strategic plan for change, getting input from both the defendant, the plaintiff and the Monitors. The plaintiffs and defendants agreed that the ICD should also evaluate compliance for CHS, but no specific authority was associated with that other than a phrase saying CHS must cooperate with the ICD. The outstanding provisions for CHS were incorporated into the plan with auditing elements included. The plan was then submitted to the Court after the ICD's appointment was formalized. The plan remains active today, although, as with any plan, subtle changes have been made along the way.

Part of the challenge for MDCR has been unstable leadership. There had been three directors or interim directors in less than two years. At the Mayor's request, the ICD conducted a national search for candidates to fill the position of Director in the MDCR. The search and selection process was completed, and James Reyes was appointed as the permanent Director of MDCR on

January 16, 2023. Director Reyes had been a Colonel in the Broward County Sheriff's Office and spent most of his career in the jail system there. He brought both technical knowledge, and maybe most of all, enthusiasm to the leadership of MDCR. He will do well as the Director, but he will need more knowledgeable and motivated executives in MDCR to help move the jail system to the right place and do it expediently.

On February 15, 2023 the Court signed the joint stipulated order appointing Gary Raney as the ICD. While all the areas under the provisions stayed with the ICD, some non-Agreement related issues shifted to the Director at his request, such as the procurement of a modern jail management system and the needed revisions to the use of force policy and practices.

The ICD was intentionally aggressive with the implementation timeline for compliance. When changes become urgent, people pay attention. Overall, the path to compliance for MDCR is on track and the ICD is confident the Court will see great improvements in the June Monitors' Report and substantial compliance in all areas in the September Monitors' Reports. MDCR staff are showing more interest and excitement than the ICD has witnessed in the past few months. The ICD has received messages from line-level officers suggesting positive changes and opportunities to improve. If the Director and his new leadership team can continue that cultural growth, MDCR can be what the Mayor had hoped – a great jail system that is safe, secure and caring.

As of the time of this report, MDCR has made substantial progress, and the ICD believes it is in substantial compliance. While this may surprise the Court, given the prior reports, the ICD's work was not obvious to the former monitoring team given the timing of the transition. Efforts began in the early fall of 2022 while the ICD was still in a consulting role with MDCR, but they took time to plan and implement. As will be explained later in this report, protection from harm/inmate classification began around September 2022, but was not implemented until April 2023 to allow for automation. Mortality and Morbidity Reviews were changed around October 2022, but the final products of that process were not complete until December 2022. Data collection for those inmates with serious mental illness (SMI) began changing in October 2022 and is still underway.

While CHS has made progress, there are provisions that remain out of substantial compliance, and some will require considerable attention and resources for compliance to be achieved.

Jackson Healthcare System has committed to providing those resources and being in compliance before the August Monitoring visit.  That will be difficult, but not impossible.

**General Overview of MDCR**

As with almost all jails, MDCR is struggling with several factors outside its control.  While the population count dropped during the Covid-19 pandemic, it has since increased to pre-Covid levels.  However, overcrowding is typically caused by how long inmates stay in custody.  From December 2019 (pre-Covid) to December 2022, the average length of stay in the MDCR increased from 273 days to 351 days – a 29% increase.  This average length of stay is mostly driven by delays in the court process, something outside MDCR's control.  Regardless, the overcrowding has caused significant burdens for the MDCR and creates daily challenges to find the appropriate beds for inmates when they must be separated by custody level, mental health level and special needs.

Staffing in the MDCR is adequate, although the resource allocation is inefficient.  Plans are currently underway to improve that with the civilianization of some administrative positions that sworn staff currently occupy. Additionally, improved analytics to measure daily staffing levels, overtime, and other factors should help MDCR place more staff working directly with inmates.

Along with the changes described in this report, it is important to note that MDCR is making other efforts to improve inmate behavior and safety.  Those include:

- More focused efforts to locate and remove contraband.

- An improved emphasis on criminal investigations related to the introduction of contraband, extortion, and similar high-risk activities.

- The hiring of additional counselors.

- Incentives for pro-social behaviors like larger televisions, commissary products, etc.

- Tablets that will allow inmates to communicate with friends and family, submit grievances and requests and take online learning courses.

- Improving the disciplinary system to make it more effective at disincentivizing violence and disruptive behaviors.

- Encouraging better practices for direct supervision and the interaction between staff and inmates.

### Key Performance Indicators

[Some graphs in this report are somewhat difficult to read.  MDCR's data system exports them in a format that cannot be adjusted.]

Key Performance Indicators have been established for the MDCR, but the reporting of the data is still in development.  Some indicators are discussed later in this report, but the following indicators show the core measures of safety for the MDCR.

*Potentially preventable deaths:*

While 2022 was a notably bad year for inmate deaths, there are no clear explanations for the increase; however, poor classification practices, staff attentiveness and illegal drugs coming into MDCR were contributing factors.

| Year | Suicides or Homicides |
|------|----------------------|
| 2019 | 0 |
| 2020 | 0 |
| 2021 | 2 |
| 2022 | 6 |
| 2023 | 1 |

An inmate worker committed suicide in the warehouse of the Metro West Detention Center on May 25, 2023.  Few details are currently available, but at this time, there do not appear to be any serious concerns with MDCR practices.  Inmate workers are among the lowest risk levels, and it is rare that those inmates commit suicide.

Complex issues like inmate deaths do not have simple solutions.  The ICD believes the improvements in late 2022 and so far in 2023 will directly improve suicide prevention, including better screening, better classification practices, improved staff attentiveness and a greater awareness of the issue.

*Battery and use of force:*

7

"Battery" in MDCR data language means an inmate battering another inmate.  This measure, combined with the data on the use of force, is a good litmus test for the level of violence in a jail system.  MDCR has not looked at the use of force as an indicator of violence in the past, but it is a key measure.  When staff have good relations with inmates, the inmates are more apt to be compliant, and less force is necessary.  Concerning policy and practices for the use of force will be discussed later in this report.

Efforts to improve protection from harm/inmate classification began around September 2022, The implementation of the classification system was delayed until April 2023 and while there have been other positive efforts, such as increasing staff attention and interaction with inmates, there have also been poor practices, such as a decision to group problem inmates together.  The following graph indicates the number of batteries and uses of force.



A more accurate measure takes into account the increasing population in MDCR and when the numbers are converted to the rate of incidents, the data shows they start to decrease after the few months of harm reduction efforts. The new classification system was implemented in April 2023, so we expect to see more significant impacts in the next few months.:





*Disciplinary system:*

Discipline is a core function for enhancing safety in jails. Violent or predatory behavior should be discouraged through a proper system of discipline and sanctions. When disciplinary systems are run well, having few disciplinary reports can be a positive indicator that the jail is running smoothly, and violence is rare. MDCR should be using discipline and sanctions to help manage the dangerous behaviors of violent or disruptive inmates. However, some staff report not using the disciplinary system because many of the disciplinary reports are dismissed due to MDCR or CHS not meeting the timing deadlines. This creates frustration with staff who perceive the discipline system as somewhat pointless. It also encourages inmates to request hearings when otherwise they would not have, in hopes the incident investigation is delayed and administratively

dismissed.  Changes are underway to simplify the disciplinary system and shorten the timelines, ensuring inmates can resolve their disciplinary cases swiftly and fairly.

*Contraband:*

Contraband is a significant problem in the MDCR.  The Pretrial Detention Center (PTDC) was opened in 1960.  About twice the contraband is found in PTDC as in any other facility, even though PTDC holds fewer inmates.  Things break more easily when they are 60 years old, and those things can often be used as weapons.  Drugs are sometimes found, and it is well known that plain paper, laced with an illicit drug, often enters the MDCR through the mail, including mail disguised as legal mail.  Officers were specifically assigned to each facility to help find contraband, and it seems to have made a moderate impact.  MDCR and the Miami-Dade Police Department have also been working more closely to infiltrate corruption cases, and a notable success occurred on May 20, 2023, when a CHS employee was arrested for trying to bring illicit drugs and cellular telephones into the Metro West facility.

It is important to note that the data does not necessarily correlate to the amount of contraband present, only the amount that is discovered and seized.  While the data for 2023 was not immediately available, the ICD believes the amount of dangerous contraband has decreased, based on the decrease in drug-related medical events.  It is also important to understand that "weapons" means anything that could potentially be fashioned or used as a weapon, such as a piece of metal.

Future plans for contraband reduction include a vast reduction in the amount of traditional mail, to be replaced by electronic mail, and continuing to improve search practices.  These, as well as the continued efforts to reduce contraband being brought in my MDCR or CHS staff, should lead to a significant reduction in contraband contributing to harmful events.



*Summary:*

Significant changes in outcomes require a systematic approach to change. While the Agreements included several positive directions from the Court, most of those were established over ten years ago and did not anticipate some of the dynamics and events that have happened since they were issued, most notably the Covid-19 pandemic. The ICD identified concerns and barriers to harm reduction and improved management and appreciates the plaintiff's cooperation in creating long-term solutions for the defendants.

Overall, reforms are progressing well, and the ICD is confident the MDCR is in substantial compliance. CHS is not yet fully in compliance and the Jackson Healthcare System will have to devote substantial resources to obtain compliance before August's Monitor visit. After substantial compliance is reached in all provisions by all agencies, the ICD has concerns about sustainability, especially because the culture in MDCR does not embrace ownership and accountability, but the new Director is making a positive difference to change that.

## Topic Areas of Outstanding Provisions

### *Protection from Harm / Objective Inmate Classification*

This group of provisions will have the greatest long-term impact on violence reduction in the MDCR.  Safe jails use valid classification systems, housing plans, discipline, incentives and information systems to ensure inmates are as safe as they can reasonably be.  None of these were being effectively used, but now all these elements are either in place or being finalized.  While there is not enough data to make a confident prediction, the early data shows a reduction in violence and the ICD expects the trend to continue.

An inmate classification system exists to identify inmate behaviors that pose risks to the inmate or others they may be in contact with. Its core purpose is to identify different behavioral risk levels, called "custody levels" to then allow the jail staff to separate those levels into different housing units. In short, high-risk, more predatory inmates should be housed together and kept separate from low-risk inmates with a greater likelihood of being victimized. The former MDCR inmate classification system was a poor system that mismatched inmates more often than was acceptable.

Additionally, around February 2020, MDCR changed the most significant criteria in the classification process. While the reasoning has been debated internally, the result is demonstrated in the graphic below.



While the detail is difficult to discern, the colors in the graph represent the nine different custody levels MDCR used and show the changes by month from January 2018 through December 2022. The drastic shift in the center blue portion of the columns demonstrates the effect of a poor decision to alter an already flawed classification process. The large blue area represents the percentage of inmates classified as a "custody level 4" on a scale from 1 to 9, with 1 being the most dangerous. MDCR's decision led to a 452% increase in custody level 4 inmates from December 2019 to April 2020.

Essentially, this change significantly reduced the number of inmates identified at lower and higher risk levels. In the same time span of December 2019 to April 2020, the percentage of custody level 2 inmates (magenta) dropped by 74%, and the percentage of custody level 1 inmates (light green) dropped by 89%. Both custody level 1 and 2 inmates were considered a maximum risk. Similarly, many low-risk inmates were also reclassified into the custody level 4 status, mixing them with the high-risk inmates and making it predictable that violence and disruptive behavior would increase.

By August 2022, the County agreed to scrap the old classification system and adopt a modern process that would more specifically define behavioral risk. Work began by analyzing the data and educating MDCR staff on modern jail classification practices. A classification data expert developed a new classification process, known as a "point system" or "point additive system."

At the same time, training was provided to all the classification staff to help them understand the changes in the process and prepare them for their expanded role in the future.

The new classification system was effectively completed in February 2023, but MDCR elected to develop the process into a computer application rather than having classification officers manually review and calculate the "points." While this caused some delay in implementation, it also increased the reliability and sustainability of the process.

The new classification instrument was in place, and all inmates were reclassified by May 5, 2023. The new instrument uses four custody levels rather than nine, as is demonstrated in the graphic. "1" is a high-risk inmate, and "4" a low-risk. With the transition, any inmates who were housed outside their new custody level were relocated to the appropriate housing unit. The new distribution of custody levels is shown in the graph to the right and is generally consistent with what is expected in a modern, validated classification system.



Protection from harm relies on not only the classification process but also a system of rewards and sanctions for behaviors. As discussed, the disciplinary system also needs correction. Of the 11,851 completed disciplinary reports in 2022, 8,634 were adjudicated, and 3,217 were dismissed. The process is being revised and simplified now and should be in place by the end of May 2023 to make the disciplinary system more reliable, mostly by reducing the number of dismissals due to MDCR or CHS not meeting timelines.

Rewards or incentives for good behavior are also important behavior management tools, and the County has implemented several measures such as placing larger televisions in the cells where the most compliant inmates are housed. Increased commissary lists, hot water on demand and similar ideas are being considered now. In the Pretrial Detention Center, generally considered the maximum-security facility, there are now incentive cells where more pro-social inmates have larger televisions and more commissary items to choose from. Additionally, the chapel area may

be updated to provide better programming space and to create a theater room where inmates can earn their way to watching movies in a theater-like setting by demonstrating ideal behaviors.

Current efforts to impact misconduct and contraband in the facilities will likely create additional impacts in the near future. One of those is the creation of a Crime Stoppers program in the jail that will allow inmates or staff to anonymously call-in tips about crimes or contraband. MDCR is in the final stages of working with the local Crime Stoppers of Miami-Dade and the Florida Keys office to create a subset of the program for the Miami-Dade jail system. There is a somewhat unusual dynamic in the Miami-Dade jail system, where inmates know staff and their families more often than in most other jails of a similar size. Unfortunately, this creates the opportunity for inmates to threaten a staff member or their family and demonstrate the ability to carry out that threat. This may cause staff to agree to bring contraband into the facility or stay silent about the information they know. The Crime Stoppers program may help overcome this because any inmate or staff member can provide information and remain anonymous.

There are many factors that help protect inmates from harm. Some are controllable, like the inmate classification system, and some are not, like the amount of mental illness in the jail. Between October 2022 and May 2023, all the major systems that most affect inmate safety have been revised, and the last few are being implemented. A few of these last ones are beyond the scope of the Agreements but are being implemented to support core efforts to reduce violence.

The ICD believes MDCR is now in compliance with these provisions. The outstanding provisions read:

*Consistent with constitutional standards, the MDCR Jail facilities shall provide inmates with a reasonably safe and secure environment to ensure that they are protected from harm. MDCR shall ensure that inmates are not subjected to unnecessary or excessive force by the MDCR Jail facilities' staff and are protected from violence by other inmates. The MDCR Jail facilities' efforts to achieve this constitutionally required protection from harm will include the following remedial measures regarding: (1) Safety and Supervision; (2) Security Staffing; (3) Sexual Misconduct; (4) Incidents and Referrals; (5) Use of Force by Staff; and (6) Early Warning System.*

*III. A.1. a. 2. Within 90 days of the Effective Date, conduct an inmate bed and classification analysis to ensure the Jail has adequate beds for maximum security and disciplinary segregation inmates. Within 90 days thereafter, MDCR will implement a plan to address the results of the analysis. The Monitor will*

> *conduct an annual review to determine whether MDCR's objective classification system continues to accomplish the goal of housing inmates based on level of risk and supervision needs.*
>
> *III.A. 1. a. 11. MDCR shall continue its efforts to reduce inmate-on-inmate violence in each Jail facility annually after the Effective Date. If reductions in violence do not occur in any given year, the County shall demonstrate that its systems for minimizing inmate-on-inmate violence are operating effectively. See also Settlement Agreement III. A. 5. c. (12)*

### *Segregation of Inmates with Serious Mental Illness*

Historically, there were two underlying issues related to segregating inmates with serious mental illness that kept the County from being in compliance with the provisions of the Consent Agreement.  First, there was no clear definition of how to measure segregation and secondly, the County struggled to collect data that would prove compliance.  It was generally believed that the County was offering the appropriate out-of-cell time and activities, but there was no reliable proof of what was offered.

The ICD worked with the Monitors and plaintiff to better define segregation and how to measure it. All agreed upon the definition that segregation occurs when an inmate is housed alone, involuntarily, and is offered less than 15 hours a week of out-of-cell time for positive activities. MDCR also offers SMI inmates their out-of-cell time at two different times, typically morning and evening.  This exceeds the definition in the Consent Agreement and what is commonly found in the Department of Justice literature, which says fourteen hours a week.

With that definition in place, the County could focus on ensuring the data was accurate.  Prior to the fall of 2022, there were common problems with documentation at the Special Management Units (SMU) in the Metro West Detention Center, where most SMI inmates are housed if they are in segregation.  The problems were identified as human error and connectivity problems with the tablets that initially record the activities.  Both were easily solved, and as of the time of this report, there are a minimal and acceptable number of documentation errors.  When those do occur, the supervisors at Metro West who are dedicated to the SMU have consistently been able to identify and correct them within days.

The remaining problem was documenting how much time an inmate was *offered* when they refused to come out of their cell and participate in an activity.  There are many reasons inmates

refuse some or all of their out-of-cell time, with one of the most common being the Florida heat or other inclement weather. The County has requested Black Creek, the vendor providing the service to document out-of-cell time, to reconfigure the tablet applications so that the *offer* of out-of-cell time could be captured. This was completed on May 18, 2023, and the roll-out began the week of May 22, 2023.

The ICD wanted to include segregation data in this report that showed the number of SMI inmates in segregation over time. The problem arose too late to include that data because CHS tracks the SMI inmates and MDCR tracks segregation, but the two datasets are not correlated. Inmates may move in and out of SMI status or a segregated housing area, making it harder to track them. However, when the ICD began consulting, the two Special Management Units for SMIs in segregation were both full, each holding over twenty inmates. As of now, there are twelve total SMI inmates in segregation in MDCR. Even more importantly, since establishing the new segregation system and assigning a lieutenant to oversee it, no inmates removed from segregation have been returned to it.

Segregation of SMI inmates is an area that involves CHS to achieve substantial compliance, and they have also had challenges providing documentation that demonstrates it.

CHS Statement: At this time, any patient in segregation noted to be decompensating (i.e., neglecting personal hygiene, actively psychotic, bizarre behaviors etc.) are immediately referred to Qualified Mental Health Professional (QMHP) as an emergent order. The rhythm of SMI rounding (3x per week) in segregation allows for QMHP to be in the unit most days of the week and further offers ongoing collaboration with MDCR to discuss patient needs. Referrals could be generated by CHS staff, as well as MDCR. This data is captured on a monthly basis and reported during the Mental Health Review Committee meeting.

The ICD believes MDCR is in substantial compliance. However, the potential for human error in logging the out-of-cell time will require MDCR to diligently train, supervise and audit the work far into the future.

The ICD believes CHS is not in substantial compliance.  There appears to be a problem with documenting the rounds, a shortage of staffing to conduct them, or both.  The outstanding provisions read:

> **III. C. 6. a. (4). i & ii.** *Inmates with SMI who are not diverted or removed from custodial segregation shall be offered a heightened level of care that includes: i. Qualified Mental Health Professionals conducting rounds at least three times a week to assess the mental health status of all inmates in custodial segregation and the effect of custodial segregation on each inmate's mental health to determine whether continued placement in custodial segregation is appropriate. These rounds shall be documented and not function as a substitute for treatment. ii. Documentation of all out-of-cell time, indicating the type and duration of activity.*
>
> **III. C. 6. a. (6)** *Inmates with serious mental illness shall not be placed into long-term custodial segregation, and inmates with serious mental illness currently subject to long-term custodial segregation shall immediately be removed from such confinement and referred for appropriate assessment and treatment.*

### *Mortality and Morbidity Reviews*

The former Monitoring team shared a goal of MDCR and CHS working together to learn from serious incidents during the Mortality and Morbidity Review (MMR) process.  From that, MDCR attempted to duplicate the CHS sentinel event process.  In doing that, though, MDCR failed to identify and address the most serious concerns, often mixing them with administrative and collateral issues like not turning on a body-worn camera.  While the CHS process worked well for a healthcare review, it did not work well for a corrections review.

A new process was created for the MDCR that included a template for information and questions such as "Could this have been prevented?" to prompt reviewers to think more broadly than just about a policy violation, inmate histories and profiles, process issues, etc.  Other changes to the process force further investigation to answer questions about past similar events, housing moves, classification changes, etc.  The timelines were also revised to give investigators time to gather and analyze the relevant information before reaching conclusions. Each review interval has established expectations to help guide the process.

Substantial compliance on death reviews is one of the most challenging areas to measure because it mostly relies upon the Monitors' subjective opinion of whether the agency's review and findings are sufficient.  While there are more clearly defined processes for sentinel events in healthcare,

there are no corrections standards, templates, or generally accepted practices to follow – other than building timelines and using broad sources of information.  No agency's mortality and morbidity reviews are perfect because there are always more things that could be uncovered with enough time and effort.  That said, compliance means the investigation must be reasonably thorough, critical and demonstrate an honest effort to openly identify failures.  MDCR has now done this.

CHS conducts their own morbidity and mortality (M&M) reviews with (or alongside) MDCR and the Monitors recently identified areas of concern focused on the sustainability of corrective action plans.  Technical assistance has helped CHS focus their M&M review on the matters that likely contributed to the negative outcome and CHS is building better systems for tracking their corrective action plans.

CHS Plan as of May 2023:
- Create Corrective Action Plans (CAP) template and Tracking tool to improve monitoring.
- Modify the M&M process to compliment the MDCR's Major Incident Review (MIR).
- Revise current tracking tool for monitoring Corrective Action Plans (CAPs).
- Provide Root Cause Analysis (RCA) training to provide staff with the skillset to identify causation, analyze data, prevent and/or minimize system-wide risk, and evaluate the corrective process to determine effectiveness of the CAP.
- Define and demonstrate measurable goals.
- Employ the services of an independent consultant to offer consultation and guidance pertaining to the M&M review.  – Completed on 4/4/23
- Provide RCA training to the Subject Matter Experts (SME) involved in the M&M process – 5/17/23
- Perform a retroactive review of previous M&M reports to demonstrate the application of the process.
- Remove opportunities of improvement from the process.  Develop one master list for all CHS CAPs.

The ICD believes MDCR is in substantial compliance with these provisions but doubts CHS is. The provisions for MMR's read:

**III. A. 7. a.** *Defendants shall sustain implementation of the MDCR Mortality and Morbidity "Procedures in the Event of an Inmate Death," updated February 2012, which requires, inter alia, a team of interdisciplinary staff to conduct a comprehensive mortality review and corrective action plan for each inmate's death and a comprehensive morbidity review and corrective action plan for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Defendants shall provide results of all mortality and morbidity reviews to the Monitor and the United States, within 45 days of each death or serious suicide attempt. In cases where the final medical examiner report and toxicology takes longer than 45 days, a final mortality and morbidity review will be provided to the Monitor and United States upon receipt.*

**III. A. 7. b.** *Defendants shall address any problems identified during mortality reviews through training, policy revision, and any other developed measures within 90 days of each death or serious suicide attempt.*

**III. A. 7. c.** *Defendants will review mortality and morbidity reports and corrective action plans biannually. Defendants shall implement recommendations regarding the risk management system or other necessary changes in policy based on this review. Defendants will document the review and corrective action and provide it to the Monitor.*

### *Audits and Continuous Improvement*

Quality Assurance is mostly dependent upon good data and critical analysis. As reported many times over the years MDCR has been under the Agreements, there has been a lack of meaningful data analysis in the Department. The data is often available, but the extraction has often been in the form of snapshots rather than trends and there are few correlations between actions and the outcome. For example, the core issue for the Settlement Agreement is violence reduction. While MDCR can report the number of incidents, there is little correlation to location, custody level, mental health level, etc. Similarly, MDCR tracks use of force events but does not purposefully track where, when, who, etc.

The latest quarterly report will soon be submitted to the Monitors and will demonstrate substantial compliance, but it still needs further development. Much of the problem is that MDCR lacks data analysts, and the learning curve has been slow. New positions for analysts have been approved but not filled. In the meantime, the ICD and others will continue to provide technical assistance.

The ICD believes MDCR is in substantial compliance with the provisions. The provisions read:

*Self-Audits*

*MDCR shall undertake measures on its own initiative to address inmates' constitutional rights or the risk of constitutional violations. The Agreement is designed to encourage MDCR Jail facilities to self-monitor and to take corrective action to ensure compliance with constitutional mandates in addition to the review and assessment of technical provisions of the Agreement.*

*a) On at least a quarterly basis, command staff shall review data concerning inmate safety and security to identify and address potential patterns or trends resulting in harm to inmates in the areas of supervision, staffing, incident reporting, referrals, investigations, classification, and grievances. The review shall include the following information:*

*(1) documented or known injuries requiring more than basic first aid;*

*(2) injuries involving fractures or head trauma;*

*(3) injuries of suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.);*

*(4) injuries that require treatment at outside hospitals;*

*(5) self-injurious behavior, including suicide and suicide attempts;*

*(6) inmate assaults; and*

*(7) allegations of employee negligence or misconduct.*

*MDCR shall develop and implement corrective action plans within 60 days of each quarterly review, including changes to policy and changes to and additional training.*

*2. Bi-annual Reports See also Consent Agreement III. D. 2.*

*a. Starting within 180 days of the Effective Date, MDCR will provide to the United States and the Monitor bi-annual reports regarding the following:*

*(8) Total number of inmate disciplinary reports*

*(9) Safety and supervision efforts. The report will include:*

> *i. a listing of maximum security inmates who continue to be housed in dormitory settings;*

> *ii. a listing of all dangerous contraband seized, including the type of contraband, date of seizure, location and shift of seizure; and*

> *iii. a listing of inmates transferred to another housing unit because of disciplinary action or misconduct.*

*(10) Staffing levels. The report will include:*

> *i. a listing of each post and position needed at the Jail;*

> *ii. the number of hours needed for each post and position at the Jail;*

> *iii. a listing of correctional staff hired to oversee the Jail;*

> *iv. a listing of correctional staff working overtime; and*

> *v. a listing of supervisors working overtime.*

*(11) Reportable incidents. The report will include:*

> *i. a brief summary of all reportable incidents, by type and date;*

> *ii. data on inmates-on-inmate violence and a brief summary of whether there is an increase or decrease in violence;*

> *iii. a brief summary of whether inmates involved in violent incidents were properly classified and placed in proper housing;*

> *iv. number of reported incidents of sexual abuse, the investigating entity, and the outcome of the investigation;*

> *v. a description of all suicides and in-custody deaths, including the date, name of inmate, and housing unit;*

> *vi. number of inmate grievances screened for allegations of misconduct and a summary of staff response; and*

> *vii. number of grievances referred to IA for investigation.*

*The County will analyze these reports and take appropriate corrective action within the following quarter, including changes to policy, training, and accountability measures.*

**IV. B.** *The County shall develop and implement written Quality Improvement policies and procedures adequate to identify and address serious deficiencies in protection from harm and fire and life safety to assess and ensure compliance with the terms of this Agreement on an ongoing basis.*

### *Sexual Misconduct*

The foundation for this provision is compliance with the Prison Rape Elimination Act (PREA). MDCR had an audit completed in 2022 and was found in compliance by a DOJ PREA auditor. The Monitors raised concerns about whether the audit was valid, so the ICD engaged a national PREA expert to review it.  She found several areas of concern and the MDCR then worked with her over several months and made numerous changes to policy, training and physical concerns in the facilities to ensure PREA compliance.  At the time of this report, MDCR is installing the final privacy barriers in the Pretrial Detention Center.  Upon completion, MDCR will begin the next cycle of PREA audits to again ensure compliance.

As a side note, one issue identified was the mirrors in the Mental Health Treatment Center that allow staff to see around a corner into the toilet area.  MDCR has elected, and the ICD agrees, to have the mirrors remain as they are the only way to see into that area of the cell and potentially intercede in a suicide attempt.

Please refer to the attached letter from 2K Consulting – the PREA expert.

The ICD believes this provision is in substantial compliance.  The provision reads:

> **Sexual Misconduct:**  *MDCR will develop and implement policies, protocols, trainings, and audits consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations, including those related to the prevention, detection, reporting, investigation, data collection of sexual abuse, including inmate-on-inmate and staff-on-inmate sexual abuse, sexual harassment, and sexual touching.*

### *Medical and Mental Health Care*

The Consent Agreement required CHS to obtain previous medical records as determined clinically necessary by the provider.  The former monitoring team deemed that this meant that the clinicians must show proof of having reviewed those records.  CHS described their current compliance as:

> CHS Statement:  The workflow has been updated, piloted, and tested.  The process is in place and is currently being monitored.  The workflow document has been sent to the Monitors and subsequently any questions have been answered.  The monitoring process is ongoing and results will be available during the DOJ visit the week of May 22, 2023.

The ICD believes CHS is in substantial compliance with this provision.  The provision reads:

> **III. A. 1. e.** *CHS shall obtain previous medical records to include any off-site specialty or inpatient care as determined clinically necessary by the qualified health care professionals conducting the intake screening.*

### *Health Assessments*

The remaining issue surrounded medication administration management.  The existing practice required a psychiatrist to manually review medication notifications, with no distinction between critical and non-critical medications.  CHS identified those medications that needed immediate attention if they were not administered.  CHS then refined the process for the provider to be notified when a refusal occurs as noted in their statement below.

CHS Statement:  CHS' Chief of Psychiatry updated the mental health (MH) critical medication list and re-launched an automatic notification to providers on March 20, 2023. Per the Consent Agreement, CHS is focusing on the patients residing in designated mental health units.  We engaged a dual prioritization approach to address the volume of our patients. The first is any patient housed in MHTC at TGK and MH Level II patients at Metro West were seen first. Then MH Levels III and IV at Metro West. The second is ranking of consults for patient visits from highest to lowest, respectively: Pending; Overdue; Dropped.

Given competing clinical priorities of MH Level I, Emergent and Urgent consults, on April 24, 2023, CHS assigned a dedicated Behavioral Health Nurse Practitioner, along with the new Associate Chief of Psychiatry to manage the refused critical medication queue. We are demonstrating a steady progress toward compliance.

The ICD will rely upon the Monitors opinion, but believes CHS is not in substantial compliance with this provision.

### *Mental Health Care and Suicide Prevention*

These provisions are the greatest remaining challenge for CHS but notable progress is being made to reach compliance by mid-summer 2023.  The fundamental issues have been the "individualization" of treatment plans and the documentation that goes with them.  CHS has provided a detailed statement below addressing these concerns.

A separate concern of the ICD is the lack of participation on the Interdisciplinary Treatment Team (IDTT) by MDCR.  Corrections staff have an important role in managing inmate care and need to be integrated into the IDTT.  That is a significant role change for MDCR who has generally viewed IDTTs as CHS's area alone.  On May 19, 2023 the ICD selected an MDCR sergeant to be a liaison with the IDTT and integrate corrections practices to help support the treatment plans.



Another concern of the ICD is the 173% increase from 2020 to the present in the number of MH Level III inmates who have been identified as needing the care required in the Consent Agreement. This, and the lesser increases in MH Level I and II inmates, has significant impacts on MDCR and CHS in both bed space and workload to conduct proper monitoring and care. CHS is currently reevaluating the leveling process given that so many changes in mental health needs have come with the post-Covid-19 mental health surge.

To better understand this, the new Chief of Psychiatry has started reviewing the existing leveling decisions to determine if the clinical decisions are accurate. So far, they appear to be; however, the definitions for the levels should be reviewed as well. There is a common belief that many of the MH Level III and probably all of the MH Level IV inmates should not be labeled as a "level." CHS is reviewing the definitions and will propose any changes in the near future.

CHS believes all IDTT's and Interdisciplinary Treatment Plans (IDTP) will be completed by July 2023. This will allow the Monitors to conduct a full review prior to their August 2023 site visit. To do this, additional resources are being assigned from Jackson Healthcare System. Once established, CHS should have a better understanding of the ongoing workload and a schedule to meet inmate needs.

CHS Statements: The Interdisciplinary Treatment Team (IDTT) meetings are a vital component of our patients care. As such, CHS has been working on formalizing, restructuring, and streamlining the IDTT process. There were several IDTT workgroup meetings (including MDCR) prior to the launch of the IDTT project where an IDTT facility schedule was established, along with an IDTT Meeting Agenda and IDTT Guidance/Tips quick sheet. This initiative has

improved the overall compliance of IDTTs scheduled and completed (i.e., 99%-100% IDTTs completed in March at TGK) Furthermore, education sessions were provided to all QMHPs to disseminate findings from Dr. Brian Main's findings which addressed Levels of Care, IDTTs/Treatment Plans, Progress Notes, and Discharge Planning. The next phase of the project will address education for MDCR regarding levels of care and IDTTs, review and update of Cerner documentation, and best clinical practices training for CHS clinicians.

Chart reviews are proceeding apace for all our Advanced Practice Registered Nurse (APRN) and psychiatrists. We are reviewing charts for documentation best practices using our updated BH Peer Review Tool. As of now we are approximately 25% complete, and have planned and staffed the project for completion by the end of May 2023.

A change will be made to CHS and interagency policy to remove the absolute requirement that MH Level I patients remain at that status for at least 72 hours, and will be changed to a policy based on clinical indication. A 72-hour mandatory provision does not reflect the original intent of the policy which was to model Florida's Baker Act law, which allows for "up to" 72 hours for evaluation, but does not mandate that length of time. This will require edits to policy CHS-058-B and CHS-033. In concert, we have identified another policy provision which would result in duplicative efforts by our psychiatrists and APRNs when a patient is deemed to have emergent or urgent behavioral health concerns and is transferred to the Temporary Housing Unit. This will require edits to policy CHS-058-B and CHS-033, as well as IP-003. This project has been planned and staffed for completion by 5/22.

Lastly, the treatment plans may be hard to distinguish by looking at the Cerner medical records. CHS is currently working with their technology department to reorganize some of the information and make the treatment plans more obvious to Cerner users.

The ICD does not believe CHS is in compliance with these provisions. The provisions related to this read:

*Care:*

**III. A. 2. d.** *Qualified Mental Health Professionals, as part of the inmate's interdisciplinary treatment team (outlined in the "Risk Management" Section, infra), will maintain a risk profile for each inmate*

*based on the Assessment Factors identified in Appendix A and will develop and implement interventions to minimize the risk of harm to each inmate.*

**C. 1. a.** *Defendants shall ensure constitutional mental health treatment and protection of inmates at risk for suicide or self-injurious behavior. Defendants' efforts to achieve this constitutionally adequate mental health treatment and protection from self- harm will include the following remedial measures regarding...*

*CHS shall develop and implement written policies and procedures governing the levels of referrals to a Qualified Mental Health Professional. Levels of referrals are based on acuteness of need and must include "emergency referrals," "urgent referrals," and "routine referrals," as follows:*

*"Emergency referrals" shall include inmates identified as at risk of harming themselves or others, and placed on constant observation. These referrals also include inmates determined as severely decompensated, or at risk of severe decompensation. A Qualified Mental Health Professional must see inmates designated "emergency referrals" within two hours, and a psychiatrist within 24 hours (or the next Business day), or sooner, if clinically indicated.*

*"Urgent referrals" shall include inmates that Qualified Mental Health Staff must see within 24 hours, and a psychiatrist within 48 hours (or two business days), or sooner, if clinically indicated. "Routine referrals" shall include inmates that Qualified Mental Health Staff must see within five days, and a psychiatrist within the following 48 hours, when indicated for medication and/or diagnosis assessment, or sooner, if clinically indicated.*

*Interdisciplinary Treatment Plans (IDTP):*

**III. C. 2. c.** *Each inmate on the mental health caseload will receive a written initial treatment plan at the time of evaluation, to be implemented and updated during the psychiatric appointments dictated by the Level of Care. CHS shall keep the treatment plan in the inmate's mental health and medical record.*

**III. C. 3. e.** *CHS shall ensure individualized treatment plans for suicidal inmates that include signs, symptoms, and preventive measures for suicide risk.*

## Topics not Related to the Agreements

### *Technology and Data*

The plaintiffs and defendants agreed that the ICD strategic plan should use a systematic approach to harm reduction and not just be limited to the provisions in the Agreements. Technology and data were included in the plan to move MDCR toward data-driven decision-making. As previously stated, data is available in MDCR systems, but MDCR has not been using it

effectively.  Additionally, MDCR cannot meaningfully track many activities because they are being logged on paper or only at a facility level.

A modern jail management system will help MDCR better track inmates and their behaviors, cell assignments, inmate activities, movement histories, etc.  Most modern systems have pre-designed dashboards that will provide better data on the positive or negative impacts of decisions and changes.

MDCR is currently in the needs assessment process and anticipates releasing a solicitation in 2023.  While the installation will likely not occur until 2025 or 2026, this is a clear path to moving forward now.

### *Use of Force / Use of Restraints*

The use of force policy in MDCR is concerning.  The language does not clearly define uses of force that may be unreasonable, and therefore, the policy needs to be rewritten to provide more guidance.  At the same time, the current review process for instances of force is inadequate. MDCR was tasked with correcting both of these but as of this report, only some progress has been made.

Part of the reason for the poor reviews of force also applies to other incidents.  Officer reports in the MDCR are substantially below standard and allow for the veiling of concerning behaviors. For example, officers are not required to write exactly what force technique they applied and instead commonly write terms like "taken to the ground."  Additionally, the MDCR has not had meaningful use-of-force training in about seven years.  The corrective actions for this issue are:

- Refresh the use of force training while also refreshing report writing instructions.

- Establish a new use of force and internal affairs reporting system.

- Improve the use of force review process with critical analysis and meaningful responses to concerning uses of force and restraints.

MDCR is awaiting a date for the software installation, but all the above should be accomplished no later than the third quarter of 2023.

*Culture and Leadership Development*

As an organization, the environment in MDCR has been apathetic about improvement. While it has been difficult to create energy around change, the new Director for MDCR is making a notable difference. Champions are beginning to step forward and offer input or welcome responsibility. Staff appears more engaged in their duties, evidenced by improved inmate culture and less minor misconduct.

After the Director is confident with his selection for the leadership team, the ICD will recommend that the MDCR create a strategic plan for leadership and change. This hopefully will transition the ICD's compliance plan into something more lasting for MDCR. Additionally, it can focus the management efforts and prioritize the many initiatives that must be completed in the next few years.

## Conclusion

The ICD does not foresee any barriers to MDCR maintaining substantial compliance; however, it is sometimes more difficult to maintain compliance than achieve it because people transfer their attention to other areas. The ICD is concerned that CHS has not devoted enough resources to complete and maintain the treatment plans, especially given the increase in the number of inmates who require them. The need for CHS staff to fully document clinical encounters is also a challenge because it appears on the surface that the staff do not have sufficient time for the documentation – another resource issue.

The ICDs barrier to ensure CHS is in substantial compliance is the lack of apparent authority to make changes. The parties are currently discussing what "must cooperate" means in terms of the ICDs ability to make organizational changes in a similar way to what has happened in MDCR. Regardless of the outcome, the ICD is ready and willing to provide any assistance that would help CHS.

Respectfully submitted:

Gary Raney, Independent Compliance Director                  May 30, 2023

**ICD Plan Update**

**Final and Redline Versions**

 

## Compliance and Reform Plan for the Miami-Dade Corrections and Rehabilitation Department

Gary Raney, Independent Compliance Director

Updated May 30, 2023

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

The following plan is formatted similarly to a strategic plan to guide the efforts in bringing the County not only into compliance, but also making and sustaining the jail to be the best it can be.  While not all-encompassing, it provides a groundwork for compliance and reform.  This plan will continually develop – until it is no longer needed – and will be used as a reporting tool for all involved.

## TABLE OF CONTENTS

1.  PROTECTION FROM HARM / CLASSIFICATION / SAFETY AND SUPERVISION ........................................................................1
2.  SEGREGATION ........................................................................................................................................................4
3.  MAJOR INCIDENT REVIEWS (FORMERLY MMRS)........................................................................................................7
4.  AUDITS AND CONTINUOUS IMPROVEMENT ................................................................................................................9
5.  SEXUAL MISCONDUCT............................................................................................................................................11
6.  MEDICAL & MENTAL HEALTH CARE .......................................................................................................................12
7.  HEALTH ASSESSMENTS..........................................................................................................................................13
8.  MENTAL HEALTH CARE AND SUICIDE PREVENTION..................................................................................................14
9.  MENTAL HEALTH PRACTICES ................................................................................................................................17
10. TECHNOLOGY AND DATA.......................................................................................................................................18
11. USE OF FORCE / USE OF RESTRAINTS .....................................................................................................................19
12. ORGANIZATIONAL CULTURE / ALIGNMENT OF ROLES AND RESPONSIBILITIES ...........................................................20
13. LEADERSHIP DEVELOPMENT .................................................................................................................................22

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| |
|---|
| **1.   Protection from Harm / Classification / Safety and Supervision**<br>Current Status:  The initial assessment tool is being implemented.  County IT is programming the other tools for automation. |

*Consistent with constitutional standards, the MDCR Jail facilities shall provide inmates with a reasonably safe and secure environment to ensure that they are protected from harm. MDCR shall ensure that inmates are not subjected to unnecessary or excessive force by the MDCR Jail facilities' staff and are protected from violence by other inmates. The MDCR Jail facilities' efforts to achieve this constitutionally required protection from harm will include the following remedial measures regarding: (1) Safety and Supervision; (2) Security Staffing; (3) Sexual Misconduct; (4) Incidents and Referrals; (5) Use of Force by Staff; and (6) Early Warning System.*

**<u>III. A.1. a. 2.</u>** *Within 90 days of the Effective Date, conduct an inmate bed and classification analysis to ensure the Jail has adequate beds for maximum security and disciplinary segregation inmates. Within 90 days thereafter, MDCR will implement a plan to address the results of the analysis. The Monitor will conduct an annual review to determine whether MDCR's objective classification system continues to accomplish the goal of housing inmates based on level of risk and supervision needs.*

**<u>III.A. 1. a. 11.</u>** *MDCR shall continue its efforts to reduce inmate-on-inmate violence in each Jail facility annually after the Effective Date. If reductions in violence do not occur in any given year, the County shall demonstrate that its systems for minimizing inmate-on-inmate violence are operating effectively. See also Settlement Agreement III. A. 5. c. (12)*

**Problem:**
Inmate classification is a system to determine an inmate's risk level for institutional behaviors.  The outcome of the assessment tool is a number or term for the level of risk, called a "custody level."  Once the custody level is established, inmates are assigned to housing units that separate inmates by those custody levels.  "Overrides" may apply to certain inmates but should not exceed about 10% of the population.

The MDCR classification system was in substantial compliance in about 2019, but it was a mediocre system at best.  Modifications were then made, making it invalid.  Rather than fix a system that can only be mediocre, the County is adopting a new, more accurate system to determine custody level.

Along with the new classification system, the County will improve its housing plan, currently referred to as housing criteria, to better align custody levels, mental health levels, segregation, etc. with the appropriate housing environments.  This will help ensure the maximum use of bed space and the proper alignment of bed space with the individual criteria.

A collateral, but related, problem is the disciplinary system.  Some inmates claim suicide ideation to avoid discipline, then they are placed in the Mental Health Treatment Center (MHTC) and consume important practitioner time.  The MDCR sometimes fails to track inmate discipline, so the inmate does not face any consequences after release from the MHTC, making it advantageous to have been there.  [Any changes will not affect those inmates with serious mental illness (SMI).]

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| | | |
|---|---|---|
| All of these matters lay the foundation for behavior modification strategies, sometimes call "strategic inmate management." The MDCR should not only utilize discipline when appropriate, particularly targeting behaviors that may lead to violence, but also incentives for positive behavior. | | |

**Remedy / Objectives:**
A modern, validated classification system coupled with a well-structured housing plan that is updated as needed. The MDCR will have a validated classification system that accurately and consistently identifies an inmate's risk level. CHS will have a leveling system that accurately and consistently identifies an inmate's mental health level. Both processes will be independently validated. Alongside that, a new housing plan will align custody and mental health status with the best housing, providing incentives for pro-social behaviors.

**Overall Strategies / Recommendations:**
Create a classification system and housing plan that is the best use of space and aligns inmates with the proper environment, then update that plan as needed, probably weekly. Begin integrating inmate behavior management strategies to produce better behavioral outcomes. This should reduce the frequency of harmful events, creating a safer jail.

**Measures:**
Independent validation of the classification data, minimal use of temporary beds and a reduction in inmate-on-inmate violence and disciplinary actions.

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| August 4, 2022, email from Dr. Hardyman and Gary Raney to Interim Director Patterson requesting a new classification system be adopted. | Interim Director Patterson | Approved in August 2022 |
| Educate staff on the need and expectations for changing from a "decision tree" system to a "point" system. | Dr. Hardyman / Gary Raney | Completed August 30, 2022 |
| Make immediate improvements in the current system. | Dr. Hardyman / Capt. Brown | Completed December 2022 |
| Establish a new temporary initial classification process:<br>• Revised offense severity index,<br>• Detainers & escape history now reflect proper proportionality of risk,<br>• Collapsed 9 custody levels into 4 (functionally),<br>• Mental Health cells are differentiated by custody levels, and<br>• The audit process and dashboards now provide better oversight of key indicators such as overrides, timeliness, housing errors and custody distributions. | Capt. Brown / Dr. Hardyman | Completed December 2022 |
| Training of all classification staff on objective inmate classification (basic course they never received in the past) | Amanda Lambert / Captain Brown | Completed January 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| | | |
|---|---|---|
| Redesign Disciplinary, Grievance and Incentives Unit for improved interaction with facilities and better behavior management strategies. | Gary Raney | Completed |
| Training of all classification staff on the processes and use of the tools. | Dr. Hardyman / DD Bennett | Completed |
| Provide ongoing training for new classification staff and advanced training for existing staff. | Gary Raney / Consultant | Completed |
| Create a modern housing plan for each facility. | Consultant / Capt. Brown | Completed |
| Implementation begins, along with environmental and personal incentives.  These include recreation, television time, games, skill-building activities, art, commissary, and other food rewards. | Classification / Facilities | Completed |
| Full implementation and processes complete. | DD Bennett / Dr. Hardyman | Completed |
| Establish tablet-based access to programs, activities, visitation, email, etc. to improve social support connections and incentivize pro-social behaviors. | Chief Moreno | Q3 2023 |
| Establish a jail "crime stoppers" to report illegal activity / misconduct in the jail system.  Available to both staff and inmates. | AD Denson | Q2 2023 |
| Finalize the systematic program for behavior incentives to reduce violence and increase compliance. | Capt. Brown / Classification Unit | Q2 2023 |
| Data validation. | Dr. Hardyman | Q2 2023 and ongoing |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| |
|---|
| **2.  Segregation** |
| Current Status:  A new Department Segregation Coordinator has been established and the review process is undergoing a major revision. |

| |
|---|
| ***III. C. 6. a. (4). i & ii.*** *Inmates with SMI who are not diverted or removed from custodial segregation shall be offered a heightened level of care that includes: i. Qualified Mental Health Professionals conducting rounds at least three times a week to assess the mental health status of all inmates in custodial segregation and the effect of custodial segregation on each inmate's mental health to determine whether continued placement in custodial segregation is appropriate. These rounds shall be documented and not function as a substitute for treatment. ii. Documentation of all out-of-cell time, indicating the type and duration of activity.* |
| ***III. C. 6. a. (6)*** *Inmates with serious mental illness shall not be placed into long-term custodial segregation, and inmates with serious mental illness currently subject to long-term custodial segregation shall immediately be removed from such confinement and referred for appropriate assessment and treatment.* |

| |
|---|
| **Problem:** |
| This issue is multi-faceted.  The current evaluation process fails in some key areas.  For example, the fundamental goal is to minimize the use of segregation, yet there has not been any comprehensive tracking of how many inmates are in segregation, what their mental health status was, or whether the use of segregation has increased or decreased over time.  That said, the MDCR asserts that segregation has decreased significantly over the past few years. |
| Additionally, like the Major Incident Review (former Mortality & Morbidity Review) process, the segregation review has become overburdened with tasks that fail to optimize outcomes.  The review process needs to be realigned to conform with generally accepted jail practices that include a proper assessment, the identification of risk and needs, a treatment plan and regular contact and follow up by both security and healthcare staff.  Multi-disciplinary staff reviews of each segregated person should be coordinated and meaningful with collective goals for MDCR and CHS.  The current system lacks multidisciplinary collaboration, meaningful discussion, and a strong process to develop strategies for removing people from segregation. |
| Before October 2022, the data for "out-of-cell" time was sometimes unreliable but that appears to be corrected.  Additionally, the poor data systems create challenges for staff to make fully informed decisions.  There may also be opportunities to improve efforts in identifying the motivations for voluntary protective custody segregation, such as having gambling or street debts or that the person simply prefers the accommodations of segregation cells.  All of this combines to create difficulties for the safety cell committees. |

| |
|---|
| **Remedy / Objective:** |
| MDCR and CHS need to realign the segregation review process to conform with generally accepted jail practices, particularly on assessing and creating the treatment plan/strategy to reduce the use of segregation.  This will start by integrating MDCR security, classification, and CHS mental health representatives and the Facility Segregation Coordinator at the facility level.  Currently, only MDCR security staff and CHS MH staff participate in the reviews.  Some inmates will not be removed, such as those who are testifying against other inmates or who have a well-established record of ongoing violence in the jail. The segregation review process should focus less on them and more on the inmates who have the greatest potential to be moved into less restrictive housing. Additionally, establishing a Department Segregation Coordinator will enhance strategies, communication, and the sharing of information across facilities as inmates move. |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

**Overall Strategies / Recommendations:**
- Reduce the initial use of segregation and increase the frequency of releases within 72 hours.
- Decrease segregation for inmates who do not need it through targeted incentives.
- Evaluate if CHS is using proper analysis techniques to determine whether an inmate should stay in segregation (external consultant).
- Improve individual treatment plans for inmates with SMI.
- Evaluate and test direct supervision, stepdown units for segregated inmates (especially protective custody).

Ensure the segregation committees have sufficient information and strategies to remove inmates from segregation, whenever advisable.  For those who continue in segregation, the data on opportunities and actual out-of-cell time must be reliable to ensure each inmate receives adequate opportunities and serious isolation concerns can be addressed.  The planning and implementation of individual treatment plans needs to be a collective effort by both MDCR and CHS.

**Measures:**
The number, rate and amount of time inmates are held in segregation and restrictive housing, separated by the reason.  Independent expert confirmation of the MDCR and CHS processes.  Ongoing tracking of out-of-cell time and activities for those in segregation.  Clear justification for each person left in segregation.

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Improve documentation of out-of-cell time. | Lt. McKenzie | Corrected in Metro West Detention Center (MWDC) in Q4 2022 and this matter is currently in compliance. |
| Ongoing audits with bi-weekly reports of any errors. | MWDC / Officer Z. Monroe | Ongoing, with minimal errors reported. |
| Establish a Department Segregation Coordinator to continuously review segregation decisions and strategies. | Gary Raney | Completed |
| Track key performance indicators (KPI) of segregation.  Numbers, location, custody and mental health levels, etc. | Kim Bones / Safety Cell Coordinators | Completed |
| Ensure the segregation committees receive complete and accurate information on those in restrictive housing. | Lt. Foreman | Competed |
| Align incentives to encourage cooperation with removal from segregation. | Capt. Brown / Facility Captains | Completed |
| Realign the segregation committee process to be more informed and responsive at the facility level. | Lt. Foreman / Chief Guevara | Completed |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| | | |
|---|---|---|
| Confirm the efficacy of the assessment processes by CHS. | Independent Consultant | Completed |
| Create meaningful data-based reports to track the use and increase/decrease in segregation while also identifying patterns that may lead to strategies to reduce segregation. | Data Analyst Consultant / MDCR Strategic Analysis Division (SAD) | Completed |
| Integrate similarly situated inmates into common housing units (alongside the development of a housing plan). | MDCR / CHS | Q2 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| |
|---|
| **3. Major Incident Reviews (formerly MMRs)**<br>Current Status:  MDCR and CHS believe this is compliant.  They are awaiting confirmation or feedback from the Monitors. |
| ***III. A. 7. a.*** *Defendants shall sustain implementation of the MDCR Mortality and Morbidity "Procedures in the Event of an Inmate Death," updated February 2012, which requires, inter alia, a team of interdisciplinary staff to conduct a comprehensive mortality review and corrective action plan for each inmate's death and a comprehensive morbidity review and corrective action plan for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Defendants shall provide results of all mortality and morbidity reviews to the Monitor and the United States, within 45 days of each death or serious suicide attempt. In cases where the final medical examiner report and toxicology takes longer than 45 days, a final mortality and morbidity review will be provided to the Monitor and United States upon receipt.*<br><br>***III. A. 7. b.*** *Defendants shall address any problems identified during mortality reviews through training, policy revision, and any other developed measures within 90 days of each death or serious suicide attempt.*<br><br>***III. A. 7. c.*** *Defendants will review mortality and morbidity reports and corrective action plans biannually. Defendants shall implement recommendations regarding the risk management system or other necessary changes in policy based on this review. Defendants will document the review and corrective action and provide it to the Monitor.* |
| **Problem:**  The current MMR process has several issues including inadequate evidence preservation and collection, lack of objectivity and thoroughness, and most of all, it often fails to identify causation. |
| **Remedy / Objective:**  A thorough investigation and analysis of Major Incidents that identifies episodic and system failures, then tracks the corrective actions to ensure sustainability.  The process has been re-engineered and is being implemented.  Ongoing training and development of critical thinking skills will be a cultural change; however, the collaborative approach of using an "analysis team" to identify issues will accelerate the learning curve. |
| **Overall Strategies / Recommendations:**  Improve investigations, centralize responsibility for fact-finding, and create thorough analysis and reviews to identify personnel and organizational failures.  This is occurring with the integration and expansion of the role of the Miami-Dade Police Department (MDPD) and the MDCR Security and Internal Affairs Bureau (SIAB) (internal affairs) and jail investigators, etc.  Corrective actions need to be thought of as system change more than discipline, and the corrective strategies need to be tracked and evaluated. |
| **Measures:**  Demonstrated tracking and sustainability of corrective actions.  Monitor validation of strategies based on generally accepted jail practices. |

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Enhance the involvement of MDPD to improve the investigation of crimes and charge inmates when appropriate. | MDPD AD Perez | In Q3 2022, a second homicide detective was added, and specific General Investigations Unit (GIU) detectives were assigned for non-death felonies, such as assaults and contraband crimes. |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| | | |
|---|---|---|
| The current reporting requirements in DSOP 10-003, "Major Incident Reporting Procedures" only require the staff member to *submit* a report to a supervisor prior to the end of the shift, unless excused. This allows the report to be incomplete and still comply with the policy. The MDCR should require that the report be approved by a supervisor prior to the end of the shift for "Major Incidents" as defined in MDCR policy. | DD Bennett | Completed Q4 2022 |
| Realign the jail investigation team with a supervising lieutenant. | DD Bennett | Completed Q3 2022 |
| Ensure the initial information is complete and accurate using multi-disciplinary analysis teams. | Captain Perez / Lt. Vickers | Completed |
| Training and support for captains on the new process. | Captain Perez / Kim Bones | Completed |
| Improve SIAB competencies. | AD Marshall | Completed |
| Provide support and more objectivity to investigations by assigning jail investigators to independently collect and review evidence. | DD Bennett / Lt. Vickers | Completed |
| Ensure corrective actions are thought out, meaningful, consistent, and sustained. | Kim Bones | Completed |
| Tracking, review, and sustainability of corrective actions. | Kim Bones | Completed |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

---

**4. Audits and Continuous Improvement**
Current Status:  This will be included in the ICD's quarterly review and report.

---

*Self-Audits*
*MDCR shall undertake measures on its own initiative to address inmates' constitutional rights or the risk of constitutional violations. The Agreement is designed to encourage MDCR Jail facilities to self-monitor and to take corrective action to ensure compliance with constitutional mandates in addition to the review and assessment of technical provisions of the Agreement.*

*a) On at least a quarterly basis, command staff shall review data concerning inmate safety and security to identify and address potential patterns or trends resulting in harm to inmates in the areas of supervision, staffing, incident reporting, referrals, investigations, classification, and grievances. The review shall include the following information:*
    *(1) documented or known injuries requiring more than basic first aid;*
    *(2) injuries involving fractures or head trauma;*
    *(3) injuries of suspicious nature (including black eyes, injuries to the mouth,*
    *injuries to the genitals, etc.);*
    *(4) injuries that require treatment at outside hospitals;*
    *(5) self-injurious behavior, including suicide and suicide attempts;*
    *(6) inmate assaults; and*
    *(7) allegations of employee negligence or misconduct.*

*MDCR shall develop and implement corrective action plans within 60 days of each quarterly review, including changes to policy and changes to and additional training.*

*2. Bi-annual Reports See also Consent Agreement III. D. 2.*
    *a. Starting within 180 days of the Effective Date, MDCR will provide to the United States and the Monitor bi-annual reports regarding the following:*
    *(8) Total number of inmate disciplinary reports*
    *(9) Safety and supervision efforts. The report will include:*
        *i. a listing of maximum security inmates who continue to be housed in dormitory settings;*
        *ii. a listing of all dangerous contraband seized, including the type of contraband, date of seizure, location and shift of seizure; and*
        *iii. a listing of inmates transferred to another housing unit because of disciplinary action or misconduct.*
    *(10) Staffing levels. The report will include:*
        *i. a listing of each post and position needed at the Jail;*
        *ii. the number of hours needed for each post and position at the Jail;*
        *iii. a listing of correctional staff hired to oversee the Jail;*
        *iv. a listing of correctional staff working overtime; and*

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

|  |
|---|
| *v. a listing of supervisors working overtime.*<br>*(11) Reportable incidents. The report will include:*<br>    *i. a brief summary of all reportable incidents, by type and date;*<br>    *ii. data on inmates-on-inmate violence and a brief summary of whether there is an increase or decrease in violence;*<br>    *iii. a brief summary of whether inmates involved in violent incidents were properly classified and placed in proper housing;*<br>    *iv. number of reported incidents of sexual abuse, the investigating entity, and the outcome of the investigation;*<br>    *v. a description of all suicides and in-custody deaths, including the date, name of inmate, and housing unit;*<br>    *vi. number of inmate grievances screened for allegations of misconduct and a summary of staff response; and*<br>    *vii. number of grievances referred to IA for investigation.*<br><br>*The County will analyze these reports and take appropriate corrective action within the following quarter, including changes to policy, training, and accountability measures.*<br><br>*__IV. B.__ The County shall develop and implement written Quality Improvement policies and procedures adequate to identify and address serious deficiencies in protection from harm and fire and life safety to assess and ensure compliance with the terms of this Agreement on an ongoing basis.* |
| **Problem:**  The data systems in the MDCR are obsolete and while considerable data exists, the lack of a JMS makes it difficult to bring the disparate datasets into good management reports.  Until a new JMS can be established, the County must maximize the use of the existing resources to identify trends, both positive and negative, and create strategies that expand on positive results and improve negative results. |
| **Remedy / Objective:**  The MDCR reports should be better organized and delivered in a format that facilitates strategy discussions.  Reports are the foundation, but the value is in the actions that come from them.  The County will reorganize the reports and produce them quarterly, making them the foundation of quarterly reviews and strategy sessions to reduce violence and improve conditions for both inmates and staff. |
| **Measures:**  Reductions in violence, disciplinary actions, and grievances where possible.  Evaluations of past strategies at each quarterly meeting. |

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Improve the quality of data in the violence reporting. | AD Guevara | Completed |
| Quarterly reports and reviews of KPIs and strategy development to correct issues and concerns.  These meetings need to include every functional area that impacts inmate behaviors (security, classification, CHS, discipline, grievance, etc.). | Gary Raney / Director Reyes / CHS Director Peyton | . Completed for MDCR |
| Sustainability of KPI improvement strategies (cumulative reviews each quarter). | Gary Raney | Q2 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

**5. Sexual Misconduct**
Current Status:  MDCR engaged a PREA expert who has completed a full assessment.  Adoption of her recommendations is nearing completion, thus confirming anticipated compliance with the Agreement.

*__Sexual Misconduct:__  MDCR will develop and implement policies, protocols, trainings, and audits consistent with the requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations, including those related to the prevention, detection, reporting, investigation, data collection of sexual abuse, including inmate-on-inmate and staff-on-inmate sexual abuse, sexual harassment, and sexual touching.*

**Problem:**  Policies, protocols, etc. are in place for compliance.  A certified PREA auditor found the County in compliance, but the Monitors raised questions about the validity of the audit.  In October 2022, DOJ accurately noted that Jackson Health System's (JMS) Roxcy Bolton Rape Treatment Center should not be the reporting entity.

**Remedy / Objective:**  Verify the validity of the PREA audit and make any corrections.  Identify a new independent reporting entity.

**Overall Strategies / Recommendations:**  The ultimate test of this provision is the absence of sexual misconduct.  If misconduct does occur, the County shall follow all appropriate processes for the investigations, actions, and reviews of the incident.

**Measures:**  Absence (or demonstrated prevention) of sexual misconduct events and the proper care and processing of any victims and offenders.

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| PREA audit conducted. | Certified PREA Auditor | Completed Q3 2022 |
| Monitor raised questions about the validity of the audit. | AD Guevara | |
| PREA expert hired to independently evaluate the audit. | Gary Raney | Completed |
| PREA auditor asked to provide explanations for the Monitor's questions. | Gary Raney / PREA Consultant | Completed |
| PREA expert verified the validity of the PREA audit, with recommendations to improve the system. | Gary Raney / PREA Consultant | Completed |
| PREA expert retained to help improve the system (from the recommendations) | AD Guevara / PREA Consultant | Completed |
| New independent reporting entity being identified and engaged. | AD Guevara | Completed (MDPD) |
| Adoption of any/all recommendations by the PREA expert. | AD Guevara | Completed |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| 6.  Medical & Mental Health Care |
|---|
| Current Status:  CHS believes this is now compliant. |

| |
|---|
| *Defendants shall ensure constitutionally adequate treatment of inmates' medical and mental health needs. Defendants' efforts to achieve this constitutionally adequate treatment will include the following remedial measures regarding: (1) Intake Screening; (2) Health Assessments; (3) Access to Medical and Mental Health Care; (4) Medication Administration and Management; (5) Record Keeping; (6) Discharge Planning; and (7) Mortality and Morbidity Reviews.* |
| ___III. A. 1. e.___ *CHS shall obtain previous medical records to include any off-site specialty or inpatient care as determined clinically necessary by the qualified health care professionals conducting the intake screening.* |
| **Problem:**  This provision is about CHS requesting inmates' outside medical records during intake and obtaining those records.  CHS maintains, and the Monitors seem to agree, the previous medical records are being requested and obtained; however, the Monitors recommend CHS verify its providers review and use the obtained medical records in post-intake medical care. |
| **Remedy / Objective:**  Ensure that CHS is properly informed when making medical decisions, specifically that the CHS providers are aware of prior medical history, when appropriate. |
| **Overall Strategies / Recommendations**:  CHS will track and confirm that providers are reviewing medical records upon intake. |
| **Measures:** Review the monthly CHS Medical Record Request Log, randomly select a specified number of inmates and confirm whether the inmates' outside medical records were received and uploaded into the inmates' medical records.  If CHS is currently in partial compliance, it will need to reach substantial compliance.  At that time, regular and random verification of provider access will be established. |

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Continue monthly CHS/JHS Health Information Management (HIM) collaboration to request and obtain medical records. | CHS Director of Ops Renee Smith | Completed |
| Clarify the expectation and measurables of providers obtaining and reading medical records. | Gary Raney | Completed |
| If in partial compliance, monitor CHS' efforts and protocols to have providers review the medical records. | Gary Raney | Complete |
| Once established, perform quarterly reviews to ensure the process is functioning as intended and designed. | Gary Raney | Q2 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| **7.  Health Assessments**<br>Current Status:  CHS does not believe compliance has been achieved. |
|---|

***III. A. 4. d.*** *Medication Administration and Management. CHS shall ensure nursing staff pre-sets psychotropic medications in unit doses or bubble packs before delivery. If an inmate housed in a designated mental health special management unit refuses to take his or her psychotropic medication for more than 24 hours, the medication administering staff must provide notice to the psychiatrist. A Qualified Mental Health Professional must see the inmate within 24 hours of this notice.*

**Problem:**
The existing medication refusal notifications do not distinguish between critical and non-critical medications.  As such, the psychiatrists must manually work through the large volume of notifications and triage appropriately.  While this is inefficient, it also increases the opportunity for error and reduces the amount of time available for psychiatric clinical care.

**Remedy / Objective:**
CHS will need to designate critical from non-critical medication types and have the list independently validated.  The current population in the designated MH housing units include the inmates in the MHTC and MWDC MH Level II and III designated units.  CHS will ensure that the prescribing provider, not necessarily a psychiatrist, is notified of these inmates' medication refusals.

**Overall Strategies / Recommendations:**
CHS will assess how the electronic mental health consultation queue (for medication refusals) is generated and managed.   This includes an assessment of the existing list of medications considered "critical", determining how the prescribing provider is notified, and establishing the respective follow-up.

**Measures:**
A random sample of the applicable inmate population will be reviewed to determine whether those that refused critical medications received timely follow-up.

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Establish a list of "critical" medications. | CMO Dr. McQueen / COP Dr. Ares-Romero | Completed |
| Validation that the medications identified as "critical" is accurate. | Gary Raney via the Monitor | Completed |
| Confirm the process to notify the prescribing provider, or alternative, when a refusal occurs. | CHS DD Ahmed | Completed |
| Conduct quarterly audits to measure reliability and follow-up. | Gary Raney and/or Independent Consultant | Q2 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| 8.   Mental Health Care and Suicide Prevention |
| --- |
| Current Status:  CHS does not believe compliance has been achieved. |

Care:

***III.C.2.d.*** *Qualified Mental Health Professionals, as part of the inmate's interdisciplinary treatment team (outlined in the "Risk Management" Section, infra), will maintain a risk profile for each inmate based on the Assessment Factors identified in Appendix A and will develop and implement interventions to minimize the risk of harm to each inmate.*

***C. 1. a.*** *Defendants shall ensure constitutional mental health treatment and protection of inmates at risk for suicide or self-injurious behavior. Defendants' efforts to achieve this constitutionally adequate mental health treatment and protection from self- harm will include the following remedial measures regarding…*

*CHS shall develop and implement written policies and procedures governing the levels of referrals to a Qualified Mental Health Professional. Levels of referrals are based on acuteness of need and must include "emergency referrals," "urgent referrals," and "routine referrals," as follows: "Emergency referrals" shall include inmates identified as at risk of harming themselves or others, and placed on constant observation. These referrals also include inmates determined as severely decompensated, or at risk of severe decompensation. A Qualified Mental Health Professional must see inmates designated "emergency referrals" within two hours, and a psychiatrist within 24 hours (or the next Business day), or sooner, if clinically indicated.*

*"Urgent referrals" shall include inmates that Qualified Mental Health Staff must see within 24 hours, and a psychiatrist within 48 hours (or two business days), or sooner, if clinically indicated.  "Routine referrals" shall include inmates that Qualified Mental Health Staff must see within five days, and a psychiatrist within the following 48 hours, when indicated for medication and/or diagnosis assessment, or sooner, if clinically indicated.*

Interdisciplinary Treatment Plans (IDTP):
***III. C. 2. c.*** *Each inmate on the mental health caseload will receive a written initial treatment plan at the time of evaluation, to be implemented and updated during the psychiatric appointments dictated by the Level of Care. CHS shall keep the treatment plan in the inmate's mental health and medical record.*

***III. C. 3. e.*** *CHS shall ensure individualized treatment plans for suicidal inmates that include signs, symptoms, and preventive measures for suicide risk.*



**Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

**Problem:**
Care:  Currently, inmates with an emergent, urgent, or routine referral are not being seen by the psychiatrists within the provision's defined timeframes.  The prior Monitors allowed APRN staff to provide care to Level III and IV inmates but require psychiatrists for Level I and II.  There are insufficient psychiatric resources to comply with the Agreement, regarding Level I and Level II inmates.

IDTP: Inmates' interdisciplinary treatment plans (IDTP) are not consistently individualized and inmate specific.  Therefore, the remedy, strategy, and measures mirror III.A.2.d.  Currently, the IDTP meetings are not occurring at an established frequency, the attendees do not have defined roles and responsibilities, and the meetings do not always yield thorough, inmate specific documentation and action steps.  CHS needs to conduct these meetings timely, efficiently, and effectively to ensure inmates are properly assessed and followed up on.

**Remedy / Objective:**
Care:  Ensure that the inmates are provided clinical care in a timely manner consistent with the Agreement and Monitoring guidance.  CHS must improve the efficient use of psychiatrists alongside their employment efforts.

IDTP: MH inmates should have individualized treatment plans that are well documented and implemented. CHS is restructuring IDTP meetings to occur on a pre-set schedule, with defined roles and responsibilities, and clear expectations of deliverables for all attendees.  Attendees may include psychiatrists, medical providers, nurses, social workers, psychologists, and correctional officers.  This may potentially be merged with the segregation reforms.

**Overall Strategies / Recommendations:**
Care:  CHS is seeking clarity about any concerns on the quality of care by APRNs.  Communication has been difficult and as the Director of Compliance, I will continue to bring CHS, Monitors and independent experts (if needed) to improve the quality of care.

IDTP: CHS will assess the current IDTP meeting model, create a schedule, assign a meeting lead, establish roles and responsibilities for each discipline, including MDCR, and create a meeting template to guide the IDTP discussion and deliverables.  The CHS leaders should ensure, through periodic audits and/or peer reviews, that staff meet expectations.

**Measures:**
Care:  Timely reviews of emergent, urgent, and routine referral queues.  This includes regular and random sampling for validation of the emergent, urgent, and routine referral population to evaluate timeliness of inmate encounter with appropriate QMHPs.

IDTP: This process will be monitored by completing the following steps: Determine IDTP population, select a representative sample of completed IDTPs, obtain IDTP meeting deliverables and inmate medical charts, evaluate whether documentation is inmate specific, and verify meeting deliverables were executed.  Outside expertise or collaboration with the Monitors is likely needed.

| Progress Notes / Plans: | Owner: | Next steps / Due Dates: |
|---|---|---|
| Care:  Engage Dr. Brian Main, an experienced correctional psychologist and independent third-party consultant, to provide technical assistance. | CHS DD Ahmed | Completed in Q4 2022 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| | | |
|---|---|---|
| Care:  Evaluate the potential harm of continuing to cohort MH Level IIIs and test integration strategies using custody levels. | Gary Raney / DMH Dr. DeJesus / Monitors | Q2 2023 |
| General:  Assess the value of an environmental design review (changing furniture, fixtures, etc. to improve living conditions) | Gary Raney / Director Reyes | Mostly complete.  Some areas still under consideration. |
| IDTP: Restructure IDTP meeting model, which includes a schedule, a meeting lead, established roles and responsibilities for each discipline (including MDCR), a meeting template to guide the IDTP discussion and deliverables, and periodic quality reviews. | COP / DMH Dr. De Jesus | Completed |
| Care: Finalize resource model for the Mental Health Department to ensure delivery on expected clinical outcomes (Agreement and sustainable care). | Director Susan Peyton / DD Ahmed | Completed |
| IDTP: CHS will restructure the IDTP meeting model to improve the individualization of treatment plans.  The individualized treatment plan that is agreed upon in the IDTT meeting will be documented in the inmate's medical record. | COP  / DMH Dr. DeJesus | Completed |
| Conduct quarterly, then semi-annual, audits of IDTP to determine timeliness and effectiveness. | Gary Raney | Q3 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| 9. Mental Health Practices |
|---|
| Current Status: MDCR and CHS do not believe compliance has been achieved. |

| |
|---|
| **Problem:** Current initial screening and clinical practices delay the appropriate housing of inmates. Overcrowding, and poor living conditions and safety practices by MDCR staff in the MHTC may contribute to harmful outcomes. Also, CHS and MDCR staff agree there are inmates who may not need to be in the MHTC. This causes overcrowding and forces mentally ill inmates to live on temporary beds (boats). |
| **Objective:** Use improved mental health assessments, housing decisions and behavioral management strategies to improve clinical care for those detainees who most need it. |
| **Overall Strategies / Recommendations:** Improve the screening and assessment processes for "MH leveling" decisions. CHS and MDCR should engage independent reviews and recommendations to improve care. MDCR should also identify and improve practices that create unnecessary admissions into the MHTC, such as reducing the perception of fear. This overlaps the housing plan and inmate behavior management strategies under classification. |

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Evaluate the diagnosis and "MH leveling" decisions in the MHTC. | CHS | Study complete. Evaluation and implementation alongside the IDTP revisions. |
| Review current assessment processes in both the intake/booking area and the MHTC to improve efficiencies and the accuracy of clinical decisions. | CHS | Q2 2023 |
| Begin tracking the total time an inmate spends waiting to be housed in the intake areas. | Gary Raney / Technical Service Coordinator Eduardo Suarez / Captain Brown | Completed |
| Ensure beds are available in the MHTC to move MH inmates into proper housing as quickly as possible. | Classification / Captain Brown | Q3 2023 |
| Seek integrations of MDCR MH practices and the local court mental health diversion practices. Consider an independent study of processes and recommendations. | Gary Raney | Q2 2023 – Cancelled (court MH program not yet operational) |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| 10. Technology and Data |
|---|

**Problem:** MDCR is seriously lacking in its use of data to inform decisions and measure progress, or the lack thereof.  The disparate systems often do not tie together, causing staff to have to look in many places to gather complete documentation to fully inform their analysis.  Additionally, the reporting process is obsolete and fails to gather data from incident reports, so all data from them must be manually extracted to be analyzed.  To complicate the problem, other technology systems, like the safety check and out-of-cell time systems, do not integrate with other systems, causing further disconnects.

**Objective:**  Have a modern JMS that is capable of capturing, tracking, and reporting all KPIs for the jail.  Integrate the reporting systems to provide management data and make information easily accessible to management.  Where systems cannot be integrated, MDCR needs to create complimentary reporting structure to provide leaders with accurate, complete, and meaningful data that can drive decisions and measure progress.

**Overall Strategies / Recommendations:**  Assess technology needs by identifying business systems, network maps and key data requirements.  Assess vendor options that best meet those needs.  Have a collaborative and thorough selection process, followed by a successful implementation with sufficient training (it will be difficult for staff to learn and adjust to what inevitably will be nothing like what they use now).  Most of this will be guided by a national expert consultant.

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Identify areas that are deficient in data collection. | JMS Consultant | Q1 2023 – underway |
| Identify all KPIs for MDCR / CHS.  Begin collecting and reporting what is available. | Gary Raney / DD Tuzeo / CHS DD Ahmed | Completed |
| Assess the use of predictive analytics on violence from MDCR and CHS data. | DM ITD / Gary Raney | Q2 2023 underway |
| Conduct a needs analysis for MDCR business systems. | Chief Moreno / Consultant | Q1 2023 underway |
| Assess the integration or complimentary uses of the CHS and proposed MDCR systems. | Chief Moreno / CHS / Consultant | Q3 2023 |
| Identify software and hardware solutions that meet the future needs of the jail. | MD County / JHS / Consultant | Q3 2023 |
| Procure and install the solutions, particularly a JMS and improved inmate tracking. | Chief Moreno / JHS / Consultant | Possibly 2024 |

18

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| 11. Use of Force / Use of Restraints |
|---|

**Problem:**  Use of force policy and practices in the MDCR do not meet generally accepted jail practices.  The policy lacks clarity and direction, and the review process is insufficient.  Additionally, training in all aspects of force is insufficient.

**Objective:**  Ensure that force, including de minimis force, is only used when objectively reasonable.  The policy should be clear to all staff, and training and supervision should align the practices to conform with policy.  An effective review process should identify unreasonable force, concerns about policy, training and supervision, and   other opportunities to improve.

**Overall Strategies / Recommendations:**  Policies and training that have clear explanations of when force, and force tools, are acceptable.  Improved reporting at all levels.  An effective review process that focuses on the identification of unreasonable force and can direct MDCR to policy, training, and supervision.  The quarterly violence analysis should include reviews of use of force trends and the most serious events.

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
|---|---|---|
| Rewrite and create use of force and restraint policies to conform with generally accepted use of force practices. | Director Reyes (by request) | Q2 2023 |
| Provide training to all staff on both policy and the use of force.  Provide training to ranking members on contemporary review practices. | Training Bureau / Consultant | Q2 2023 |
| Establish effective use of force tracking, similar to "Blue Team" software. | Chief Moreno | Q2 or 3 2023 |
| Establish and train a Use of Force Review Committee (UFRC) | Gary Raney | Q3 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| 12. Organizational Culture / Alignment of Roles and Responsibilities |
| --- |
| **Problem:**  While there are very positive aspects to the culture in the MDCR, there are also concerns.  Some of these are caused by poor systems that lead to a lack of accountability and sometimes apathy.  For example, the current culture, while personally collegial, fails to focus on obvious care and custody concerns including fundamental duties like watch/wellbeing checks and dutiful attention to inmate safety. |
| **Objective:**  Properly trained and engaged staff who recognize indicators of harm or other safety/security concerns, and take action, as needed. |
| **Overall Strategies / Recommendations:** Training in the MDCR is seriously deficient and needs to be improved.  Roles and responsibilities of each rank need to be clarified and enforced.  Positive behavior should be recognized and rewarded, and negative behavior should be addressed.  Direct supervision principles should be used, where appropriate. |
| **Measures:**  Improved employee engagement and retention.  Swift and meaningful discipline for employees who demonstrate unethical behaviors.  Less employee discipline overall and less need to mandate employees to help fulfill the core missions of the MDCR. |

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
| --- | --- | --- |
| Study the disciplinary practices for serious misconduct to see whether unethical officers are being retained. | Director Reyes | Director Reyes is currently revising the disciplinary review process to better align the discipline with the severity of misconduct. |
| Provide leadership and supervision skill building. | MDPD | MDPD is no longer being used.  Leadership development should occur after the restructure in Q2 2023 |
| Increase accountability for basic duties like sight/wellbeing checks and fundamental human conditions.  Identify unit management strategies for supervisors and implement them. | DD Bennett / Chief Denson / Acting Chiefs | Mostly completed |
| Implement shift briefings with training topics and policy review. (CBA issue in discussion) | DD Bennett | Director Reyes in discussion with unions.  This is a top priority. |
| Chart the lines of authority for sergeants and corporals (the core of leadership for cultural change) to identify overlaps and ambiguities. | DD Bennett / DD Tuzeo / Gary Raney | Q3 2023 |
| Lessen the frequency of movement in the upper ranks of MDCR. | Gary Raney / MDCR Director | Completed |
| Analyze the pros and cons of reducing the number of levels in the MDCR hierarchy.  Plans are underway to eliminate a rank level. | Gary Raney / MDCR Director | A level of the upper organization was eliminated in February 2023. |
| Assess positions in MDCR that would benefit from replacing sworn staff with professional staff. | Gary Raney / DD Tuzeo / DD Bennett | Q2 2023 – Has begun |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| | | |
|---|---|---|
| Conduct a training needs assessment and training schedule for MDCR. | Contractor? | Q2 2023 |
| Prepare a draft organizational chart that streamlines authority and better aligns functional areas with clear and consistent supervision. | Gary Raney / Director Reyes / Deputy Directors | Completed |
| Improve the promotional process to focus on knowledge, culture, and leadership competencies.  Currently, only a written test is used. | Director Reyes? | Q2 2023 |
| Rewrite policies to improve the readability for staff and make them more accessible. | TBD | Begin in 2023 |

 **Compliance & Reform Plan for the Miami-Dade Corrections & Rehabilitation Department and Corrections Health Services**
Gary Raney, Independent Compliance Director

| **13. Leadership Development** | | |
| --- | --- | --- |

**Problem:** MDCR has not emphasized learning and integrating contemporary jail practices, apparently for many years. Many of the issues over the past months/years may be attributable to the lack of technical knowledge, combined with the turnover in ranks and lack of collaboration. While a new Director can eventually bring many improvements, the organization will not be successful unless there is a notable increase in knowledge, perspective, and commitment of the upper ranks of MDCR.

**Objective:** Improve the vision, cohesion, and commitment of the upper ranks in MDCR.

| Progress Notes / Plans: | Owner: | Next Steps / Due Dates: |
| --- | --- | --- |
| Director Search | Gary Raney / Miami-Dade Human Resources | Completed |
| Identify national resources for leadership development training. Hopefully, courses can be brought to MDCR for as many to attend as possible, but individual training is important as well. | Gary Raney / MDCR Leadership | Mostly complete |
| Affiliate MDCR leadership with national networking groups and opportunities to learn from others, like NIC's large jail network, the American Jail Association, etc. | Gary Raney / MDCR Director | Q1 2023 |
| Develop in-house, rank-level academies, like a sergeant's academy, lieutenants' academy, etc. | AD Guevara | Q3 2023 for sergeants' academy |
| Consider internal/external mentorship programs for personal development. | MDCR Leadership | Q3 2023 |

**Letter regarding PREA Compliance**

**2K CONSULTING, LLC**
6333 Highway 90
Grand Ridge, FL 32442
814-883-9766

May 15, 2023

Gary Raney
GAR Inc.
7154 W. State Street, Suite 260
Boise, ID 83714

Dear Mr. Raney,

In February I conducted a thorough review of the Miami-Dade Corrections and Rehabilitation (MDCR) Department's Prison Rape Elimination Act (PREA) compliance. The review included a site tour of all four locations, informal interviews, documentation analysis and an assessment of current policies and procedures. During the review I found areas of policy and procedure that required modification including: transgender/intersex searches, hiring and promotion procedures, incomplete Memorandum of Understandings (MOUs), training curriculums, the risk assessment tool and process, the outside reporting entity, victim advocacy services and facility investigations. Additionally, I found areas in the facilities that required modifications, including: updated signage, restrooms, video monitoring views, mirrors and search areas. At the conclusion of the review I provided MDCR leadership with verbal and written documentation of the identified issues. The leadership staff, including the agency PREA Coordinator took immediate action to implement corrective action. MDCR staff worked diligently over the last three months to ensure all identified issues were alleviated. As of date, the MDCR has provided documentation and confirmation of corrective action of all areas. It appears from this review that MDCR is in compliance with PREA standards.

On another note, I want to express how impressed I am with the MDCR leadership staff, including the agency PREA Coordinator. They have been receptive of all feedback and have illustrated initiative and motivation to correct issues related to the PREA standards. The MDCR staff have exhibited the want and the will to promote sexual safety within their facilities. I applaud them and their commitment to PREA.

Sincerely,

Kendra Prisk

Certified DOJ PREA Auditor

**Quarterly Performance Analysis**

# 2023

# Quarterly Performance Report

Miami-Dade Corrections and
Rehabilitation Department (MDCR)

_____

Q1- January 1, 2023 – March 31, 2023



Strategic Management Analysis Review Team
(SMART)

May 18, 2023

(Revised May 23, 2023)

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Contents

Introduction ............................................................................................................................................2

Facilities ..................................................................................................................................................2

Inmate Population ....................................................................................................................................5

    Average Daily Population ......................................................................................................................6

    Bookings ...............................................................................................................................................7

Strategic Initiatives .................................................................................................................................9

    Reduce Inmate Violence ....................................................................................................................10

    Reduce Uses of Force ........................................................................................................................11

    Ensure Fair Inmate Disciplinary Process ..........................................................................................14

    Minimize Inmate Grievances .............................................................................................................17

    Reduce Contraband ...........................................................................................................................20

    Prevent In-Custody Deaths ...............................................................................................................23

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Introduction

Miami-Dade Corrections and Rehabilitation Department's (MDCR) mission is to provide safe, secure, and humane detention to individuals in our custody while preparing them for a successful return to the community. In 2017, we adopted Key Performance Indicators (KPI) to help us track the impact of strategic initiatives and actions implemented to reduce inmate violence, uses of force, in-custody deaths, other major incidents, and contraband, and ensure our inmate grievance and discipline processes are fair and effective.

## Facilities

MDCR has five distinct facilities/areas that include:

**Metro West Detention Center (MWDC)** – MWDC is a third-generation direct supervision facility with open bay housing units, where the inmate population is supervised directly and continuously by staff stationed inside each housing unit. MWDC has a bed capacity of 2,670[1], a rated capacity of 2,234, and houses sentenced and unsentenced male inmates, with minimum to maximum custody levels. MWDC is also utilized as step-down housing for sub-acute mental health male inmates with Mental Health Level designations (MHL) II-IV, who have been stabilized and transferred from the Mental Health Treatment Center. There are thirty-six (36) open bay housing units, two (2) Special Management Units (SMU) and one (1) clinic isolation housing area. Nine (9) of the thirty-six (36) housing units are designated for the mental health population and one housing unit is utilized as medical /Assisted Daily Living (ADL) unit.

(MWDC Snapshot 15th day - 2nd month in the Quarter – March 15, 2023)



| Headcount | Gender | Special Pop. Count |
|---|---|---|
| • 2,373 | • Male - 2,373<br>• Female - N/A | • MHL II  - 27<br>• MHL III - 1,044<br>• ADL - 22<br>• SMU - 20 |

**Pre-Trial Detention Center (PTDC) –** PTDC is first generation linear facility with open and podular cells, where the inmate population is supervised by staff conducting intermittent supervision from outside the housing areas and by continuous monitoring via electronic surveillance. PTDC has a bed capacity of 1,459[2], a rated capacity of 1,400, and houses sentenced and unsentenced male inmates, with minimum to maximum custody levels. PTDC also houses the weekender population. There are eighty (80) housing cells, twenty-four (24) single occupancy cells, and one (1) direct supervision housing unit. Twenty-nine (29) of the eighty (80) housing cells are pod modular design with nine (9) currently utilized for court staging and Video Court.

---

[1] Classification & Inmate Management Bureau (CIMB);
[2] CIMB

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023



| Headcount | Gender | Special Pop. Count |
|---|---|---|
| • 976 | • Male - 976<br>• Female - N/A | • MHL- III - 108<br>• SMU - 76 |

(PTDC Snapshot 15th day - 2nd month in the Quarter – March 15, 2023)

**Turner Guilford Knight Correctional Center (TGKCC) –** TGKCC is a third-generation direct supervision facility, with pod modular housing units, where the inmate population is supervised directly and continuously by staff stationed inside each housing unit. TGKCC has a bed capacity of 1,382[3] with a rated capacity of 1000 and houses sentenced and unsentenced, adult and juvenile, male, and female inmates with minimum to maximum custody levels. MDCR's Mental Health Treatment Center (MHTC) is located inside this facility with six (6) units dedicated to house acute and sub-acute male and female inmates with Mental Health Level designations (MHL) I-III. TGKCC also serves as MDCR's centralized booking & release facility and is used for transitional housing for new arrestees pending classification and transfer to permanent housing. TGKCC has nineteen (19) housing units, one (1) Special Management Unit (SMU), one (1) Medical Housing Unit/Temporary Housing Unit (THU), and (1) one medical isolation housing unit.



| Headcount | Gender | Special Pop. Count |
|---|---|---|
| • 983 | • Male -626<br>• Male Juv - 20<br>• Female - 325<br>• Female Juv -2 | • MHTC & MH - 455<br>• THU - 15<br>• SMU -29 |

(TGKCC Snapshot 15th day - 2nd month in the Quarter – March 15, 2023)

**Intake and Release Bureau (IRB)** – The IRB is the intake/booking area for MDCR and does not house inmates. Although physically located in the Turner Guilford Knight Correctional Center, the IRB is separated out because of its distinct functions and staffing.

(IRB Snapshot 15th day - 2nd month in the Quarter – March 15, 2023)

| Incustody Headcount | Booked | Released |
|---|---|---|
| 4,497 | 128 | 104 |

---
[3] CIMB

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

**Boot Camp Program (BCP)** – Boot Camp is a program for convicted male and female youthful offenders between the ages of 14 and 24 who are supervised in a paramilitary setting that integrates academic, vocational, rehabilitative programs, the Thinking for a Change model, structured activities, and a wide array of services. BCP is structured into three phases: Phase I – Basic four (4) months; Phase II Work Release two (2) months; Phase III Aftercare during which the cadets are released and supervised for ten (10) months.

(BCP Snapshot 15th day - 2nd month in the Quarter – March 15, 2023)



| Headcount |
|---|
| • Phase I - 15 |
| • Phase II -15 |
| • Phase III -52 |

We also manage male and female pre-trial and sentenced populations in the community through the Monitored Release Program (MRP) - House Arrest, but further information regarding this Unit is not included in this report.

(MRP Snapshot 15th day - 2nd month in the Quarter – March 15, 2023)



| Headcount | Charges |
|---|---|
| •811 | • Misd - 395 |
| | • Felons -416 |

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Inmate Population

MDCR operates one of the largest correctional systems in the United States with responsibility for the care, custody, and control of over 4,800 persons incarcerated in our detention facilities. Demographics of our inmate population for January 1, 2023 - March 31, 2023:



| Gender | Race* | Disposition* |
|---|---|---|
| •92% Male<br>•8% Female | •57% Black<br>•42% White<br>•<1% All Other | • 8% Sentenced<br>• 76% Unsentenced<br>• 16% Partial Sentenced |

| Charges* | Mental Health | Average Daily Population |
|---|---|---|
| •93% Felonies<br>•5% Misds,<br>•8% Traffic & Holds | •70% with identified behavioral health concerns. | •4,569 |

*Note: Data calculated as % of average daily population for Jan-March 31st 2023.*

*\*Source: Power BI MDCR In-Facility Jail Population Data March 15, 2023*

## Average Length of Stay



*Source: Power BI MDCR Inmate Data May 1, 2023*

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Average Daily Population



## ADP by Facility for January 1 – March 31, 2023



## ADP re: Behavioral Health

| ADP | 2019 | 2020 | 2021 | 2022 | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Q1 | Q2 | Q3 | Q4 |
| Total in-custody | 4,329 | 3,683 | 4,274 | 4,674 | 4,569 | - | - | - |
| **Behavioral Health** | | | | | | | | |
| Level I | 79 | 55 | 63 | 66 | 75 | - | - | - |
| Level II | 192 | 210 | 251 | 336 | 343 | - | - | - |
| Level III | 552 | 454 | 821 | 1,070 | 1,238 | - | - | - |
| Level IV | 1,514 | 1,501 | 1,713 | 1,743 | 1,559 | - | - | - |

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Bookings

| Bookings | Q1 | Q2 | Q3 | Q4 | Total Year Bookings |
|---|---|---|---|---|---|
| 2023 | 11,546 | - | - | - | - |
| 2022 | 11,224 | 11,044 | 11,375 | 10,416 | 44,059 |
| 2021 | 10,638 | 11,162 | 10,994 | 10,085 | 42,879 |
| 2020 | 11,547 | 6,825 | 8,013 | 8,707 | 35,092 |
| 2019 | 13,929 | 13,830 | 13,281 | 12,254 | 53,294 |

## Bookings by Arrest Type January 1, 2023 – March 31, 2023



## Bookings by Charges

| Bookings | 2019 | 2020 | 2021 | 2022 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|
| Total Bookings | 53,298 | 35,096 | 42,880 | 44,059 | 11,546 | - | - | - |
| **Charge Severity** | | | | | | | | |
| Felony | 23,987 | 17,183 | 21,362 | 22,148 | 6,022 | - | - | - |
| Misdemeanor | 18,466 | 12,094 | 13,773 | 13,723 | 3,451 | - | - | - |
| No Miami-Dade | 2,314 | 1,304 | 1,671 | 1,695 | 491 | - | - | - |
| Traffic | 8,531 | 4,515 | 6,074 | 6,493 | 1,582 | - | - | - |
| Total Releases | 53,461 | 34,704 | 42,644 | 44,214 | 11,592 | - | - | - |

7

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Strategic Initiatives

### Reduce Inmate Violence

We measure inmate-on-inmate violence in our facilities as the number and rate of battery on inmate (BOI) incidents. This is one of our most critical strategic initiatives for ensuring a safe and secure environment for inmates and staff. In a continued effort to reduce inmate violence, MDCR has implemented a new objective jail classification system, actively monitors data collection and analysis related to inmate violence, inmate disciplinary and grievance systems, security, and gang intelligence, has enhanced inmate programming and re-entry services and has implemented several violence reduction initiatives.

### Key Performance Indicators

| Battery on Inmate (BOI) Incidents | Quarterly TARGET | 2019 Q Avg | 2020 Q Avg | 2021 Q Avg | 2022 Q Avg | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2 | Q3 | Q4 |
| # of incidents | ≤ 293 | 325 | 287 | 487 | 556 | 436 | - | - | - |
| [4]Incident rate per 1000 inmates | ≤ 68 | 75 | 78 | 114 | 119 | 95 | - | - | - |

### BOI Rate



---

[4] Incident Rate Calculation – Number of incidents/Average Daily Population*1000

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Initiatives

| Initiative | Description | Date initiated |
|---|---|---|
| **Staff Training** | Refresher training on key components of direct supervision principles re: inmate management was provided system-wide and incorporated in basic training curriculum. Added training on diversity and cell management. | Jun 2022 |
| **Inmate Programming** | Programming increased at all facilities to include a pilot Focus Program which targeted & engaged inmates with a history of fighting under a dedicated Correctional Counselor. Re-entry services & programming for county sentenced inmates substantially increased via creation of the Reentry Unit .and specialized training of re-entry staff, e.g., Trauma Informed Counseling, and Ohio Risk Assessment System. | Oct 2022 |
| **Open Environment Trial** | A select group of Level II inmates were transferred from the MHTC to MWDC open bay unit and provided opportunities to participate in an array of structured and non-structured activities. | Sep 2022 |
| **Jail Management System (JMS)** | MDCR's is actively pursuing acquisition of a JMS to adequately support inmate classification requirements and facilitate data collection & statistical analysis. | Ongoing |
| **Upgrade OJC System** | MDCR's Objective Classification System was enhanced to a point-based system with the designation of custody levels primarily focused on inmate behavior, ensuring inmates are housed based on level of risk and supervision needs. The new OJC system was implemented mid-April and the re-classification of the entire inmate population, as well as their movement to housing assignments consistent with the new custody levels is scheduled to be completed May 2023. | Mar 2023 |
| **Incentives** | Facility Supervisors in coordination with Classification & Inmate Management Bureau Transferring are implanting a variety of strategies in designated housing units to incentivize good behavior. | Ongoing |
| **Inmate Informational Sessions** | Facility Supervisors conduct monthly meetings with inmates to identify issues and concerns | Ongoing |
| **Response Teams** | Response Teams were assigned at each facility to assist staff with responding to and investigating inmate violence incidents; providing higher staff presence & engaging the inmate population; assisting with shakedowns & other security details as needed | Jan 2023 |

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Impact/Analysis

Although the KPI (target) was not achieved, the number and rate of inmate violence incidents (BOIs) are lower when compared to the quarterly avg., for the past two years (2021-2022). MDCR will continue to work on decreasing inmate on inmate violence through timely and appropriate staff intervention and inmate engagement; utilizing the new OJC for best inmate management strategies and focusing on the series of initiatives implemented. Additionally, we will continue to conduct monthly samplings and detailed reviews of BOI incidents to make timely course corrections. A review of BOIs for Q1 2023 reflected the following:

## BOIs for January 1, 2023 – March 31, 2023

| BOI Incidents | BOI Rate | Mental Health |
|---|---|---|
| **22% decrease** in BOI incidents compared to 2022 Q. avg. | **20% decrease** in the BOI rate compared to 2022 Q. avg. rate. | • 79% of inmates involved in a BOI were assigned a MH level at the time |

| Time and Day | Primary Cause | Injury |
|---|---|---|
| • Most BOIs occurred between (15:00-15:59 & 18:00-18:59) and on Mondays. | • 47% of BOIs were initiatied by discourtesy or disrespect between inmates | • 12% of BOIs did not result in injuries<br>• 5% resulted in a serious injury |

10

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Reduce Uses of Force

We measure uses of force in our facilities as number and rate of response to resistance (RTR) incidents[5]. All Response to Resistance (RTR) incidents are reviewed independently by the RTR Review Team which is comprised of Sergeants and a Lieutenant. This team evaluates compliance with policy and procedures, determines if the RTR was justified, unjustified or warrants further review. Additionally, MDCR utilizes an Early Warning Information System (EWIS) to identify staff use of force trends (uof)[2], take preventive and corrective actions if warranted, as well as identify training opportunities. BOIs initiatives also support reduction of RTRs, but additional initiatives are developed to target this critical strategic initiative.

### Key Performance Indicators

| Response to Resistance (RTR) | Quarterly TARGET | 2019 Q Avg | 2020 Q Avg | 2021 Q Avg | 2022 Q Avg | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2 | Q3 | Q4 |
| # of incidents | ≤ 145 | 161 | 163 | 242 | 295 | 257 | - | - | - |
| [6]Incident rate per 1000 inmates | ≤ 33 | 37 | 44 | 57 | 63 | 56 | - | - | - |
| % of BOIs resulting in an RTR | ≤ 16% | 18% | 20% | 16% | 15% | 19% | - | - | - |

### RTR Rate



---

[5] MDCR currently refers to Use of Force (UOF) incidents as Response to Resistance (RTR) incidents but is in the process of revising the policy which uses the UOF term.
[6] Incident Rate Calculation – Number of incidents/Average Daily Population*1000

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Level of Force Response[7]

| Type of Response | 2019 | 2020 | 2021 | 2021 | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Q1 | Q2 | Q3 | Q4 |
| OC Spray | 405 | 499 | 746 | 1,021 | 234 (48%) | - | - | - |
| Physical Control | 448 | 464 | 625 | 765 | 158 (33%) | - | - | - |
| Conducted Energy Weapon | 3 | 5 | 15 | 21 | 2 (<1%) | - | - | - |
| Restraint Chair | 1 | 2 | 0 | 3 | 0 | - | - | - |
| Cell Extraction | 6 | 1 | 3 | 7 | 3 (1%) | - | - | - |

## Initiatives

| Initiative | Description | Date initiated |
|---|---|---|
| **Revise RTR Policy** | Revise RTR policy to Policy in draft. | Jan 2023 |
| **Training** | Train staff on new policy & incorporate scenario-based training | TBD |
| **RTR Review Team** | Transferred RTR review Sgts to SIAB under direct supervision of veteran Lt. | Jan 2023 |
| **RTR Review Process** | Establish RTR Disp. Panels comprised of command staff & senior leadership to conduct targeted reviews on incidents involving elevated levels of force. | TBD |
| **Staff Discipline** | Increase discipline for unreasonable force. | Jan 2023 |
| **MDCR IDTT Coordinator** | Assign an MDCR supervisor to work directly with CHS and Classification to optimize inmate behavior management. | May 2023 |

---

[7] Depicts the highest level of force used by each responding staff member per incident.

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Impact/Analysis

Although the KPI (target) was not achieved, the number and rate of RTRs are lower than the quarterly avg., for the prior year (2022). The transfer of the RTR review team to SIAB increased their access to documentation and surveillance records. Additionally, several team members completed specialized UOF training (Forensics Science Training) in March 2023. We expect the assignment of an MDCR supervisor as an IDTT Coordinator to assist in the reduction of RTRs and BOIs among behavioral health inmates by working closely with CHS and Classification toward early detection, timely intervention and appropriate behavioral management and housing, The RTR policy is being revised to incorporate new language and the enhanced review process. The noted initiatives will assist MDCR's continued efforts to reduce RTR incidents and reinforce MDCR's policy authorizing only the reasonable and necessary force based on the totality of circumstances.

## RTRs for January 1, 2023 – March 31, 2023:

| RTR Incidents | RTR Rate | Mental Health |
|---|---|---|
| •**13% decrease** in RTR incidents compared to 2022 Q. avg. | •**11% decrease** in the RTR rate compared to 2022 Q. avg rate. | •85% of inmates involved in an RTR were assigned a MH level at the time |

| RTR Review  (257) | Primary Cause | Injury | BOIs |
|---|---|---|---|
| •193 Justified<br>•6 Unjustified<br>•58 in review | •48% of RTRs resulted from physical resistance to a lawful command | •76% of 471 inmates invovled in RTR incidents reecieved basic first aid | •19% of BOIs resulted in RTRs = 4% increase from 2022 Q. avg. |

13

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Ensure Fair Inmate Disciplinary Process

MDCR's goal is to administer a fair and consistent inmate disciplinary process that appropriately sanctions inmates for institutional misconduct. Inmates exhibiting noncompliant behavior and/or violating facility rules may be charged with a violation, face a disciplinary hearing, and if found guilty, receive a sanction. The completion of the disciplinary hearings along with the timely imposition of sanctions ensures an effective disciplinary process and that offending inmates receive discipline to correct the behavior. Conversely, disciplinary reports dismissed for reasons under MDCR's control, negatively impact our disciplinary process and ability to appropriately manage inmate behavior. MDCR utilizes an Inmate Disciplinary System (IDS) to track and process all disciplinary reports.

### Key Performance Indicator

| Inmate Discipline | Quarterly TARGET | 2019 avg | 2020 avg | 2021 avg | 2022 avg | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2 | Q3 | Q4 |
| % of disciplinary reports dismissed for reasons under MDCR's control[8] | ≤ 16% | 18% | 13% | 9% | 10% | 22% | - | - | - |

### Dismissed Disciplinary Reports



Quarterly Average Percent of Disciplinary Reports Dismissed for Reasons under MDCR Control

- % of disciplinary reports dismissed
- Quarterly Performance Target < 16%

---

[8] DRs dismissed for reasons under MDCR's control includes reports entered in error, exceeding established time frame, inmate transferred to another facility, insufficient facts, and incomplete documentation.

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Disciplinary Reports Dispositions and Sanctions

| Inmate Disciplinary Reports | 2019 | 2020 | 2021 | 2022 | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Q1 | Q2 | Q3 | Q4 |
| Total Reports | 10,923 | 9,753 | 12,931 | 11,756 | 2,191 | - | - | - |
| | | | | | | | | |
| Guilty | 7,117 | 6,691 | 8,719 | 6,925 | 1,050 | - | - | - |
| Not Guilty | 961 | 997 | 1,891 | 1,709 | 195 | - | - | - |
| Dismissed[9] | 2,845 | 2,065 | 2,321 | 3,122 | 946 | - | - | - |
| | | | | | | | | |
| Loss of Privileges (commissary, telephone, television, visitation) | 21,288 | 24,357 | 21,997 | 11,768 | 1,667 | - | - | - |
| Other | 451 | 206 | 171 | 177 | 40 | - | - | - |
| Disciplinary Segregation | 3,307 | 2,806 | 2,865 | 2,798 | 457 | - | - | - |

## Guilty DR Dispositions by Rule Violation for January 1, 2023 – March 31, 2023



---

[9] Includes DRs dismissed outside MDCR's control (e.g., inmate released, transfer to another agency, unavailable due to medical / mental condition, etc.).

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Initiatives

| Initiative | Description | Date initiated |
|------------|-------------|----------------|
| Disciplinary Process | Streamline disciplinary process from 13 to 4 steps | March 2023 |
| Reassign tasks to process DRs & Hearings | Custody Services staff will be trained to process DRs & conduct Hearings. | TBD |
| IDS | Added DR Appeal Process<br>Added the Dismissal Reason for Higher Charges.<br>Added the Dismissal Reason for Identified as Victim.<br>Update & operationalize steps | Sep 2022<br><br><br>March 2023 |
| IDS Management | Relocated the oversight of the IDS & the IDS Coordinator from RSB to Classification & Inmate Management Bureau to better coordinated inmate management. | March 2023 |
| Update IDS policy | Update policy to reflect new process | March 2023 |

## Impact/Analysis

The KPI (target) was not achieved, and we experienced the highest percent (22%) of DRs dismissed within MDCR's control within the past four years (2019-2022). Formal discipline requires written documentation and a disciplinary hearing to be held within seven workdays after the incident. A review of MDCR's Inmate disciplinary process revealed a lengthy (13) step process. The process is further complicated by requiring approval of multiple users, in the IDS, including Re-Entry Services Bureau (RSB) staff and CHS staff before allowing the process to proceed to the next step. Both operations (RSB & CHS) have experienced staffing challenges. The process is now streamlined to (4) steps with only the IDS pending final revisions. Additionally, the serving of DRs and DR Hearings will be shifted away from RSB to Custody Services ensuring available staff and freeing up RSB to focus on inmate programming and re-entry services. Lastly, the IDS Coordinator position and oversight of the IDS has been transferred to Classification & Inmate Management Bureau to operationalize the revised IDS, ensure discipline is consistent, inmate appeals are processed, and sanctions comply with jail standards. The preceding efforts will result in a more efficient and effective IDS, which will not only reduce the number of dismissed DRs but also directly support the new OJC system.

## Disciplinary Reports for January 1, 2023 – March 31, 2023:

| DR Dispositions | Primary Violation | DRs by Facility | Mental Health |
|-----------------|-------------------|-----------------|---------------|
| •52%  Guilty<br>•9% Not Guilty<br>•43% Dismissed | •44%  Aggression with thw majority re: BOI | •MWDC - 1,241<br>•PTDC -698<br>•TGKCC - 233 | •81% of the disciplinary reports involved an inmate with a MH level |

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Minimize Inmate Grievances

We view inmate grievances as a measure of our ability to meet inmates' basic needs and respond in a timely manner to inmate requests. An Inmate Grievance Committee comprised of counselors and officers meets monthly to discuss and implement measures to maintain an efficient and effective grievance system. MDCR utilizes an Inmate Grievance System (IGS) to track and process all inmate grievances. All inmate grievances alleging staff misconduct or complaints are forwarded to the Facility/Bureau Supervisor for assessment and action. The Supervisor determines if the complaint can be addressed internally or requires further investigation by the Security and Internal Affairs Bureau (SIAB). Medical grievances are forwarded to and processed by CHS.

### Key Performance Indicators

| Inmate Grievances | Quarterly TARGET | 2019 Q avg | 2020 Q avg | 2021 Q avg | 2022 Q avg | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2 | Q3 | Q4 |
| % of substantiated non-medical inmate grievances | ≤ 20% | 24% | 24% | 33% | 30% | 26% | - | - | - |
| % of substantiated medical inmate grievances | ≤ 31% | 35% | 16% | 20% | 17% | 20% | - | - | - |

### Substantiated Non-Medical Grievances



NON-MEDICAL: Quarterly Average Percent of Substantiated Inmate Grievances

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Substantiated Medical Grievances



## Types and Disposition of Inmate Grievances

| Inmate Grievances | 2019 | 2020 | 2021 | 2022 | | 2023 |
|---|---|---|---|---|---|---|
| | | | | | | Q1 |
| Total Grievances | 4,106 | 8,335 | 17,453 | | 20,169 | 2,880 |
| | | | | | | |
| Substantiated | 28% | 22% | 30% | | 27% | 24% |
| Unsubstantiated | 63% | 48% | 41% | | 44% | 51% |
| Rejected | 8% | 30% | 29% | | 29% | 24% |
| Pending | 0 | 0 | 0 | | 0 | 1% |
| **Non-Medical** | | | | | | |
| Total & Top 3 | 1,528 | 3,290 | 7,009 | | 7,596 | 1,626 |
| Commissary | 17% | 31% | 47% | Commissary | 47% | Commissary 37% |
| Staff Complaints | 40% | 27% | 23% | Staff Complaints | 20% | Staff Complaints 27% |
| Facility Ops | 24% | 29% | 17% | Facility Ops | 22% | Facility Ops 23% |
| **Medical** | | | | | | |
| Total & Top 3 | 1,712 | 2,060 | 4,564 | | 5,350 | 1,254 |
| Medical care | 70% | 73% | 74% | | 73% | 75% |
| Dental care | 25% | 16% | 15% | | 13% | 11% |
| Mental Health | 5% | 6% | 7% | | 12% | 13% |

Initiatives

| Initiative | Description | Date initiated |
|------------|-------------|----------------|
| **Vending machines** | Installed vending machines at MWDC to alleviate the commissary supply issue. | Nov 2022 |
| **IGS Management** | Relocated the oversight of the IGS from RSB to Classification & Inmate Management Bureau to better coordinate inmate management. | TBD |

Impact/Analysis

Although MDCR did not meet the KPI (target), the percentage of sustained grievances (26%) was 4% lower than the quarterly avg., of the prior year (2022). CHS surpassed its target (KPI) 11%. Although vending machines were installed at MWDC to alleviate commissary grievances due to supply and demand issues, they remain the top non-medical grievance. Complaints about staff and facility operations have remained among the top 3 grievances since 2019. MDCR will continue open discussions with the inmate population to identify resolutions at the lowest level to reduce these grievances. The oversight of the IGS will be transferred to Classification & Inmate Management Bureau to directly support the new OJC system.

Inmate Grievances for January 1, 2023 – March 31, 2023:

| Top 3 Non-Medical Grievances | Substantiated Facility Grievances | Grievances referred to SIAB | Grievance Dispositions (2880) |
|------------------------------|-----------------------------------|-----------------------------|-------------------------------|
| •Commissary<br>•Staff Complaints<br>•Facility Ops | •MWDC: 905 (78%)<br>•TGK : 126 (11%)<br>•PTDC : 125 (11%) | •1 staff complaint | •Substantiated -24%<br>•Unsubstant. - 51%<br>•Rejected - 24%<br>•Pending - 1% |

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Reduce Contraband

We are committed to providing safe and secure detention for inmates and staff with minimal contraband. We use both formal shakedowns, a planned procedure for searching an entire cell/unit/pod, and informal non-shakedown events like cell checks and random frisk searches to manage contraband entering the facilities.

### Key Performance Indicators

| Contraband Found | Quarterly TARGET | 2019 Q avg | 2020 Q avg | 2021 Q avg | 2022 Q avg | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2 | Q3 | Q4 |
| Total Contraband<br>a. Shakedowns<br>b. Informal events | ≤ 2,381<br>≤ 131 | a. 2,647<br>b. 149 | a. 2,098<br>b. 167 | a. 2,312<br>b. 201 | a. 5,367<br>b. 206 | a. 6,605<br>b. 139 | - | - | - |
| Weapons<br>a. Shakedowns<br>b. Informal events | ≤ 21<br>≤ 4 | a. 23<br>b. 6 | a. 8<br>b. 4 | a. 27<br>b. 8 | a. 112<br>b. 18 | a. 56<br>b. 11 | - | - | - |
| Illegal Drugs<br>a. Shakedowns<br>b. Informal events | ≤ 17<br>≤ 23 | a. 19<br>b. 26 | a. 6<br>b. 32 | a. 19<br>b. 14 | a. 17<br>b. 6 | a. 29<br>b. 5 | - | - | - |
| Excessive Medication<br>a. Shakedowns<br>b. Informal events | ≤ 135<br>≤ 13 | a. 150<br>b. 8 | a. 79<br>b. 17 | a. 43<br>b. 10 | a. 45<br>b. 12 | a. 32<br>b. 4 | - | - | - |
| Cell Phones<br>a. Shakedowns<br>b. Informal events | 0<br>0 | a. 1<br>b. 1 | a. 0<br>b. 0 | a. 0<br>b. 0 | a. 0<br>b. 0 | a. 0<br>b. 0 | - | - | - |

20

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Shakedown Events



## Non-Shakedown Events



## Total Contraband Found in Shakedowns by Facility for January 1, 2023 – March 31, 2023



Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Initiatives

| Initiative | Description | Date initiated |
|---|---|---|
| **Identification of Drug found** | Staff attempts to identify the suspected drug using specialized device. | Nov 2022 |
| **Dedicated Shakedown Team** | Established specialized teams at each facility to assist with shakedowns and respond to major incidents; Augmented facility staffing with staff from specialty areas on Holidays and during periods of low activity to conduct large scale shakedowns. | Jan 2023 |
| **Operationalized Intel** | SIAB coordinates & assist facilities to include using canine unit in targeted shakedowns based on sourced intel. | Jan 2023 |
| **Eliminated paper introduction into facility** | All mail is copied and provided to inmates. Original correspondence is destroyed. | Ongoing |

## Impact/Analysis

There was a 21% increase in total contraband items found during this report period compared to the quarterly avg. in 2022. However, there was a 48% decrease in contraband items identified as weapons. The increased number of contraband items detected can be attributed to the increased searches and varying contraband detection measures used. Random and scheduled shakedowns will continue to be conducted in all areas of each facility. Facility/Bureau Supervisors update Unit/Area Search Log schedules to ensure staff conducts random searches and Shift/Supervisor Commander ensure staff conduct daily searches of assigned areas.

## Contraband Found for January 1, 2023 – March 31, 2023



| Top 3 Contraband Types Found | Top Weapon Types Found | BOIs with Weapons | Total Incidents involving suspected Illegal drugs |
|---|---|---|---|
| • Misc. Contraband 26%<br>• Food Items 17%<br>• Bed Sheets/pillow cases 10% | • 67 objects ID'd as weapons<br>• Edged object 48%<br>• Pointed object 16% | • 8 (2%) BOI incidents involved a weapon | • Jan- 1<br>• Feb- 2<br>• Mar- 2 |

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Prevent In-Custody Deaths

MDCR continues its efforts to prevent inmate suicides and reduce the number of non-suicide deaths as part of its commitment to provide a safe and secure detention environment and protect all our inmates from harm. All prior noted initiatives as well as those specific to this section contribute toward this effort.

### Key Performance Indicators

| In-Custody Deaths | TARGET | 2019 | 2020 | 2021 | 2022 | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2 | Q3 | Q4 |
| # of inmate suicides | 0 | 0 | 0 | 0 | 4 | 0 | - | - | - |
| # of inmate deaths | 0 | 8 | 10 | 16 | 18 | 2 | - | - | - |



### Inmate Deaths from during January 1, 2023 – March 31, 2023

| Inmate Deaths | 2019 | 2020 | 2021 | 2022 | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Q1 | Q2 | Q3 | Q4 |
| Total in-Custody | 8 | 10 | 16 | 18 | 2 | - | - | - |
| **Suicide** | | | | | | | | |
| Number of attempts | 12 | 5 | 11 | 10 | 1 | - | - | - |
| Number completed | 0 | 0 | 0 | 4 | 0 | - | - | - |
| | | | | | | | | |
| Illness/Natural Causes | 7 | 5 | 7 | 6 | 1 | - | - | - |
| COVID complications | 0 | 4 | 5 | 1 | 0 | - | - | - |
| Accidental Injury | 0 | 1 | 1 | 0 | 0 | - | - | - |
| Homicide | 0 | 0 | 2 | 1 | 0 | - | - | - |
| Alcohol/Drug Intoxication | 0 | 0 | 0 | 2 | 0 | - | - | - |
| Other/Pending | 1 | 0 | 1 | 6 | 1 | - | - | - |

Miami-Dade Corrections and Rehabilitation Department – Quarterly Performance Report
Q1 January 1, 2023 – March 31, 2023

## Initiatives

| Initiative | Description | Date initiated |
|---|---|---|
| **Welfare Checks** | MDCR conducts continuous inmate welfare and security checks throughout each shift to prevent inmate suicides and incidents drug ingestion, inmate violence etc. | Ongoing |
| **Medical Care** | MDCR collaborate with Corrections Health Services (CHS) to identify and rapidly respond to inmates in need of medical care for life threating issues. | Ongoing |
| **MH Assessments** | CHS conducts Mental health screening/assessments on all inmates at intake. MDCR has established an IDTT coordinator to assist and collaborate with CHS. | Ongoing |
| **MIRs** | Streamlined and created a more efficient & effective Major Incident Review (MIR) process. Implementation of Corrective Action Plans and lessons learned from MIRs | Ongoing |
| **Corrective Action Plans (CAP)** | Established Compliance Chief position to generate and monitor CAPs derived from MIRs. Utilization of application to assist with the identification and tracking of CAPs. | Ongoing |
| **Treatment Plans** | MDCR and CHS actively meet to discuss inmates displaying behavior or condition requiring further medical / mental health assessment. An individualized treatment plan is developed as needed to assist the inmate in correct behavior / condition, meeting needs to include designation of appropriate housing, services, and management. | Ongoing |

## Impact/Analysis

MDCR and CHS continue to work tirelessly to ensure the overall wellbeing of the inmate population, minimize risks and protect them from harm. There were two (2) inmate deaths in this reporting period. One (1) has been ruled as "natural causes" and the other determination is pending. There have been no suicides and one attempted suicide which was prevented due to staff vigilance and rapid intervention.

## Inmates Deaths For January 1, 2023 – March 31, 2023



**Inmate Deaths (2)**
- 1 Natural Causes
- 1 Cause pending

**Inmate Suicides**
- None

**Attempted Suicides**
- 1