UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                      1:13-CV-21570 CIV

MIAMI-DADE COUNTY;                          The Honorable Beth Bloom
MIAMI-DADE COUNTY BOARD OF
COUNTY
COMMISSIONERS; MIAMI-DADE
COUNTY
PUBLIC HEALTH TRUST

Defendants,

---

## Independent Monitor's Consent Agreement Compliance Update

---

### October 24, 2023

Monitoring Team

Dr. Kenneth A. Ray, DBH, MEd          Dr. Richard G. Dudley, Jr. MD          Dr. Muthusamy Anandkumar, MD, MBA
Lead Monitor                          Mental Health Monitor                  Medical Monitor


Kenneth A. Ray Justice Services, LLC
4200 Woodhaven Court Ashland, KY 41102
Email: ken@rjsjusticeservices.com



Criminal Justice
Courts
Law Enforcement
Corrections
Security
Healthcare
Institutional

Federal
State
County
Municipal
Communities

Research
Analysis
Assessment
Development
Implementation
Evaluation
Facilitation
Curricula
Coordination
Collaboration

Systems
Technology
Organizational
Leadership
Recruitment
Selection
Staffing
Training

Policy
Procedure
Risk Management
Legal
Litigation

Fiscal Management
Budget
Grants
Procurement
Options
Alternatives

Strategy
Sustainability
Professional
Competent
Confidential
Ethics
Integrity
Performance

PO Box 1481 Ashland, KY 41105 - 606.694.3031 – ken@rjsjusticeservices.com

------------------------------------ *"Dedicated to Public Safety, and to Community Wellness"* ------------------------------------

October 24, 2023

To:   The Honorable Beth Bloom
      United States District Court
      Of the Southern District of Florida
      Miami, Florida

From: Dr. Kenneth A. Ray, DBH, MEd
      Court Appointed Independent Monitor

      *In re*: The United States of American v. Miami-Dade County, Miami-Dade Board of County
      Commissions, and the Miami-Dade County Public Health Trust
      Case 1:13-CV-21570 CIV

**Re: Independent Monitor's Consent Agreement Compliance Update**

Judge Bloom,

I have the privilege of presenting the update report on the Consent Agreement on behalf of the Monitoring Team. This report results from months of extensive collaboration between the monitoring team, United States officials, and the committed officials and staff of Miami-Dade County.

The 16th compliance report, submitted on August 24, 2023, involved a comprehensive review process. It encompassed the examination of previous monitoring reports, the analysis of records and data spanning from October 2022 to July 2023, four onsite visits, and numerous virtual and telephonic meetings with all parties involved. This Update Report involves a meticulous reexamination of relevant data, documents, and information from the 16th report, along with the assessment of new data and information provided from July 2023 through early October 2023. After thorough collaboration and a rigorous assessment process, including independent verification of compliance claims by defendants, we have confirmed that all eleven (11) Consent Agreement subsections, which were previously noted as Partial Compliance in the 16th Report, have now achieved Substantial Compliance.

We eagerly anticipate the forthcoming status hearing and the opportunity to meet with Your Honor. The monitoring team remains committed to your vital oversight in upholding the constitutional rights of incarcerated individuals at the Miami-Dade Department of Corrections and Rehabilitation.

Respectfully,

Dr. Kenneth A. Ray, DBH, MEd, Monitor

Attachment: Consent Agreement Compliance Update
EC: The Parties and monitoring team

Affiliations:












KENNETH A. RAY - RJS JUSTICE SERVICES      PO BOX 1481 ASHLAND, KY 41105-1481      PHONE: 606.694.3031 EMAIL: ken@rjsjusticeservices.com

American Psychological Association   National Commission on Correctional Health Care   FBI Law Enforcement Executive Development Association   National Sheriffs' Association
National Association for Civilian Oversight of Law Enforcement   American Correctional Association   Association of Inspectors General
Association for Persons with Developmental Disorders and Mental Health Needs   American Evaluation Association   Police Executive Research Forum   Justice Research and Statistics Association

**MONITOR'S CONSENT AGREEMENT COMPLIANCE UPDATE**
**The United States v. Miami-Dade County, Florida et. al.**
**1:13-CV-21570 CIV**
**October 23, 2023**

**MONITOR'S CONSENT AGREEMENT COMPLIANCE UPDATE**
**The United States v. Miami-Dade County, Florida et. al.**
**1:13-CV-21570 CIV**
**October 23, 2023**

**Table of Contents**

Cover Letter                                                                                            NA

Table of Contents                                                                                      3

Table of Figures                                                                                       4

Assessment of Subsection:                                                                              5-20

1) III.A.1.e. Intake Screening CHS Outside Medical Records                                              5

2) III.A.2.d Health Assessments Interdisciplinary Team Risk Profiles                                    6

3) III.A.4.d Medication Administration and Management Psychotropic Medical Refusals                     7

4) III.A.7.a. Mortality and Morbidity Comprehensive Reviews                                             8

5) III.A.7.b. Mortality and Morbidity Review Identification of Problems and Measures                    10

6) III.A.7.c. Mortality and Morbidity Review Bi-Annual Reviews and Risk Management                      10

7) III.C.1.a.(1)(2)(3). Mental Health Referral by Acuity Levels                                         11

8) III.C.2.c. Mental Health Treatment Written Initial Treatment Plans and Updates                       14

9) III.C.3.e. Suicide Assessment and Prevention Individualized Treatment Plans                          15

10) III.C.6.a.(4). Custodial Segregation of SMI Inmates and Mental Health Rounds                        17

11) III.C.6.a.ii. Custodial Segregation Out-of-Cell Time Documentation                                  18

12) III.C.6.a.(6). Custodial Segregation Removal of SMI Inmates                                         20

**MONITOR'S CONSENT AGREEMENT COMPLIANCE UPDATE**
**The United States v. Miami-Dade County, Florida et. al.**
**1:13-CV-21570 CIV**
**October 23, 2023**

**Table of Figures (Compliance Charts & Tables)**

| Figure | Description | Page |
|---|---|---|
| 1. | III.A.1.e. KPI 1. Intake Screen Offsite Medical Records RFI & Review | 5 |
| 2. | III.A.1.e. Intake Screening Key Compliance Data | 5 |
| 3. | III.A.2.d. KPI 1 & 2 IDTT QMHP Risk Profile & Safety Plans | 6 |
| 4. | III.A.2.d KPI 1 & 2 Health Assessments Key Compliance Data | 6 |
| 5. | III.A.4.d. KPI 1 & 2 Psychotropic Medication Refusal Notification and Consultation | 7 |
| 6. | III.A.4.d. KPI 1 & 2 Medication Administration & Management Key Compliance Data | 7 |
| 7. | MDCR Inmate Deaths Jan-Sept 2020-2023 | 8 |
| 8. | Reported Causes of Inmate Deaths | 8 |
| 9. | Inmate Deaths & Mortality Rates 2020-2023 | 9 |
| 10. | Inmate Mortality & ADP Descriptive Statistics & Comparisons | 9 |
| 11. | III.A.7.c. KPI 1 Mortality & Morbidity Bi-Annual Review | 10 |
| 12. | III.A.7.c. KPI 1 Mortality & Morbidity Bi-Annual Review Key Compliance Data | 10 |
| 13. | III.C.1.a. (1-3) KPI 1 & 2 MH Referral Completion & MH Staffing | 11 |
| 14. | III.C.1.a. (1-3) KPI 1 Completed MH Referrals & Percentage Completed | 12 |
| 15. | III.C.1.a. (1-3) KPI 1 MH Referrals Completed Data | 12 |
| 16. | III.C.1.a. (1-3) KPI 2a Behavioral Health MH Referrals Completed w/in Required Time | 13 |
| 17. | III.C.1.a. (1-3) KPI 2b Psychiatric MH Referrals Completed w/in Required Time | 13 |
| 18. | III.C.2.c. KPI 1. Percent Inmates Audited with Initial TX Plan at Time of Evaluation | 14 |
| 19. | III.C.2.c. KPI 2. Percent MH Caseload Inmates w/TX Plans Updated During Psychiatric/MH Appointments by Level of Care | 15 |
| 20. | III.C.3.e. KPI 1 Suicide Assessment & Prevention Treatment Plans | 16 |
| 21. | III.C.3.e. KPI 1. Percent Suicide Assessment and Prevention Individualized TX Plans for Suicidal Inmates that Include Signs, Symptoms, and Preventive measures for Suicide Risk Data | 16 |
| 22. | III.C.6.a (4) i. KPI 1 QMHP SMI Segregation Rounds Offered | 17 |
| 23. | III.C.6.a.(4) i. KPI 1 QMHP SMI Segregation Rounds Offered Key Compliance Data | 17 |
| 24. | III.C.6.a.ii. MDRC SMI in Custodial Segregation | 18 |
| 25. | III.6.C.a.ii. KPI 1 SMI Segregation Out-of-Cell Time Offers & Duration | 19 |
| 26. | III.C.6.a.ii. KPI 1 SMI Seg Out-of-Cell Time & Duration Key Performance Data | 19 |
| 27. | MDCR SMI & SMI Segregation Population Jan-Sept 2023 | 20 |

**MONITOR'S CONSENT AGREEMENT COMPLIANCE UPDATE**
**The United States v. Miami-Dade County, Florida et. al.**
**1:13-CV-21570 CIV**
**October 23, 2023**

On August 25, 2023, the Independent Compliance Monitor issued the 16th Compliance Report. This assessment found that 105 out of 116 subsections of the Consent Agreement were in Substantial Compliance, Sustained Compliance, or had reached the Sunsetted status.

Since the submission of the 16th report, the monitoring team and the parties have diligently collaborated. Our primary focus has been to identify and address obstacles preventing Substantial Compliance with the remaining eleven (11) subsections. This effort included developing data reports for accurate progress measurement, exchanging records and data, analyzing extensive datasets, scrutinizing documents provided by defendants claiming compliance, conducting numerous virtual and telephone meetings, and on-site visits. The monitoring team has thoroughly examined every aspect, and we can now confidently affirm that the eleven (11) remaining subsections have achieved Substantial Compliance as described herein. Subsection III.A.7.a Mortality and Morbidity Reviews advanced to Substantial Compliance in the 16th report and is also updated in this report.

---

1) **III.A.1.e. Intake Screening CHS shall obtain previous medical records to include any off-site specialty or inpatient care as determined clinically necessary by the qualified health care professionals conducting the intake screening.**

---

**Assessment: Substantial Compliance**

<u>Compliance Update</u>: Modifications to the electronic health record system (EMR) demonstrate stable consistency for reliable tracking and monitoring of the status of off-site medical records requested at intake by qualified health care professionals (QHP). These modifications automatically alert QHPs to receipt of those records and documents when the QHP reviews the records.

Setting a compliance threshold of 90% of received records are reviewed by a QHP, CHS met this threshold for June, August, and September.  Key Performance Indicator data for this Subsection of the Agreement (KPI 1) is shown below from June through September 2023.



Figure 1. III.A.1.e. KPI 1. Intake Screen Off-Site Medical Records RFI & Review

| Figure 2. III.A.1.e. KPI 1 Intake Screening Key Compliance Data | Jun | Jul | Aug | Sep |
|---|---|---|---|---|
| KPI Compliance Threshold: | 90% | 90% | 90% | 90% |
| **KPI 1. Percent of Received Records Reviewed** | **97.0%** | **83.9%** | **98.4%** | **93.3%** |
| Data: Ttl. Clinical Necessary Indicated Records Requested | 84 | 92 | 102 | 45 |
| Numerator: Ttl. Returned Records Reviewed and Documented by QHP: | 64 | 52 | 61 | 28 |
| Denominator: Ttl. Requested Records Received: | 66 | 62 | 62 | 30 |

It is our understanding that CHS timely initiates remedial measures anytime off-site records are not received or reviewed. Specifically, the system documents when follow-up requests are made for records that were not

received, and troubleshoots any instance when received records are not reviewed by a QHP to prevent future occurrences.

It is important to note that this subsection may be at risk for downgrade to Partial Compliance based on the declining compliance trend shown above. It is important that CHS continue to closely monitor the reliability of the automatic reporting and its remediation processes.

**2) III.A.2.d Health Assessments: Qualified Mental Health Professionals, as part of the inmate's interdisciplinary treatment team (outlined in the "Risk Management" Section, infra), will maintain a risk profile for each inmate based on the Assessment Factors identified in Appendix A and will develop and implement interventions to minimize the risk of harm to each inmate.**

**Assessment: Substantial Compliance**

Compliance Progress Update: Inmate medical records maintain robust documentation that risk profiles are being consistently developed, maintained, and updated for each inmate as part of the interdisciplinary team (IDTT) process as indicated. Concomitantly, the IDTT develops, implements, and monitors safety plans for each inmate whose risk profile indicates an inmate is a real or potential risk of self-harm.

CHS achieved the 90% threshold during July through September for required risk profile documentation (KPI 1) and during August and September for the creation, implementation, and monitoring of required safety plans (KPI 2). The charts below show compliance performance for this subsection of the Agreement as stated.



Figure 3. III.A.2.d. KPI 1 & 2
IDTT QMHP Risk Profile & Safety Plans

KPI 1. Percent Suicide Risk Inmates w/Risk Profile
KPI 2. Percent Suicide Risk Inmates w/Safety Plan
KPI Compliance Threshold:

| Figure 4. III.A.2.d KPI 1 & 2 Health Assessments Key Compliance Data | Jun | Jul | Aug | Sep |
|---|---|---|---|---|
| **KPI Compliance Threshold:** | | 90% | 90% | 90% |
| **KPI 1. Percent Suicide Risk Inmates w/Risk Profile** | | 95.0% | 99.0% | 99.0% |
| Data: Ttl. Total Suicide Risk Inmates w/Positive Suicide Assessment | | 114 | 135 | 184 |
| Numerator: Ttl. Positive Suicide Risk Assessments w/Risk Profile Documented | | 108 | 134 | 182 |
| Denominator: Ttl. Positive Suicide Risk Assessments | | 114 | 135 | 184 |
| **KPI 2. Percent Suicide Risk Inmates w/Safety Plan** | | 61% | 98% | 100% |
| Data: Denominator: Ttl. Total Suicide Risk Inmates w/Positive Suicide Assessment | | 114 | 135 | 184 |
| Numerator: Ttl. Suicide Risk Inmates w/ Safety Plan | | 70 | 132 | 184 |
| Denominator: Ttl. Total Suicide Risk Inmates w/Positive Suicide Assessment | | 114 | 135 | 184 |

3) **III.A.4.d Medication Administration and Management:** CHS shall ensure nursing staff pre-sets psychotropic medications in unit doses or bubble packs before delivery. If an inmate housed in a designated mental health special management unit refuses to take his or her psychotropic medication for more than 24 hours, the medication administering staff must provide notice to the psychiatrist. A Qualified Mental Health Professional must see the inmate within 24 hours of this notice.

**Assessment: Substantial Compliance**

<u>Compliance Update</u>: Modifications to the electronic health record system (EMR) demonstrate stable consistency for reliable tracking and monitoring of psychotropic medication refusals as required by this subsection of the Agreement. The system automatically notifies a psychiatrist anytime an inmate housed in a designated particular management unit refuses to take their medication for more than 24 hours. This action also automatically triggers a QMHP consultation with the inmate refusing their medication within 24 hours of the initial notification to the psychiatrist.



CHS has met the 90% threshold during June through September for the psychiatrist notification of a medication refusal (KPI 1) and a QMHP seeing the refusing inmate within 24 hours of the initial notification KPI 2). The charts below show compliance performance for this subsection of the Agreement as stated.

| Figure 6. III.A.4.d KPI 1 & 2 Medication Administration and Management Key Data | Jun | Jul | Aug | Sep |
|---|---|---|---|---|
| **KPI Compliance Threshold (90%)** | **90%** | **90%** | **90%** | **90%** |
| **KPI 1. Percent of Refused Psychotropic Rx Psychiatrist Notifications** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Data: Ttl. Psychotropic Medical Refusals | 87 | 192 | 345 | 352 |
| Numerator: Ttl. Refusal Notifications | 87 | 192 | 345 | 352 |
| Denominator: Ttl. Refusals | 87 | 192 | 345 | 352 |
| **KPI 2. Percent QMHP Consults w/Refusing Inmate w/in 24 Hrs. of Notification** | **21.8%** | **54.2%** | **95.4%** | **96.6%** |
| Data: Ttl. Psychotropic Medical Refusal Notifications | 87 | 192 | 345 | 352 |
| Numerator: Ttl. Refusing Inmate Seen by QMHP w/in 24 Hrs. of Notification | 19 | 104 | 329 | 340 |
| Denominator: Ttl. Refusal Notifications | 87 | 192 | 345 | 352 |

4) **III.A.7.a. Mortality and Morbidity Review: Defendants shall sustain implementation of the MDCR Mortality and Morbidity "Procedures in the Event of an Inmate Death," updated February 2012, which requires, inter alia, a team of interdisciplinary staff to conduct a comprehensive mortality review and corrective action plan for each inmate's death and a comprehensive morbidity review and corrective action plan for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Defendants shall provide results of all mortality and morbidity reviews to the Monitor and the United States, within 45 days of each death or serious suicide attempt. In cases where the final medical examiner report and toxicology takes longer than 45 days, a final mortality and morbidity review will be provided to the Monitor and the United States upon receipt**

**Assessment: Substantial Compliance**

<u>Compliance Progress Update</u>: In 2023, there have been five (5) inmate deaths from January to September, marking a significant decline. This represents a 44.4% reduction compared to 2020 (9), a 64.3% decrease from 2021 (14), and a 64.3% decrease from 2022 (14).



Notably, there have been no accidental inmate deaths in 2023 during this period, while in 2020, there was one (1), in 2021, there were two (2), and in 2022, there were also two (2). Similarly, there have been no reported inmate homicides in 2023, whereas there was one (1) in 2020, two (2) in 2021, and two (2) in 2022.

Regarding natural deaths, there have been five (5) in 2023, marking a 43% decrease from 2022 (7), a 60% decrease from 2021 (10), and a 50% decrease from 2020. It's worth noting that no inmate suicides were reported in 2020 and 2021. However, there has been one (1) inmate suicide in 2023, which represents a 75% decrease from 2022 (4).

**Figure 8. Reported Causes of Inmate Deaths**

Accidental

| 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|
| 1 | 2 | 2 | 0 |

Homicide

| 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|
| 0 | 2 | 1 | 0 |

Natural

| 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|
| 8 | 10 | 7 | 4 |

Suicide

| 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|
| 0 | 0 | 4 | 1 |

The inmate mortality rate from January to September 2023 is 117.2 deaths per 100,000 Average Daily Population (ADP)[1]. This reflects a substantial decline compared to 2020, with a 53.3% decrease from 250.9, a 67.7% decrease from 363.0 in 2021, and a 63.1% decrease from 317.7 in 2022 for the same reporting period.

Annual data shows that mortality rates have declined far more than the Average Daily Population (ADP). Between 2021 and 2022, mortality rates per 100,000 ADP dropped 12.5%, compared to a 1.2% decrease in ADP. From 2022 to 2023, mortality rates fell 63.1% while ADP decreased 4.5%. In summary, the likelihood of inmate deaths is now about 14 times lower, despite only modest reductions in inmate population.



Figure 9. Inmate Deaths & Mortality Rates (Jan-Sep)

Figure 10. Inmate Mortality & ADP Descriptive Statistics & Comparisons

| Year | Inmate Mortalities | ADP | MR Per 100K ADP | Mortality Var +/- | ADP Var +/- | MR Var +/- | Mortality % Var +/- | ADP % Var +/- | MR Var % +/- | 2023 MR % Var +/- | |
|------|-----|------|-----|------|-------|--------|--------|-------|--------|------|--------|
| 2020 | 9 | 3,587 | 250.9 | | | | | | | -134 | -53.3% |
| 2021 | 14 | 3,857 | 363.0 | 5.0 | 270.2 | 112.1 | 55.6% | 3.1% | 44.7% | -246 | -67.7% |
| 2022 | 14 | 4,406 | 317.7 | 0.0 | 549.3 | -45.2 | 0.0% | -1.2% | -12.5% | -200 | -63.1% |
| 2023 | 5 | 4,265 | 117.2 | -9.0 | -141.7 | -200.5 | -64.3% | -4.5% | -63.1% | 0 | 0 |

Our analysis of seven (7) incidents and their related medical and custody records shows that MDCR medical and correctional teams are consistently conducting thorough reviews of significant events. Governed by comprehensive policies, these Mortality and Morbidity Reviews (MnMs) and Major Incident Reviews (MIRs) include custodial and clinical evaluation, root cause analyses, and peer reviews. They are triggered by events like fatalities or suicide attempts. When our independent reviews suggest further improvements, MDCR/CHS officials proactively update their corrective action plans, which are implemented and later assessed for effectiveness.

Our assessment finds that MDCR and CHS have met most or all the elements required by this subsection of the Consent Agreement.

---

[1] Mortality rate calculation industry standard is (number of deaths / ADP) x 100,000 over a given period.

5) **III.A.7.b. Mortality and Morbidity Review: Defendants shall address any problems identified during mortality reviews through training, policy revision, and any other developed measures within 90 days of each death or serious suicide attempt.**

**Assessment: Substantial Compliance**

<u>Compliance Progress Update</u>: The revised format for corrective action plans (CAPs) discussed in the 16th Report was implemented shortly thereafter. CHS and MDCR continue to adhere to their updated review policies and the revised MnM format. An analysis of the seven (7) cases from December 2022 to June 2023 shows consistent improvement in developing, documenting, and implementing CAPs. While many corrective actions are completed within 90 days, some, like the comprehensive overhaul of the suicide prevention program or modifications to the electronic medical record system can require additional time. MDCR's MIR CAPs have shown definite progress in compliance with requirements.

6) **III.A.7.c. Mortality and Morbidity Review: Defendants will review mortality and morbidity reports and corrective action plans bi-annually. Defendants shall implement recommendations regarding the risk management system or other necessary changes in policy based on this review. Defendants will document the review and corrective action and provide it to the Monitor.**

**Assessment: Substantial Compliance**

<u>Compliance Progress Update</u>: CHS continues to consistently schedule and review completed mortality and morbidity reviews at least bi-annual. In fact, records and data provided by CHS demonstrate that mortality and morbidity cases are re-reviewed throughout the year. Our examination of corrective action plans (CAPs) shows updates are routinely documented following the reviews and that CAP recommendations are adequately implemented according CAP



**Figure 11. III.A.7.c. KPI 1. Mortality & Morbidity Bi-Annual Review Performance**

☐ KPI 1. % Mortality and Corrective Action Plans Reviewed Bi-Annually
■ ■ ■ KPI Compliance Threshold (100%)

specifications. CHS performance with this subsection appears to exceed Agreement expectations.

| Figure 12. III.A.7.c. KPI 1 Mortality and Morbidity Bi-Annual Review Key Compliance Data | Jun | Jul | Aug | Sep |
|---|---|---|---|---|
| KPI Compliance Threshold (100%) | 100% | 100% | 100% | 100% |
| KPI 1. % Mortality and Corrective Action Plans Reviewed Bi-Annually | 100.0% | 100.0% | 100.0% | 100.0% |
| Data: Total MnM and CAPS Scheduled for Bi-Annual Review | 17.0 | 21.0 | 20.0 | 21.0 |
| Numerator: Ttl. Scheduled MnM and CAP Reviews Completed | 17.0 | 21.0 | 20.0 | 21.0 |
| Numerator: Ttl. CAPS Recommendations Completed as Indicated | 12.0 | 12.0 | 15.0 | 15.0 |
| Numerator: Ttl. Documented Reviews and CAPS Provided to Monitor and USDOJ | 12.0 | 12.0 | 15.0 | 15.0 |
| Denominator: Total MnM and CAPS Scheduled for Bi-Annual Review | 12.0 | 12.0 | 15.0 | 15.0 |

7) **III.C.1.a.(1)(2)(3). CHS shall develop and implement written policies and procedures governing the levels of referrals to a Qualified Mental Health Professional. Levels of referrals are based on acuteness of need and must include "emergency referrals," "urgent referrals," and "routine referrals," as follows: (1) "Emergency referrals" shall include inmates identified as at risk of harming themselves or others, and placed on constant observation. These referrals also include inmates determined as severely decompensated, or at risk of severe decompensation. A Qualified Mental Health Professional must see inmates designated "emergency referrals" within two hours, and a psychiatrist within 24 hours (or the next business day), or sooner, if clinically indicated. (2) "Urgent referrals" shall include inmates that Qualified Mental Health Staff must see within 24 hours, and a psychiatrist within 48 hours (or two business days), or sooner, if clinically indicated. (3) "Routine referrals" shall include inmates that Qualified Mental Health Staff must see within five days, and a psychiatrist within the following 48 hours, when indicated for medication and/or diagnosis assessment, or sooner, if clinically indicated.**

## Assessment: Substantial Compliance

<u>Compliance Progress Update</u>: Substantial compliance with this subsection was rapidly achieved by a 113.6% increase in mental health staff, from 43.4 in May to 92.7 by September, strategic improvements in process workflows, prescriptive mental health staff assignments, and persistent determination by CHS and MDCR staff and officials. These improvements have led to an atypically rapid increase in compliance that is unprecedented in the history of this case and this Monitor's experience monitoring similar Agreements for



**Figure 13. III.C.1.a.(1-3) KPI 1 & 2.**
**MH Referral Completion Performance & MH Staffing**

more than a decade. One notable achievement is the successful clearing of the backlog of Mental Health (MH) referrals by August, and this backlog has not resurfaced as of the end of September. To gauge the impact of these changes, we independently examined Key Performance Indicator(s).

The percentage of MH referrals completed per month showed remarkable progress, escalating from 83.9% in June to 99.4% in September. This substantial increase is indicative of the effectiveness of the recent changes.

The total number of MH referrals related to this subsection significantly decreased, dropping from approximately 8,327 in June to just 2,501 in September due to the successful backlog clearance. This 36% reduction in monthly MH referrals directly translated into a 64% improvement in the number of MH referrals completed since June.

Furthermore, the overall compliance with this subsection surpassed the 90% threshold by September, signifying a noteworthy achievement. Specifically, the percentage of total MH referrals being completed

within the required timeframes grew from 64.8% in June to 95.3% in September, demonstrating substantial compliance.

When examining specific KPIs within MH referrals, Behavioral Health (QMHP) MH referral completion timeliness compliance increased from 69.1% in June to 94.9% in September. Similarly, Psychiatry MH referral completion timeliness improved significantly, rising from 54.3% to 95.8% MH referrals being completed within required timeframes during the same period. Removing Psychiatric MH referrals ("Rhythm Referrals) that were not related to this subsection also contributed to this overall improvement and a more streamlined workflow process. Significant modifications to the electronic medical records data system were quickly made and validated to report only data relevant to this subsection.

Finally, it's important to note that our independent analyses of mental health referral data, onsite interviews conducted with inmates by monitoring team members, and offsite examinations of electronic mental health referral charts and records corroborate our conclusions regarding these performance improvements.

The following charts show described improvements for this subsection.



Figure 14. III.C.1.a. (1-3). KPI 1. Completed MH Referrals & Percentage Completed

| Figure 15. III.C.1.a. (1-3) KPI 1 MH Referrals Completed Data | Jun | Jul | Aug | Sep |
|---|---|---|---|---|
| KPI Compliance Threshold (90%) (All numerators must achieve 90% or better) | 90% | 90% | 90% | 90% |
| KPI 1. Percent Ttl. MH Referrals Completed | 83.9% | 79.2% | 97.7% | 99.4% |
| Numerator: Ttl. MH Referrals Completed | 6,988 | 5,890 | 2,844 | 2,485 |
| Denominator: Ttl. MH Referrals | 8,327 | 7,437 | 2,912 | 2,501 |



Figure 16. III.C.1.a.(1-3). KPI 2a. Behavioral Health MH Referrals Completed w/in Required Timeframes



Figure 17. III.C.1.a.(1-3). KPI 2b. Psychiatric MH Referrals Completed w/in Required Timeframes

8) **III.C.2.c. Mental Health Treatment: Each inmate on the mental health caseload will receive a written initial treatment plan at the time of evaluation, to be implemented and updated during the psychiatric appointments dictated by the Level of Care. CHS shall keep the treatment plan in the inmate's mental health and medical record.**

**Assessment: Substantial Compliance**

Compliance Progress Update: CHS has introduced a dedicated mental health treatment plan form within our electronic medical records system. Traditionally, individualized treatment plans were developed during initial assessments but were integrated into the inmate's medical record. The introduction of this standalone treatment plan form has significantly enhanced the efficiency and timeliness of reviewing and modifying these plans in response to an inmate's treatment progress and specific behavioral health and psychiatric requirements.

Treatment plans encompass evidence-based and personalized treatment interventions aligned with the established different levels of care. The determination of the frequency of psychiatric and behavioral consultations, as well as treatment modalities, is based on prescribed levels of care and the acuity of the illness. These treatment plans undergo regular assessments by the Interdisciplinary Treatment Team (IDTT), ensuring that patient status is continually evaluated, and updates are made as necessary.

An in-depth analysis of data provided by CHS indicates that, for the months of July, August, and September, 100% (KPI 1) of the sampled records for individuals with Serious Mental Illness (SMI) revealed the existence of initial treatment plans at the time of their evaluation. Likewise, the same sample demonstrated that treatment plans were consistently updated during psychiatric or mental health appointments in accordance with the inmate's level of care. Performance metrics for this indicator exhibit positive figures, with 82.2% of treatment plans audited in July, 97.1% in August, and 90.5% in September (KPI 2) being updated as required.

| Figure 18. III.C.2.c. KPI 1. Percent Inmates Audited with Initial TX Plan at Time of Evaluation | | | Month | Jul | Aug | Sept |
|---|---|---|---|---|---|---|
| | | | Total | 100% | 100% | 100% |
| | | | Level I | 100% | 100% | 100% |
| | | | Level II | 100% | 100% | 100% |
| | | | Level III | 100% | 100% | 100% |
| | | | Level IV | 100% | 100% | 100% |

| Month | July | | | August | | | September | | |
|---|---|---|---|---|---|---|---|---|---|
| SMI Inmates According to Level of Care | SMI Count | Audited | w/Initial Plan at Evaluation | SMI Count | Audited | w/Initial Plan at Evaluation | SMI Count | Audited | w/Initial Plan at Evaluation |
| Total | 1,367 | 69 | 69 | 1,574 | 75 | 75 | 1,483 | 71 | 71 |
| Level I | 111 | 11 | 11 | 132 | 13 | 13 | 121 | 12 | 12 |
| Level II | 379 | 18 | 18 | 445 | 22 | 22 | 393 | 19 | 19 |
| Level III | 346 | 20 | 20 | 404 | 20 | 20 | 369 | 20 | 20 |
| Level IV | 531 | 20 | 20 | 593 | 20 | 20 | 600 | 20 | 20 |

| Figure 19. III.C.2.c. KPI 2. Percent MH Caseload Inmates w/TX Plans Updated During Psychiatric/MH Appointments by Level of Care | | | Month | Jul | Aug | Sept |
|---|---|---|---|---|---|---|
| | | | Total | 93% | 96% | 94% |

| Month | July | | | August | | | September | | |
|---|---|---|---|---|---|---|---|---|---|
| SMI Inmates According to Level of Care | Patients / TX Plans | Updated TX Plans | Non-Evaluated Rhythm of Care TX Plans | Patients / TX Plans | Updated TX Plans | Non-Evaluated Rhythm of Care TX Plans | Patients / TX Plans | Updated TX Plans | Non-Evaluated Rhythm of Care TX Plans |
| Total (L1-IV) | 29 | 24 | 40 | 35 | 32 | 40 | 42 | 38 | 29 |

**9) III.C.3.e. Suicide Assessment and Prevention: CHS shall ensure individualized treatment plans for suicidal inmates that include signs, symptoms, and preventive measures for suicide risk.**

Consent Agreement Appendix A[2] outlines minimum criteria encompassing (1) screening, (2) suicide risk assessment elements, (3) triggering factors, and (4) established thresholds for identifying actual or potential suicide risks. These four (4) primary criteria serve as the foundation for crafting individualized suicide prevention treatment plans, as mandated by this section of the agreement. The inquiry elements encompass:

1. Screening Factors – History, Ideation and Observation. Screening shall inquire as to the following:

    1) Past suicidal ideation and/or attempts
    2) Current suicidal ideation, threat, or plan
    3) Prior mental health treatment or hospitalization
    4) Recent significant loss - such as the death of a family member or close friend
    5) History of suicidal behavior by family members and close friends
    6) Suicide risk during any prior confinement
    7) Any observations of the transporting officer, court, transferring agency, or similar individuals regarding the inmate's potential suicidal risk

2. Assessment Factors – Any of the following:

    1) Suicide risk screening indicates moderate or high risk
    2) Any suicide attempt in the past
    3) Any suicidal ideations, with intent/plan within the past 30 days
    4) Any command hallucinations to harm self within the past 30 days
    5) Any combination of the following:
        a) Suicidal ideations within the past year with or without intent/plan
        b) Suicidal gestures (current and/or within past year)
        c) One or more of the following diagnoses:
            i. Bipolar Disorder, Depressed
            ii. Major Depression With or Without Psychotic Features
            iii. Schizophrenia
            iv. Schizoaffective Disorder
            v. Any diagnosis within the Pervasive Developmental Disorder Spectrum
            vi. Any other factor(s) determined by the interdisciplinary team (IDT) as contributing to suicide risk (e.g. recent loss, family history of suicide, etc.)

---

[2] As referred to at ECF Document 5-2 FLSD Docket 05/01/21, III.C.b., p.26.

     6)  Any history of self-injurious behavior (SIB) resulting in injury requiring medical attention within the past year

3.  <u>Trigger Events Occurring in the Jail</u>:

    1)  Any suicide attempt
    2)  Any aggression to self resulting in major injury

4.  <u>Thresholds Reached in the Jail</u>:

    1)  Any suicide
    2)  Any suicide attempt resulting in outside medical treatment
    3)  Two or more episodes of suicidal ideation/attempts within 14 consecutive days
    4)  Four or more episodes of suicidal ideations/ attempts within 30 consecutive days

**Assessment: Substantial Compliance**

<u>Compliance Progress Update</u>: Onsite review of patient charts, consultation with CHS officials, and examination of data provided demonstrate solid compliance with this subsection of the Consent Agreement.

CHS audits 15 individualized treatment plans per month to assess compliance with this subsection. The treatment plans are examined for completeness and whether all suicide prevention and care screening, assessment, triggering events, and threshold elements are present in each plan. Each plan is also assessed for required updates and whether those updates were implemented as written.

Performance improved from 80% of plans including the criteria stated above in June 2023 to 100% by August and again in September. This positive trajectory is a strong indicator of sustainable performance ongoing. Additionally, we anticipate that the number of plans reviewed will increase once updates the EMR are finalized.



Figure 20. III.C.3.e. KPI 1 Suicide Assessment & Prevention Treatment Plans w/All Suicide Risks & Lethality Levels

| Figure 21. III.C.3.e. KPI 1. Percent Suicide Assessment and Prevention Individualized TX Plans for Suicidal Inmates that Include Signs, Symptoms, and Preventive measures for Suicide Risk Data. | Jun | Jul | Aug | Sep |
|---|---|---|---|---|
| KPI Compliance Threshold (90%) | 90% | 90% | 90% | 90% |
| KPI 1. Percent Ttl. Individualized TX Plans w/All Suicide Risk & Lethality Levels | 80.0% | 93.3% | 100.0% | 100.0% |
| Numerator: Ttl. Individualized TX Plans that Include Signs, Symptoms, and Preventive Measures for Suicide Risk according to risk and lethality Levels (15 TX Plans Per Month) | 12.0 | 14.0 | 15.0 | 15.0 |
| Denominator: Ttl. Individual Suicide Prevention TX Plans Reviewed | 15.0 | 15.0 | 15.0 | 15.0 |

10) **III.C.6.a.(4). Custodial Segregation: Inmates with SMI who are not diverted or removed from custodial segregation shall be offered a heightened level of care that includes:**

  i. **Qualified Mental Health Professionals conducting rounds at least three times a week to assess the mental health status of all inmates in custodial segregation and the effect of custodial segregation on each inmate's mental health to determine whether continued placement in custodial segregation is appropriate. These rounds shall be documented and not function as a substitute for treatment.**

## Assessment: Substantial Compliance

<u>Compliance Progress Update</u>: Independent examination and comprehensive analysis of large data sets provided by CHS, specifically focusing on data pertinent to compliance with this subsection of the Agreement, reveal a substantial level of adherence.

CHS consistently submits reliable datasets derived from the Electronic Medical Records (EMR) system, documenting segregation rounds conducted by Qualified Mental Health Professionals (QMHPs) for Seriously Mentally Ill (SMI) inmates. These datasets encompass crucial information such as the dates and times of round execution, critical for assessing compliance.



Figure 22. III.C.6.a.(4) KPI 1. QMHP Seg Rounds Offered

Our examination and analysis of the data provided for the period spanning June through September 2023 establish that a minimum of three (3) rounds per week are consistently offered by QMHPs to SMI inmates in segregation. This level of compliance ranges from 95.5% to 100% during this period, with statistics reflecting June at 100%, July at 95.5%, August at 100%, and September at 100% (KPI 1). It is noteworthy that, in the majority of cases, SMI inmates housed in segregation receive more than the stipulated three (3) rounds per week.

Furthermore, our review of CHS data and the electronic medical records unambiguously confirms that QMHP assessments of SMI inmates in segregation are being conducted with regularity and are adequately documented within patient medical records. Importantly, our examination yields no evidence suggesting that these rounds are being used as a substitute for proper treatment protocols.

In sum, the data analysis underscores CHS's commitment to ensuring compliance with the relevant Agreement subsection, providing robust evidence of adherence to essential standards in the care and evaluation of SMI inmates within the segregation environment."

| Figure 23. III.C.6.a.(4) i. KPI 1 QMHP SMI Segregation Rounds Key Compliance Data | Jun | Jul | Aug | Sep |
|---|---|---|---|---|
| KPI Compliance Threshold (90%) | 90% | 90% | 90% | 90% |
| KPI 1. Percent Ttl. SMI Custodial Segregation QMHP Rounds w/ Minimum of Three (3) Rounds Per Week | 100.0% | 95.5% | 100.0% | 100.0% |
| Data: Ttl. QMHP SMI Segregation Rounds Offered | 144 | 151 | 170 | 271 |
| Numerator: Minimum QMHP SMI Seg Rounds Per Week Per SMI Inmate | 3.0 | 2.9 | 3.0 | 3.0 |

| Denominator: Minimum Required QMHP SMI Seg Rounds Per Week Per SMI Inmate | 3.0 | 3.0 | 3.0 | 3.0 |
| --- | --- | --- | --- | --- |

**11) III.C.6.a.ii. Custodial Segregation: Documentation of all out-of-cell time, indicating the type and duration of activity.**

**Assessment: Substantial Compliance**

<u>Compliance Progress Update</u>: This Consent Agreement defines Custodial Segregation as, "…*the solitary confinement of an inmate to a specific secure housing unit or single cell that is separated from the general population continuously for 15 or more hours a day. There are three forms of segregation: Administrative, Disciplinary Detention and Protective Custody."*

That definition is rooted in industry conventions but no longer holds relevance in the context of compliance monitoring. Its foundation lies in the policies and practices of the MDCR up until late 2022. Furthermore, this definition finds its basis in extensive research, specifically addressing the actual and potential harm experienced by inmates, especially those with mental health conditions, when subjected to prolonged segregation.

However, it is essential to note that the core of this research assumes that inmates placed in segregation have minimal, if any, influence over the frequency of out-of-cell time provisions, the nature of activities during such periods, and the duration of these breaks from their cells. The central concern highlighted in all such research is the potential exacerbation of mental health issues among inmates with pre-existing conditions, or the emergence of mental health symptoms in individuals without prior mental health conditions when subjected to extended periods of segregation.



Figure 24. MDCR 2023 SMI Inmates in Segregation

Notably, since late 2022, the practices within the MDCR have evolved to address these concerns comprehensively. In particular, they have empowered inmates in segregation with significantly more control over their out-of-cell time compared to MDCF past practices and the traditional industry practices prevalent in the industry.

Substantial revisions in MDCR policy have resulted in a remarkable and significant reduction in the number of Seriously Mentally Ill (SMI) inmates placed in segregation during the period spanning from January through September 2023. Our independent examination and analysis of large and evolving datasets, consistently provided by MDCR, reveal an approximate 66% decrease in the number of SMI inmates housed in segregation. This number has seen a dramatic decline, plummeting from 30 individuals in January to a mere 10 in September.

As mentioned earlier, one of the pivotal changes introduced by MDCR is the significantly enhanced provision of out-of-cell time to SMI inmates within segregation units. This transformation encompasses more frequent opportunities for inmates to leave their cells, longer durations of these outings, and a diverse array of choices encompassing personal, therapeutic, and recreational activities.

Our evaluation and analysis of extensive datasets routinely furnished by MDCR consistently demonstrate that SMI inmates housed in segregation are, on average, granted out-of-cell time more than four (4) times daily. This extends for approximately six (6) hours (KPI 1) virtually every day of the week on average. Such access to out-of-cell time is indicative of a substantial shift in the approach toward SMI inmate care within the correctional system, underpinned by MDCR's commitment to improved mental health support.

During our onsite visits in August, we conducted interviews with several SMI (Seriously Mentally Ill) inmates who were housed in segregation. All of the interviewed inmates appeared to be stable



Figure 25. III.C.6.a.ii. KPI 1. SMI Seg Out-of-Cell Offers Per Day & Duration

and generally in good spirits. They provided positive descriptions of their experiences in segregation, expressing satisfaction with the amount of time they spent outside their cells and how often they are offered out-of-cell opportunities. None of them raised concerns about insufficient out-of-cell time, and they all spoke highly of the custody and healthcare staff working in the segregation unit.

| Figure 26. III.C.6.a.ii. KPI 1 SMI Seg Out-of-Cell Time & Duration Key Performance Data | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|
| SMI Seg ADP | 30 | 33 | 22 | 17 | 20 | 14 | 14 | 14 | 10 |
| Per ADP Days OOC Offered Per Week | | | | | | | 6.11 | 5.73 | 6.99 |
| **Per ADP OOC Offers Per Day** | | | Analysis Pending Data Updates | | | | **4.38** | **4.39** | **4.43** |
| Per ADP OOC Offers Per Week | | | | | | | 22.2 | 25.1 | 25.8 |
| **Per ADP OOC Hrs. Offered Per Day** | | | | | | | **5.84** | **6.07** | **5.97** |
| Per ADP OOC Hrs. Offered Per Week | | | | | | | 29.6 | 37.3 | 34.5 |

12) **III.C.6.a.(6). Custodial Segregation: Inmates with serious mental illness shall not be placed into long-term custodial segregation, and inmates with serious mental illness currently subject to long-term custodial segregation shall immediately be removed from such confinement and referred for appropriate assessment and treatment**.

**Assessment: Substantial Compliance**

<u>Compliance Progress Update</u>: MDCR has made a deliberate and significant departure from the historical practice of placing Seriously Mentally Ill (SMI) inmates in long-term segregation. This transformation is marked by several key developments. Firstly, it's important to note that SMI segregation, in its previous form as known when the Consent Agreement was initially approved by the Court, no longer exists within the MDCR.

Secondly, a pivotal aspect of this change has been the implementation of a new inmate classification system. This system has played a crucial role in reducing the segregation of SMI inmates by expanding the range of non-segregation housing alternatives available for them across the correctional system. A discussion of these developments can be found in the Monitor's 16th Report.



Figure 27. MDCR SMI and SMI Segregation Population (January - September 2023)

While analyzing large MDCR data sets, it becomes evident that there has been a notable shift in the landscape of SMI inmate housing within MDCR facilities. From January 2023 to September 2023, the overall population of SMI inmates within these facilities witnessed a marginal decrease of approximately 5.2%. However, what stands out is the substantial reduction in the percentage of SMI inmates housed in segregation during the same period. This percentage plummeted from 1.34% (30 individuals) in January 2023 to 0.47% (10 individuals) in September. To put it differently, the number of SMI inmates placed in segregation went from 13.4 per 1000 total SMI inmates to just 4.74. This represents an impressive reduction of approximately 65%, which is significantly more pronounced than the overall decrease of 5.2% in total SMI inmate population during this reporting period.

As of September 2023, it's noteworthy that less than one-half of one percent of all SMI inmates were housed in segregation under the revised segregation policy and practice. This data underscores the effectiveness of MDCR's efforts to reform and reduce the utilization of segregation for SMI inmates.

END OF REPORT