UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:13-CV-21570 BB

UNITED STATES OF AMERICA

        Plaintiff,

v.

| | |
|---|---|
| MIAMI-DADE COUNTY, THE BOARD OF COUNTY COMMISSIONERS *et al.*, | INDEPENDENT COMPLIANCE DIRECTOR COURT DIRECTED REPORT |
| Defendants. | March 20, 2025 |

_____/

Whereas the Monitors will submit a report on the outcomes of the Consent Agreement, this report will focus more on the processes and changes from 2022 to the present.

## Introduction

After struggling to reach and maintain substantial compliance with the 2013 Consent Agreement and Settlement Agreement, in June 2022, Miami-Dade County contracted with retired Sheriff Gary Raney as a consultant to advise the County on bringing the Miami-Dade Corrections and Rehabilitation Department (MDCR) into substantial compliance with the outstanding provisions from the Agreements. Sheriff Raney had 39 years of corrections experience, serving 31 years in the Ada County Sheriff's Office in Boise, Idaho, the last ten as the elected sheriff, and an additional eight years of consulting privately and for the U.S. Department of Justice.

The Consent Agreement initially had 116 paragraphs, and the Settlement Agreement had 56. The Consent Agreement mainly applied to Corrections Health Services (CHS), a division of Jackson Health System (Jackson). At the time of Sheriff Raney's engagement, approximately nine paragraphs of the Consent Agreement and five paragraphs of the Settlement Agreement were not in substantial compliance.

In the fall of 2022, the Department of Justice and the County submitted a Joint Stipulated Order to the Court, asking it to appoint Sheriff Raney as an "Independent Compliance Director" (ICD)

over MDCR to bring it into substantial compliance with the Agreements. On February 15, 2023, the Court signed the Order, granting the new ICD broad authority over MDCR. In response to the Order, the ICD created a strategic plan for reaching compliance and submitted it to the Court. Although the ICD had no direct authority over Corrections Health Services (CHS), the plan included how it would also reach substantial compliance with the outstanding provisions.

The ICD assisted MDCR as several systems were redesigned, including:

- Inmate classification
- Segregation
- Inmate incentives and discipline
- Major incident reviews, formerly referred to as mortality and morbidity reviews
- Quality assurance reports.

This took several months to implement, and MDCR reached substantial compliance with all remaining provisions in May 2023.

On October 25, 2024, the defendants and the Department of Justice again appeared in court before the Honorable Beth Bloom. An update was provided, and after the court hearing, Judge Bloom ordered the ICD to submit this report regarding CHS's compliance with the Consent Agreement.

In November 2024, the Settlement Agreement was terminated after MDCR had remained in substantial compliance. This closure would not have been accomplished without the leadership of Mayor Daniella Levine Cava, who became personally involved in this matter in 2022 to accelerate needed reforms. Mayor Cava first hired the ICD as a consultant before the Court appointed him, and in both roles, he worked to create and implement the changes. Mayor Cava also recruited new leadership, increased correctional officer pay, streamlined hiring processes, and reduced mandatory overtime, all of which improved morale, performance and outcomes.

**Overview of CHS**

Jackson Health System (Jackson) is a nonprofit healthcare organization governed by the Public Health Trust, a group of citizen volunteers representing the Miami-Dade Board of County Commissioners. Jackson provides correctional health services to MDCR, so a division of Jackson is CHS. While Miami-Dade County substantially contributes to the Health Trust and, in turn, the $77 million CHS budget, there is no additional funding for initiatives or new service

lines in MDCR. This can make it challenging for Jackson to draw resources from other areas to increase financial support for CHS.

The charts below show the average daily in-custody population in MDCR and the total staff in CHS from 2013 to 2024. While the average daily population dipped between 2014 and 2020, CHS staffing steadily increased.



The staffing level for CHS decreased from 2019 to 2021, likely as a response to the COVID-19 pandemic and MDCR's temporary population reduction. CHS staffing began increasing again in 2022, but it remained non-compliant with several remaining provisions.

After the former and current monitoring teams expressed concern over staffing numbers, an analysis was completed in 2023, confirming there were insufficient staff to fulfill the duties required in the Consent Agreement.

In summer/early fall 2023, Jackson added 50 full-time equivalent positions to CHS, both temporary and permanent, in what is referred to as "the surge." The surge was the effort to clear the backlog of mental health needs and meet the ongoing requirements. Once the backlog was cleared, contract and temporary positions were eliminated, but the permanent staff remained. The increase in staffing levels for mental health providers is shown in the following table:

| Discipline | 5/30/2023 | 9/7/2023 | 3/4/2024 | 2/24/2025 |
|---|---|---|---|---|
| Psychologist | 2 | 7 | 6 | 7 |
| Licensed clinical social worker | 7 | 22 | 14 | 13 |
| Social Worker | 12 | 28 | 21 | 19 |
| Mental Health Counselor | 4 | 10 | 11 | 9 |
| Psychiatrist | 6 | 8 | 8 | 8 |
| APRN | 12 | 18 | 19 | 20 |
| **Totals** | **43** | **93** | **79** | **76** |

3

Staffing is not the only issue that kept CHS from being in substantial compliance. Still, it is the recurring theme throughout many of the non-compliant provisions that existed at the time of the ICD's appointment. Today, thanks to staffing and many process improvements, CHS is meeting the goal of the Agreement and providing high-quality medical and mental health care.

## The Path to Substantial Compliance

As mentioned, the core issue for CHS not reaching compliance was insufficient staffing. In the Monitors' 15th report in November 2022, they wrote, "The Monitors are very concerned about the deficient numbers of psychiatrists and QMHPs and their roles in patient care." After the new monitoring team was appointed in January 2023, during their first site visit, the Monitors voiced the same concerns. Also, during this time, there was an ongoing debate about the use of Advanced Practice Registered Nurses (APRNs). While the ICD is not qualified to offer an opinion about the proper role of an APRN in correctional healthcare, they were part of the CHS strategy for reaching substantial compliance. The current monitoring team agreed to their use in early 2023, and since then, the APRNs have made successful contributions to managing the psychiatric workload and providing increased access to care.

Another important factor that brought about substantial compliance was a change in leadership in Jackson and CHS. The Senior Vice President of Operations in Jackson took over the responsibilities for CHS and brought a positive and supportive attitude from Jackson's leadership. CHS's leadership team was enhanced and restructured to create better planning, processes and reviews. The CHS team has become more cohesive and outcome-focused than in the past.

Key performance indicators were developed in cooperation with the Monitors and consultants to accurately measure compliance with the provisions. However, they were also developed to provide ongoing assessments of care long after the Consent Agreement is terminated. Jackson provided CHS with technical assistance for data and application development and helped build sophisticated data sets and tracking for key performance indicators. Data is only valuable if used; therefore, the dashboards that the technical assistance providers in Jackson developed are straightforward, timely and accurate.

In the ICD's opinion, these three factors — staffing, leadership, and data — were the recipe for substantial compliance. The ICD was critical of Jackson/CHS in early 2023 for a lack of action. Today, the ICD believes CHS is a high-functioning organization that delivers quality care to the inmates/patients in MDCR.

In the 15th report, the Monitors wrote:

*This work requires specific emphasis to achieve and sustain compliance [and] include[s], but [is] not limited to:*

i. *Retention of a permanent Director of Behavioral Health/Chief Psychiatrist.*
   - These positions, as well as lead clinicians within their disciplines, were established.
ii. *Productivity analyses and remedies, including reducing missed patient appointments that cause lags to timely access to care, duplication of work by providers, dissatisfaction by inmates/patients (and staff who must manage them), and preventable risk of harm.*
   - The concerns about clinical care have been addressed through the efforts previously described that led to substantial compliance with the Consent Agreement. As to staff dissatisfaction, Jackson commissioned an independent survey that will be discussed later in this report.
iii. *Morbidity and Mortality Reviews (III. A.7. a.-c.).*
   - The deficiencies have been corrected and will be discussed later in this report.
iv. *Management of long-term custodial segregation of inmates with serious mental illness (III.C.6.a(4)i. and ii).*
   - The collaboration between MDCR and CHS has created a model program for jails dealing with people who present behavioral problems stemming from mental illness. It is remarkable what has happened in the segregation units.
v. *Data collection, analysis, collaboration with MDCR, objective and measurable corrective actions, and evaluation of the impacts of corrective actions.*
   - CHS has established an exemplary set of key performance indicators and tracks them regularly. This will be discussed here, but details can also be found in the Monitor's report. MDCR is working toward a system that can provide similar management data for corrections.
vi. *Consolidated initiatives and countermeasures anchored in data and focused on root* [analysis] *to address causes of inmate violence, including uses of force.*
   - This is being proven in the ongoing reduction of violence and will be discussed.
vii. *Documentation and implementation of the electronic health record and outside record review findings.*
   - This is now consistently occurring in cooperation with Jackson's records department. The compliance is reflected in the data contained in the Monitor's report.
viii. *Specificity in treatment planning for inmates with mental illness.*
   - This has been corrected and is currently a meaningful and collaborative effort using interdisciplinary team members, including MDCR staff.

The Monitors determined that the following provision with three paragraphs was in non-compliance:

- ***III. A. 7. a. – c**. Mortality and Morbidity Reviews (three paragraphs).*

The Monitors determined that these nine (9) paragraphs were in partial compliance:

- ***III. A. 1. e.** Medical Records*
- ***III. A. 2. d.** Qualified Mental Health Professionals*
- ***III.A. 4. d.** Medication Administration and Management*
- ***III. C. 1. a.** Referral Process and Access to Care*
- ***III. C. 2. c.** Mental Health Treatment*
- ***III. C. 3. e.** Suicide Assessment and Prevention*
- ***III. C. 6. a. (4). i., ii,** Custodial Segregation*
- ***III. C. 6. a. (6)** Custodial Segregation*

### Individual Provisions

*Medical and Mental Health Care*

> **III. A. 1. e.** CHS shall obtain previous medical records to include any off-site specialty or inpatient care as determined clinically necessary by the qualified health care professionals conducting the intake screening.

Interestingly, obtaining medical records from other healthcare systems is not a routine practice in Jackson's community care. Regardless, the Consent Agreement mandated it occurs in CHS. If the medical record for an inmate/patient is in Jackson's medical records software, it is easily accessible by the CHS providers. When it is not Jackson data, the Jackson Medical Records Department will request the record from the other healthcare system. This occurs roughly 50 times a month, and Jackson receives responses about 75% of the time. Over the last three months, the average turnaround time for the requested records has been three days. While the ICD is not familiar with these aspects of healthcare, the quick turnaround seems commendable.

Equally important, CHS now ensures providers access these prior medical records in their assessment and diagnosis processes. As will be a common theme throughout this report, the increased staffing for CHS has provided the time for providers to be more thorough in their work.

*Health Assessments*

> **III. A. 2. d.** Qualified Mental Health Professionals, as part of the inmate's interdisciplinary treatment team (outlined in the "Risk Management" Section, infra), will maintain a risk profile for each inmate based on the Assessment Factors identified in Appendix A and will develop and implement interventions to minimize the risk of harm to each inmate.

The prior problems stemmed from a lack of staffing and poor processes that contributed to the shortcutting of clinical notes and plans. Formerly, the risk profile and assessment factors were two separate processes and forms. CHS worked to combine them, providing a more efficient but thorough assessment and a more comprehensive set of information to the providers, which creates better continuity. Just as important, there are automatic triggers in the process that require prompt care for any inmate/patient at risk for self-harm. This more efficient and thorough process has been successful for many months now.

Additionally, the interdisciplinary team previously included only disciplines within healthcare: medical, psychiatry, and behavioral health. The ICD appointed an MDCR staff member to participate in the interdisciplinary treatment team meetings. Custody staff can be integral to behavior management and contribute their observations and experiences throughout the day. This created an interdisciplinary treatment team that included custody staff and is consistent with generally accepted jail practices and mental health care.

The more accurate risk profile is used consistently through ongoing assessments and interdisciplinary treatment team meetings. It has become the process it was always meant to be.

> **III. A. 4. d.** Medication Management CHS shall ensure nursing staff pre-sets psychotropic medications in unit doses or bubble packs before delivery. If an inmate housed in a designated mental health special management unit refuses to take his or her psychotropic medication for more than 24 hours, the medication administering staff must provide notice to the psychiatrist. A Qualified Mental Health Professional must see the inmate within 24 hours of this notice.

CHS previously had redundant mental health referral processes for psychotropic medication refusals, creating duplication and inefficiencies. Additionally, the medications that were previously identified as "critical" if an inmate refused them were not consistent with generally accepted psychiatric practices. In other words, CHS had too many "critical" medications and duplication and process inefficiencies when they were refused, creating unnecessary work.

In the first quarter of 2023, new criteria were established for critical medication. This criterion was consistent with generally accepted psychiatric practices and was reviewed and approved by the Monitors. Under the new system, low-level psychotropic medications may not trigger a referral until the second or third refusal, but an antipsychotic long-acting injectable like Haldol would always trigger a referral upon the first refusal. When appropriate under these criteria, the refusal triggers what is referred to as an "autofire," meaning the electronic medical record system automatically sends the referral to the psychiatric team. This removes most of the subjectivity that existed in the past and has made the referral system more accurate and reliable, making the healthcare responses to refusals timelier.

Most importantly, the prior referral process only applied to the jail's Mental Health Treatment Center population. Now, the new process applies across the entire jail's mental health population, allowing CHS to intercept concerning behaviors anywhere in the system and respond to them as needed.

*Mortality and Morbidity Reviews*

> **III. A. 7. a.** Defendants shall sustain implementation of the MDCR Mortality and Morbidity "Procedures in the Event of an Inmate Death," updated February 2012, which requires, inter alia, a team of interdisciplinary staff to conduct a comprehensive mortality review and corrective action plan for each inmate's death and a comprehensive morbidity review and corrective action plan for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Defendants shall provide results of all mortality and morbidity reviews to the Monitor and the United States, within 45 days of each death or serious suicide attempt. In cases where the final medical examiner report and toxicology takes longer than 45 days, a final mortality and morbidity review will be provided to the Monitor and United States upon receipt.
>
> **III. A. 7. b.** Defendants shall address any problems identified during mortality reviews through training, policy revision, and any other developed measures within 90 days of each death or serious suicide attempt.
>
> **III. A. 7. c.** Defendants will review mortality and morbidity reports and corrective action plans bi-annually. Defendants shall implement recommendations regarding the risk management system or other necessary changes in policy based on this review. Defendants will document the review and corrective action and provide it to the Monitor.

In 2022 and early 2023, corrective action plans were CHS's most significant obstacle to reaching and maintaining substantial compliance with the mortality and morbidity review

requirements. Mistakes recurred, even after corrective actions were implemented, mostly around emergency responses. These are often a challenge because of the infrequency of their occurrence and the urgency of proper actions when they occur. As with any organization, new staff rotate in as experienced staff leave. The decentralization of the jail system and the staffing schedules all present challenges to delivering frequent and consistent training for MDCR and CHS. This appeared to be why corrective actions were not always sustainable.

Since 2023, CHS has improved orientation and in-service training for its staff. This includes:

- A standardized five-day orientation course for all new CHS staff members. This includes an introduction to CHS/MDCR policies, practices and protocols but stresses emergency response techniques, such as using an AED or Lucas device (CPR compression machine) in a jail system. The training is tailored to each role, such as doctors, nurses, social workers, etc.
- Annual refresher courses for all clinical staff and monthly training sessions. The monthly sessions focus more on emergency response and daily quality of care. From February 2023 through February 2025, in addition to the mandatory annual training required by Jackson and the state of Florida, CHS provided clinical training for nurses and providers on 24 topics related to healthcare delivery and the standard of care. In 2024, 7,139 educational hours were provided to CHS staff.
- CHS is now able to track the effectiveness of its educational program by measuring results every three months with annual comparisons. The need for repeated corrective actions has almost been eliminated, and CHS leadership strongly believes the training has resulted in improved clinical encounters and outcomes.

CHS has also implemented a "focused case review" process along with the existing mortality and morbidity review process. The focused case reviews apply to instances that do not meet the criteria for mortality and morbidity reviews yet may be an opportunity to learn and improve processes and care. A qualified provider does the review and seeks to identify any urgent concerns so they can be addressed quickly. The process also exists to identify lesser concerns that may need a more thorough investigation to identify improvement opportunities.

The success of the efforts is demonstrated in the graphic below:



The most important measure of the success of mortality and morbidity reviews is the number of inmate deaths, and one of the most preventable deaths in the jail system is suicide. The improvements discussed in this report regarding assessments, access to care, treatment, attention to data and detail, better medication, new interdisciplinary treatment team processes, and strengthened cooperation with MDCR staff have all led to the most significant outcome in 2025: no suicides.

One of the most notable improvements begins in the booking process, where now every inmate/patient who comes into the MDCR system is assessed using the Columbia-Suicide Severity Rating Scale, one of the most widely recognized initial suicide screening tools in the country.  With the forthcoming Miami Center for Mental Health and Recovery, the question may arise regarding which improvements were the most significant contributors to the positive outcomes and could be applied there.  In the ICD's opinion, no single change stands out. All of the changes can be grouped into overarching strategies that include earlier and better assessments at intake and while in custody, and improved mental health and medical care, mainly brought about by adequate staffing.

Whatever the cause, the decrease in suicides since the peak in 2022 is commendable for everyone involved.  It is even more significant considering the 42% increase in the inmate/patient population from 2022 to 2024.

|                 | 2020   | 2021   | 2022   | 2023   | 2024   | 2025              |
|-----------------|--------|--------|--------|--------|--------|-------------------|
| Bookings        | 35,096 | 42,880 | 44,059 | 43,633 | 49,738 | Insufficient data |
| Suicides        | 0      | 0      | 5      | 2      | 1      | 0                 |
| Rate per 10,000 | 0.0    | 0.0    | 1.1    | 0.5    | 0.2    | 0                 |

*Mental Health Care and Suicide Prevention*

> **C. 1. a.** Defendants shall ensure constitutional mental health treatment and protection of inmates at risk for suicide or self-injurious behavior. Defendants' efforts to achieve this constitutionally adequate mental health treatment and protection from self-harm will include the following remedial measures regarding...
>
> CHS shall develop and implement written policies and procedures governing the levels of referrals to a Qualified Mental Health Professional. Levels of referrals are based on acuteness of need and must include "emergency referrals," "urgent referrals," and "routine referrals," as follows:
>
> "Emergency referrals" shall include inmates identified as at risk of harming themselves or others, and placed on constant observation. These referrals also include inmates determined as severely decompensated, or at risk of severe decompensation. A Qualified Mental Health Professional must see inmates designated "emergency referrals" within two hours, and a psychiatrist within 24 hours (or the next Business day), or sooner, if clinically indicated.
>
> "Urgent referrals" shall include inmates that Qualified Mental Health Staff must see within 24 hours, and a psychiatrist within 48 hours (or two business days), or sooner, if clinically indicated.
>
> "Routine referrals" shall include inmates that Qualified Mental Health Staff must see within five days, and a psychiatrist within the following 48 hours, when indicated for medication and/or diagnosis assessment, or sooner, if clinically indicated.

The fundamental reason why CHS was not in substantial compliance was that it did not have enough staff to fulfill these requirements. This was one of the most obvious findings after the January 2023 monitoring visit and the subsequent staffing study by Jackson.

The prior monitoring team disliked the use of APRNs, although they are commonly used in Florida and nationally. The problem with requiring psychiatrists was the ability to hire them. Jackson would post for these positions, but they remained open, sometimes for years. With the introduction of APRNs in 2023, the new positions were filled quickly, significantly increasing

access to care. Quality audits since then have shown no difference in the quality of care or the outcomes for inmates/patients. Currently, twenty APRNs are being supervised by eight full-time psychiatrists – a commendable ratio.

To compound the staffing issues, the previously described psychiatric referral process made the response system less efficient. Staff were triggering visits without consistent guidelines, creating duplication. The referral system was revised and automated, reducing duplicate referrals by about 40%. Additionally, data dashboards were created in the summer of 2023, allowing CHS leadership to make daily assignment changes to address the referral needs.

Lastly, a new sick call process for providers was developed. Previously, healthcare staff often gathered sick call requests while distributing medication and passed them through other staff members before reaching the person who could address the need. Now, the requests are collected and sent directly to the providers, who review them and assign staff as needed.

The surge in CHS staffing in mid-2023 allowed it to catch up with these delinquent referrals and establish a baseline staffing level moving forward. As previously shown, there was a 56% increase in psychiatrist and APRN staffing from mid-2023 to early 2025. The lowest level of compliance since June 2023 was 96%, and the latest data from January 2025 showed 99% compliance.

> **III. C. 2. c.** Each inmate on the mental health caseload will receive a written initial treatment plan at the time of evaluation, to be implemented and updated during the psychiatric appointments dictated by the Level of Care. CHS shall keep the treatment plan in the inmate's mental health and medical record.

One of the important initiatives that CHS implemented in 2022 was a "Core Four Huddle" in each facility. While still referred to as the "Core Four," the standing participants now include the facility health administrator, lead physician, lead psychiatrist, director of patient care services, lead psychologist and an MDCR staff member. This multidisciplinary collaboration has consistently proven effective at guiding day-to-day operations and tracking inmates/patients who require additional attention.

As has been described, the previous treatment plans lacked specificity, maximum collaboration, and a system that ensured follow-through. The process was overly burdensome, and there were not enough staff members to fill the needs.

Once again, adequate staffing, restructured and focused leadership, and attention to metrics have significantly improved the care and outcomes for inmates/patients.

> **III. C. 3. e.** CHS shall ensure individualized treatment plans for suicidal inmates that include signs, symptoms, and preventive measures for suicide risk.

The ICD is not qualified to offer an opinion on the quantity or quality of care. Based on the ICD's knowledge, the substantial compliance of this provision has been explained previously in this report.

> **III. C. 6. a. (4). i.** Inmates with SMI who are not diverted or removed from custodial segregation shall be offered a heightened level of care that includes:
>
> i. Qualified Mental Health Professionals conducting rounds at least three times a week to assess the mental health status of all inmates in custodial segregation and the effect of custodial segregation on each inmate's mental health to determine whether continued placement in custodial segregation is appropriate. These rounds shall be documented and not function as a substitute for treatment.
>
> ii. Documentation of all out-of-cell time, indicating the type and duration of activity.

As with many other provisions, CHS failed to meet substantial compliance because there simply was insufficient staff to address the need. The solution was similar to what was experienced in other provisions in that substantial compliance was reached with adequate staffing, process improvement, leadership and reliable key performance indicators. One of the most notable changes occurred with the assignment of dedicated CHS staff in the Special Management Unit at the MetroWest Detention Center and dedicated behavioral health leads in each facility. The collaboration between dedicated MDCR and CHS staff has had great benefits. Continuing with the trend reported in the ICD's last report, the number of inmates/patients with a serious mental illness continues to hover around ten, down from the dozens of people a few years ago.

As for the documentation of out-of-cell time, the ICD explained the process changes in previous self-assessment reports. To recap, technology issues in the documentation system failed to capture many entries. Significant technology system changes were made, and they corrected the problem in the late spring of 2023. MDCR has continued to maintain substantial compliance since that time.

> **III.C.6.a.(6).** Custodial Segregation: Inmates with serious mental illness shall not be placed into long-term custodial segregation, and inmates with serious mental illness currently subject

> to long-term custodial segregation shall immediately be removed from such confinement and referred for appropriate assessment and treatment.

There are technically no inmates/patients with a serious mental illness being held in long-term segregation. Six to eight hours a day or more out of their cell, coupled with activities, programming and care, creates an environment that is stellar for a jail system. Conflicts are rare in the Special Management Unit, and thanks to the staff who work there, lasting behavior changes are the norm. Since segregation practices were revised in 2023, only one person has ever returned to the unit after being moved to live with other inmates/patients.

## Additional Commentary

While it is fundamental that there must be enough staff to complete the tasks, the ICD wholeheartedly agrees with many others in the human services industries who believe that people who care about what they do and those they serve have a bigger impact on outcomes than processes and data. The ICD believes the MDCR and CHS organizational culture has dramatically improved, especially since the increase in CHS staffing and restructuring of leadership.

In 2024, Jackson commissioned an independent study on employee engagement in CHS. Most of the study centered on employee opinions and perspectives, and the engagement survey received an impressive 75% response rate. The survey questions were evaluated against national healthcare data and showed positive perceptions, with CHS employees responding more positively than the national average for:

- I would stay with this organization if offered a similar position elsewhere.
- I would like to be working at this organization three years from now.
- I am proud to tell people I work for this organization.
- I would recommend this organization as a good place to work.
- Overall, I am a satisfied employee.

The culture in CHS, especially as a correctional healthcare provider measured against community providers, is commendable, and the ICD hopes the focus on a positive culture continues.

As has been stressed throughout this report, the increase in CHS staffing is directly proportional to access to care. The best example of this may be demonstrated in the below graph showing the increase in individual and group therapy sessions:



In closing, the ICD feels it is noteworthy to update the court regarding MDCR's continued success. The following notable improvements from 2023 to the end of 2024 are worth reporting, and it appears there will be a sustained improvement in 2025:

- A 10% decrease in inmate-on-inmate violence.
- A 34% decrease in inmate-on-staff violence.
- A 29% decrease in inmate-on-inmate violence involving an edged or pointed weapon.
- A 12% decrease in the use of force.
- A 73% decrease in inmate discipline cases that were dismissed due to MDCR's administrative failures.
- A 30% decrease in nonmedical grievance response times by MDCR, from 13 days to nine days.

MDCR still lacks good data systems, and it is the ICD's hope that when those are established, MDCR can mirror the successes of CHS in establishing key performance indicators and using data to drive change.

## Conclusion

The ICD is honored and privileged to be trusted by the Court and asked for this report. While the ICD only has a layperson's knowledge of healthcare, hopefully, this report reflects that success for CHS relied on several factors, the most important of which were resources, leadership, and the support of caring people.

15

The ICD believes CHS is in substantial compliance with all provisions of the Consent Agreement.  As the Court knows, MDCR and CHS, like other organizations, will likely make changes when no longer under the Court's watchful eye. While practices required from the 12-year-old Agreements may be modified, the ICD does not believe either organization will trend backward in the foreseeable future.

Respectfully submitted:

Gary Raney,
Independent Compliance Director